# Exhibit 50

American Pregnancy Association

a Amazon Fire TV
$99. $84.00

(h
t=

# Fetal Development




Calculating the day your baby begins to develop and keeping track of your pregnancy dates can be a challenge. The development of pregnancy is counted from the first day of the woman's last normal period, even though the development of the fetus does not begin until conception. Pregnancy is calculated from this day because each time a woman has a period, her body is preparing for pregnancy.



**DTX 129**
*Church & Dwight v. SPD*
14-CV-585 (AJN)

The following information is used as a general guide for healthy pregnancy development, although development may vary due to the mother's health or a miscalculation of ovulation. *Gestational age* is the age of the pregnancy from the last normal menstrual period (LMP), and *fetal age* is the actual age of the growing baby. Most references to pregnancy are usually in gestational age rather than fetal age development, but we have included both so that it is clear what stage development is at. Measurements will be given in total length from head to toe, but each pregnancy can differ in weight and length measurements, and these are just a general guideline.

(h
t=

Pregnancy is also divided into trimesters which last about 12 – 14 weeks each. Similar to development, these can be calculated from different dates so not all trimester calculations will equal the same. The following information divides the three trimesters into a little over 3 completed months each. The first trimester is week 1 through the end of week 13. The second trimester usually ends around the 26th week and consists of the 4th, 5th and 6th completed months. The third trimester can end anywhere between the 38th – 42nd week and is the 7th, 8th and 9th completed months of pregnancy.

- First Trimester (http://americanpregnancy.org/while-pregnant/first-trimester/)
- Second Trimester (http://americanpregnancy.org/while-pregnant/second-trimester/)
- Third Trimester (http://americanpregnancy.org/while-pregnant/third-trimester/)

Last Updated: 01/2014

(h
t=

# Exhibit 51



Advertisement



## Leadership & Governance



# The American College of Obstetricians and Gynecologists: Overview and Leadership

Founded in 1951 in Chicago, Illinois, The College has over 58,000 members and is the nation's leading group of professionals providing health care for women. Based in Washington, DC, it is a private, voluntary, nonprofit membership organization.

The College works primarily in four areas:

- Serving as a strong advocate for quality health care for women.
- Maintaining the highest standards of clinical practice and continuing education for its members.
- Promoting patient education and stimulating patient understanding of and involvement in medical care.
- Increasing awareness among its members and the public of the changing issues facing women's health care.

---

Bylaws of the American Congress of Obstetricians and Gynecologists
Amended February 2015.

Bylaws of the American College of Obstetricians and Gynecologists
Amended February 2015.

Conflict of Interest Disclosure Policy (College and Congress).

Conflict of Interest Policy for Executive Board Members, Committee Members, Task Force Members, and Executive and Senior Staff (College and Congress).

Diversity Statement for Volunteer and Leadership Positions

Statement of Values (College and Congress).

Whistleblower Policy (College and Congress).

Executive Board (College and Congress)

Executive Staff

The College's Code of Professional Ethics
The College's new Code of Professional Ethics was approved by the Executive Board in 2011.

The College Fact Sheet
Founded in Chicago in 1951, The College's membership has grown to more than 58,000 members specializing in obstetric-gynecologic care.

The College's Scope of Practice of Obstetrics and Gynecology
The College's Scope of Practice of Obstetrics and Gynecology was approved by the Executive Board February 6, 2005.

Committee Descriptions
Descriptions of The College committees are provided for your review.

Advertisement


**Grants, Sponsorships, and Other Support**

The American College of Obstetricians and Gynecologists accepts industry funding to support the College's mission of improving health care for women. In 2009, 2010, 2011, 2012, and 2013, grants, sponsorship, and other support comprised only a small fraction of the College's total revenue.



American Congress of Obstetricians and Gynecologists
409 12th Street SW, Washington, DC 20024-2188 | Mailing Address: PO Box 70620, Washington, DC 20024-9998
Copyright 2015. All rights reserved. Use of this Web site constitutes acceptance of our Terms of Use

# Exhibit 52

The Fix

# Marco Rubio demanded people look at the science on abortion. So we did.

By Philip Bump May 15, 2014

"Science is settled," Sen. Marco Rubio (R-Fla.) told Sean Hannity on Wednesday. Rubio wasn't talking about climate change (as anyone who's been paying attention this week might guess) but rather "that human life begins at conception."

Rubio's comments were predicated on his recent remarks that downplayed the role of humans in causing climate change. In response, critics repeatedly noted that the scientific community overwhelmingly agrees that humans are to blame. That clearly annoyed Rubio. (You can listen to his comments here.)

"All these people always wag their finger at me about 'science' and 'settled science.'," he told Hannity. "Let me give you a bit of settled science that they'll never admit to. Science is settled, it's not even a consensus, it is a unanimity, that human life begins at conception. So I hope the next time that someone wags their finger about science, they'll ask one of these leaders on the left: 'Do you agree with the consensus of scientists that say that human life begins at conception?' I'd like to see someone ask that question."

We reached out to the American College of Obstetricians and Gynecologists, an association comprised of a large majority of the nation's ob-gyns. The organization's

executive vice president and CEO, Hal C Lawrence, III, MD, offered his response to Rubio.

> Government agencies and American medical organizations agree that the scientific definition of pregnancy and the legal definition of pregnancy are the same: pregnancy begins upon the implantation of a fertilized egg into the lining of a woman's uterus. This typically takes place, if at all, between 5 and 9 days after fertilization of the egg – which itself can take place over the course of several days following sexual intercourse.

In other words: Consensus exists (if not unanimously), and the consensus is that uterine implantation is the moment at which pregnancy begins.

We presented that description to the senator's office, asking if he wanted to clarify or moderate his statement. Brooke Sammon, the senator's Deputy Press Secretary, told us that "Senator Rubio absolutely stands by the comment."

There's a blurry line between "pregnancy" and "life" in this discussion. When we asked ACOG if the two were interchangeable, we were told that the organization "approach[es] everything from a scientific perspective, and as such, our definition is for when pregnancy begins." On the question of when *life* begins, then, the scientific experts we spoke with didn't offer any consensus.

"Life" is something of a *philosophical* question, making Rubio's dependence on a scientific argument — which, it hardly bears mentioning, is an argument about abortion — politically tricky. After all, if someone were to argue that life begins at implantation, it's hard to find a moral argument against forms of birth control that prevent that from happening. If that someone were, say, running for president as a conservative Republican, that could be problematic.

---

Philip Bump writes about politics for The Fix. He is based in New York City.

**Get The Fix**

Daily updates delivered just for you.

# Exhibit 53

3 of 3 DOCUMENTS

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright (c) 2015, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** This document is current through the March 5, 2015 ***
*** issue of the Federal Register ***

TITLE 45 -- PUBLIC WELFARE
SUBTITLE A -- DEPARTMENT OF HEALTH AND HUMAN SERVICES
SUBCHAPTER A -- GENERAL ADMINISTRATION
PART 46 -- PROTECTION OF HUMAN SUBJECTS
SUBPART B -- ADDITIONAL PROTECTIONS FOR PREGNANT WOMEN, HUMAN FETUSES AND NEONATES INVOLVED IN RESEARCH

**Go to the CFR Archive Directory**

*45 CFR 46.202*

§ 46.202 Definitions.

The definitions in § 46.102 shall be applicable to this subpart as well. In addition, as used in this subpart:

(a) Dead fetus means a fetus that exhibits neither heartbeat, spontaneous respiratory activity, spontaneous movement of voluntary muscles, nor pulsation of the umbilical cord.

(b) Delivery means complete separation of the fetus from the woman by expulsion or extraction or any other means.

(c) Fetus means the product of conception from implantation until delivery.

(d) Neonate means a newborn.

(e) Nonviable neonate means a neonate after delivery that, although living, is not viable.

(f) Pregnancy encompasses the period of time from implantation until delivery. A woman shall be assumed to be pregnant if she exhibits any of the pertinent presumptive signs of pregnancy, such as missed menses, until the results of a pregnancy test are negative or until delivery.

(g) Secretary means the Secretary of Health and Human Services and any other officer or employee of the Department of Health and Human Services to whom authority has been delegated.

(h) Viable, as it pertains to the neonate, means being able, after delivery, to survive (given the benefit of available medical therapy) to the point of independently maintaining heartbeat and respiration. The Secretary may from time to time, taking into account medical advances, publish in the Federal Register guidelines to assist in determining whether a neonate is viable for purposes of this subpart. If a neonate is viable then it may be included in research only to the extent permitted and in accordance with the requirements of subparts A and D of this part.

□□□□□**R**□□*[40 FR 33528,* Aug. 8, 1975; *66 FR 3878, 3882,* Jan. 17, 2001, withdrawn and revised at *66 FR 56775, 56779,* Nov. 13, 2001]

**A**□□□□**R**□□□□AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
*5 U.S.C. 301; 42 U.S.C. 289*(a).

□□□□□□[EFFECTIVE DATE NOTE: *66 FR 56775, 56779,* Nov. 13, 2001, revised Subpart B, effective Dec. 13, 2001.]

NOTES APPLICABLE TO ENTIRE SUBTITLE:
[PUBLISHER'S NOTE: Nomenclature changes to Subtitle A appear at *66 FR 39450, 39452,* July 31, 2001.]
[PUBLISHER'S NOTE: For Federal Register citations concerning Race to the Top--Early Learning Challenge (RTT-ELC) program, see: *78 FR 53964,* Aug. 30, 2013.]

NOTES APPLICABLE TO ENTIRE SUBCHAPTER:
[PUBLISHER'S NOTE: For Federal Register citations concerning Race to the Top--Early Learning Challenge (RTT-ELC) program, see: *77 FR 58301,* Sept. 20, 2012.]

NOTES APPLICABLE TO ENTIRE PART:
[PUBLISHER'S NOTE: For Federal Register citations concerning Part 46 Waivers, see: *68 FR 36929,* June 20, 2003.]
EDITORIAL NOTE: The Department of Health and Human Services issued a notice of waiver regarding the requirements set forth in part 46, relating to protection of human subjects, as they pertain to demonstration projects, approved under section 1115 of the Social Security Act, which test the use of cost-sharing, such as deductibles, copayment and coinsurance, in the Medicaid program. For further information see *47 FR 9208,* Mar. 4, 1982.

# □ □hi□it □□□□□

Submit Query Search Planned Parentho

Planned Parenthood®
Care. No matter what. FOLLOW

FIND A
HEALTH CENTER
&
BOOK AN
APPOINTMENT

Zip Code GO Su

INFO FOR TEENS ↗

TOOLS FOR PARENTS ↗

TOOLS FOR EDUCATORS ↗

# How Pregnancy Happens



Considering Pregnancy
Pre-Pregnancy Health
How Pregnancy Happens
Pregnancy Week by Week

# How Pregnancy Happens at a Glance

- Pregnancy begins when a fertilized egg implants in the uterus.
- Getting pregnant can happen in different ways.
- Understanding your fertility pattern can help with avoiding pregnancy as well as getting pregnant.

Understanding how pregnancy happens is important. If you want to avoid pregnancy, it helps to know when a woman is most likely to get pregnant, and when she is not. If you are trying to become pregnant, it is important to know when getting pregnant is most likely and the different ways it can happen.

Whether you are trying to avoid pregnancy, trying to get pregnant, or are just curious, you may have lots of questions. Here are some answers about how pregnancy happens.

## » When Does Pregnancy Begin?

In order for a woman to become pregnant, she must release an egg from her ovary — ovulation. Next, the egg and sperm must meet and form a single cell — fertilization. Then pregnancy begins when and if the fertilized egg attaches to a woman's uterus and begins to grow — implantation.

### MENSTRUATION

During the first two weeks of a woman's menstrual cycle she has her period. This usually lasts 3–7 days. After that, hormones make eggs mature in her ovaries, and the lining of her uterus thickens.

### OVULATION

Ovulation happens about two weeks before a woman's next period would take place. The egg enters a fallopian tube and starts moving toward the uterus.

### FERTILIZATION

After vaginal intercourse or alternative insemination, several hundred sperm travel up through the uterus and into the fallopian tubes. An egg may be in one of the tubes. One sperm may fertilize the egg. The

# □□hi□it □□□□□

Question

Pregnancy, Fertility and Childbirth

# When does pregnancy begin?



A Answers (6)

-  Follow Following Unfollow Pending Disabled

AMehmet Oz, MD, Cardiology, **answered**



Pregnancy begins when a mature eg[illegible]voman is fertilized by a mature sperm from a man. Learn more… More

Helpful? 1 person found this helpfu[illegible]

- Follow Following Unfollow Pending Disabled

AHonor Society of Nursing (STTI) **answered**

Pregnancy begins when a woman's ovum is fertilized by a male's sperm. However, often doctors "date" a pregnancy from the first day of

… More

Helpful?

-  Follow Following Unfollow Pending Disabled

APaula Greer, Midwifery Nursing, **answered**

Most people think pregnancy begins when the female egg and the male sperm make that connection. In the medical field we actually define the pregnancy as beginning when the fertilized egg actually implants or beds itself into the uterus. This corresponds with the first missed menstrual cycle. Pregnancy is actually 10 menstrual cycles. For short cycles that maybe the baby that delivers at 37-38 weeks. For the normal

menstrual cycle that may be 39-40 weeks and for prolonged cycles that may be the baby that wants to stay in till 41 weeks.

Less
Helpful?

-  Follow Following Unfollow Pending Disabled

AJohn K. Jain, MD, Reproductive Endocrinology & Infertility, **answered**

In nature, the human egg only lives 24 hours after ovulation. It is during this time that sperm must fertilize the egg. Approximately 1 week later, 7-8 days after ovulation and 21-22 days after the beginning of the menstrual period, the embryo (fertilized egg) implants into the inner lining of the uterus called the endometrium and quickly sets up a connection with maternal blood vessels. As the pregnancy grows it releases the pregnancy hormone called human chorionic gonadotropin (hCG) into the maternal blood. This hormone can be detected one week after implantation (28 days from the beginning of the menstrual period and 2 weeks after ovulation) in the blood or urine. So, pregnancy officially begins at the time of implantation but is usually not detectable until the pregnancy hormone shows up in the blood and urine.

Less
Helpful?

-

 Follow Following Unfollow Pending Disabled

ADiana Blythe, MD, Pediatrics, **answered** on behalf of Pediatric Associates

When a pregnancy begins is actually somewhat complicated. Many people think that the pregnancy starts when a sperm fertilizes and egg.

… More
Helpful?

-  Follow Following Unfollow Pending Disabled

ADeborah Raines, MSN, Nursing, **answered** on behalf of Honor Society of Nursing (STTI)

According to the American College of Obstetricians and Gynecologist (ACOG) Pregnancy is established when a fertilized egg has been

… More
Helpful?

## Videos (6)

- 

  [What Medications Should I Avoid If I'm Pregnant or Trying...]1:07

- 

  [What Is Hyperemesis Gravidarum?]0:43

  

  [How Is Hyperemesis Gravidarum Treated?]0:34

  

  [How Can I Deal with Lack of Sex Drive While I'm Pregnant?]1:34

  

  How Soc Giving E Have Se

PreviousNext

## Topics

- 1st Trimester Of Pregnancy
- 2nd Trimester Of Pregnancy
- 3rd Trimester Of Pregnancy
- Abortion
- Choosing A Practitioner & Pregnancy
- Conception Achieved (Pregnancy)
- Fetal Development Basics & Pregnancy
- Health & Pregnancy
- Labor, Delivery & Post Period Of Pregnancy
- Morning Sickness & Pregnancy
- Postpartum Depression
- Pregnancy Complications

More Less

## Questions

- QWhen is the proper time to tell your child they have a sibling on the way?
- QWhat should I avoid during pregnancy?
- QWhat exercises help prepare me for labor and delivery?
- QWhen in my pregnancy should I start a Centering Pregnancy group?
- QAre vivid dreams common during pregnancy?
- QWhich screening tests are performed during pregnancy?

See All Pregnancy, Fertility and Childbirth Questions

## Articles

- Are Raw-Food Diets Dangerous If gnant?
- 6 Surprises in the First Trimester

See All Related Articles



**Pregnancy, Fertility and Childbirth**

**Once you become pregnant, it is important to follow your doctors recommendations for prenatal care, which can help to make sure that… More**

Follow

## Pregnancy, Fertility and Childbirth Q&As

**QCan I prevent problems with pregnancy after age 40?**

**QHow should I count my baby's kicks during pregnancy?**

## Clipboards




Did You See? Close



What is pregnancy?

About

- What is Sharecare
- Find Experts
- Advisory Board

Contact us

- Contact Sharecare
- Become an Expert
- User Support

Press Room

- Company Info
- Press Releases
- Sharecare In The News

Connect

- 
- 

- 
- 

© 2010-2015 Sharecare, Inc. All content his site is the responsibility of the party posting such content. Participation on this site by a par imply endorsement of any other party's content, products, or services. Content should not be used fo advice, diagnosis, or treatment.

0
Tweet
0
Clip!
0
Like
Share

Privacy Terms Site Map

# Exhibit 56

JEFFREY G. KNOWLES*
JULIA D. GREER*
DAVID MEHRETU (DM 1747)
COBLENTZ PATCH DUFFY & BASS LLP
One Ferry Building, Suite 200
San Francisco, California 94111-4213
Telephone: 415.391.4800
Facsimile: 415.989.1663

* Admitted *Pro Hac Vice*

IRA JAY LEVY (IL 2632)
GOODWIN PROCTER, LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: 212.813.8800
Facsimile: 212.355.3333

Attorneys for Defendant
SPD SWISS PRECISION DIAGNOSTICS GmbH

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHURCH & DWIGHT CO., INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>SPD SWISS PRECISION DIAGNOSTICS GmbH, a Swiss Corporation,<br><br>Defendant. | Case No. 14-CV-585 (AJN) (GWG)<br><br>**DEFENDANT SPD'S RESPONSE TO FIRST SET OF REQUESTS FOR ADMISSION PROPOUNDED BY PLAINTIFF CHURCH & DWIGHT CO., INC.**<br><br>The Hon. Alison J. Nathan<br><br>Trial Date: December 8, 2014 |

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, Defendant SPD Swiss Precision Diagnostics GmbH ("Responding Party" or "SPD") hereby submits these objections and responses to the First Set of Requests for Admission propounded by Plaintiff Church & Dwight Co., Inc. ("Propounding Party" or "C&D").

**PRELIMINARY STATEMENT**

Nothing in this response should be construed as an admission by Responding Party with respect to the admissibility or relevance of any fact or document, or of the truth or accuracy of any characterization or statement of any kind contained in Propounding Party's Requests for Admission. Responding Party has not completed its investigation of the facts relating to this case, its discovery or its preparation for trial. All responses and objections contained herein are based only upon information that is presently available to and specifically known by Responding Party. It is anticipated that further discovery, independent investigation, legal research and analysis will supply additional facts and add meaning to known facts, as well as establish entirely new factual conclusions and legal contentions, all of which may lead to substantial additions to, changes in and variations from the responses set forth herein. The following objections and responses are made without prejudice to Responding Party's right to produce at trial, or otherwise, evidence regarding any subsequently discovered information. Responding Party accordingly reserves the right to modify and amend any and all responses herein as research is completed and contentions are made.

**GENERAL OBJECTIONS**

Responding Party generally objects to the Requests for Admission as follows:

1. Responding Party objects generally to the Requests for Admission to the extent that they seek to elicit information that is neither relevant to the subject matter of this action, nor reasonably calculated to lead to the discovery of admissible evidence;

2. Responding Party objects generally to the Requests for Admission to the extent

that they are unreasonably overbroad in scope, and thus burdensome and oppressive, in that each such request seeks information pertaining to items and matters that are not relevant to the subject matter of this action, or, if relevant, so remote therefrom as to make its disclosure of little or no practical benefit to Propounding Party, while placing a wholly unwarranted burden and expense on Responding Party in locating, reviewing and producing the requested information;

3. Responding Party objects generally to the Requests for Admission to the extent that they are burdensome and oppressive, in that ascertaining the information necessary to respond to them would require the review and compilation of information from multiple locations, and voluminous records and files, thereby involving substantial time of employees of Responding Party and great expense to Responding Party, whereas the information sought to be obtained by Propounding Party would be of little use or benefit to Propounding Party;

4. Responding Party objects generally to the Requests for Admission to the extent that they are vague, uncertain and overbroad, being without limitation as to time or specific subject matter;

5. Responding Party objects generally to the Requests for Admission to the extent that they seek information at least some of which is protected by the attorney-client privilege or the attorney work-product doctrine, or both;

6. Responding Party objects generally to the Requests for Admission to the extent that they seek to have Responding Party furnish information that is a matter of the public record, and therefore, is equally available to the propounding party as to Responding Party; and

7. Responding Party objects generally to the Requests for Admission to the extent that they seek to have Responding Party furnish information that is proprietary to Responding Party and contains confidential information.

8. Responding Party expressly incorporates each of the foregoing General Objections into each specific response to the requests set forth below as if set forth in full therein. An answer to a request is not intended to be a waiver of any applicable specific or general objection to such request.

Without waiver of the foregoing, Responding Party further responds as follows:

## RESPONSES TO REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 1:**

Admit that it is convention among medical professionals to date the length of pregnancy from the first day of a woman's last menstrual period ("LMP").

**RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

Responding Party objects to this Request for Admission to the extent that use of the phrases "medical professionals" and "length of pregnancy" renders it vague and uncertain. Different types of "medical professionals" use different methods for dating the length of pregnancy under different circumstances. In addition, the phrase "date the length of pregnancy" is vague and uncertain in that it falsely implies that medical professionals consider pregnancy to begin on the first day of a woman's last menstrual period.

Subject to and without waiving its objections, and reasonably construing this Request for Admission as seeking an admission that it is convention for all medical professionals under all circumstances to treat pregnancy as beginning at LMP, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 2:**

Admit that medical professionals do not ordinarily date the length of pregnancy with reference to ovulation.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

Responding Party objects to this Request for Admission to the extent that use of the phrases "medical professionals," "length of pregnancy," and "with reference to ovulation" renders it vague and uncertain.

Subject to and without waiving its objections, and reasonably construing this Request for Admission as seeking an admission that all medical professionals do not ordinarily use ovulation to mark the commencement of pregnancy, Responding Party responds: DENIED.

**<u>REQUEST FOR ADMISSION NO. 3</u>:**

Admit that LMP occurs, on average, approximately two weeks before ovulation.

**<u>RESPONSE TO REQUEST FOR ADMISSION NO. 3</u>:**

Subject to and without waiving its general objections, Responding Party responds: ADMITTED.

**<u>REQUEST FOR ADMISSION NO. 4</u>:**

Admit that an estimate of the number of weeks that may have passed since a woman last ovulated is not the same as a doctor's estimate of how far along a woman is in her pregnancy.

**<u>RESPONSE TO REQUEST FOR ADMISSION NO. 4</u>:**

Responding Party objects to this Request for Admission to the extent that use of the phrases "doctor's estimate" and "how far along a woman is in her pregnancy" renders it vague and uncertain.

Subject to and without waiving its objections, and reasonably construing this Request for Admission as seeking an admission that an estimate of the number of weeks that may have passed since a woman last ovulated is never the same as how any doctor will estimate how far along a woman is in her pregnancy, Responding Party responds: DENIED.

**<u>REQUEST FOR ADMISSION NO. 5</u>:**

Admit that according to the American Congress of Obstetricians and Gynecologists a pregnancy is considered to be established only when the process of implantation is complete.

**<u>RESPONSE TO REQUEST FOR ADMISSION NO. 5</u>:**

Responding Party objects to this Request for Admission to the extent that use of the terms/phrases "according to," "established," "process of implantation," and "complete" renders it vague and uncertain.

Responding Party further objects to this Request for Admission as not seeking admissible

evidence or information reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving its objections, and reasonably construing this Request for Admission as seeking an admission that the definitive position of the American Congress of Obstetricians and Gynecologists is that pregnancy is considered to be established only when the process of implantation is complete, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 6:**

Admit that according to the American Congress of Obstetricians and Gynecologists the biological start of pregnancy is the implantation of the blastocyst into the lining of the uterus.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

Responding Party objects to this Request for Admission to the extent that use of the terms/phrases "biological start of pregnancy," "according to" and "implantation" renders it vague and uncertain.

Responding Party further objects to this Request for Admission as not seeking admissible evidence or information reasonably calculated to lead to the discovery of admissible evidence..

Subject to and without waiving its objections, and reasonably construing this Request for Admission as seeking an admission that the definitive position of the American Congress of Obstetricians and Gynecologists is that the biological start of pregnancy is the implantation of the blastocyst into the lining of the uterus, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 7:**

Admit that, in general, medical professionals do not define "conception" as the "fertilization of an ovum (egg) by sperm."

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

Responding Party objects to this Request for Admission to the extent that use of the term "medical professionals" renders it vague and uncertain.

Responding Party further objects to this Request for Admission as not seeking admissible evidence or information reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving its objections, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 8:**

Admit that hCG is not detectable upon fertilization of the egg and does not become detectable until a fertilized egg implants in the lining of a woman's uterus.

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

Responding Party objects to this Request for Admission to the extent that use of the term "detectable" renders it vague and uncertain.

Responding Party further objects to this Request for Admission as not seeking admissible evidence or information reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving its objections, and reasonably construing this Request for Admission as seeking an admission that hCG levels in maternal blood and urine rise rapidly after a fertilized egg implants in the lining of a woman's uterus, Responding Party responds: ADMITTED.

**REQUEST FOR ADMISSION NO. 9:**

Admit that the most precise marker for the start of pregnancy is the implantation of a fertilized egg in the lining of a woman's uterus.

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

Responding Party objects to this Request for Admission as unintelligible, in particular to the extent that use of the phrases "most precise marker" and "start of pregnancy" renders it vague and uncertain.

Responding Party further objects to this Request for Admission as not seeking admissible evidence or information reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving its objections, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 10:**

Admit that ovulation and fertilization of the egg are different biological events.

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

Responding Party objects to this Request for Admission as not seeking admissible evidence or information reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving this and its general objections, Responding Party responds: ADMITTED.

**REQUEST FOR ADMISSION NO. 11:**

Admit that implantation of a fertilized egg in the lining of a woman's uterus generally occurs days after ovulation, and can sometimes begin as many as 7-9 days after ovulation.

**RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

Responding Party objects to this Request for Admission as not seeking admissible evidence or information reasonably calculated to lead to the discovery of admissible evidence.

Responding Party further objects to this Request for Admission to the extent that use of the terms/phrases "days after ovulation" and "sometimes" renders it vague and uncertain.

Subject to and without waiving its objections, and reasonably construing this Request for Admission as seeking an admission that implantation of a fertilized egg in the lining of a woman's uterus generally occurs several days after ovulation, and can on occasion take place as many as 7-9 days after ovulation, Responding Party responds: ADMITTED.

**REQUEST FOR ADMISSION NO. 12:**

Admit that the milestones for the timing of prenatal care and fetal development are based on the convention used by medical professionals that the length of a woman's pregnancy is dated from LMP.

**RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

Responding Party objects to this Request for Admission to the extent that use of the phrases "the milestones for the timing of prenatal care and fetal development" and "are based" renders it vague and uncertain.

Responding Party further objects to this Request for Admission as not seeking admissible evidence or information reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving its objections, and reasonably construing this Request for Admission as seeking an admission that, milestones for the timing of prenatal care and fetal development are always based on the convention of dating  pregnancy from LMP, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 13:**

Admit that medical time limitations on methods for terminating pregnancy are based on the convention used by medical professionals that the length of a woman's pregnancy is dated from LMP.

**RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

Responding Party objects to this Request for Admission to the extent that use of the phrases "medical time limitations on methods for terminating pregnancy" and "are based" renders it vague and uncertain.

Subject to and without waiving its objections, and reasonably construing this Request for Admission as seeking an admission that, time limitations on methods for terminating pregnancy are always based on dating the length of pregnancy from LMP, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 14:**

Admit that the front panel of the box in which the Weeks Estimator has been sold

(depicted in paragraph 26 of the Complaint) conveys the message that the Weeks Estimator can estimate how many weeks a woman has been pregnant.

**RESPONSE TO REQUEST FOR ADMISSION NO. 14:**

Responding party objects to this Request for Admission to the extent that the phrase "how many weeks a woman has been pregnant" is vague and uncertain.

Subject to and without waiving this objection, and reasonably construing the Request for Admission as seeking an admission that the front panel of the box depicted in paragraph 26 of the Complaint conveys the message that the Weeks Estimator estimates how many weeks have passed since the first day of a woman's last menstrual period (which Responding Party understands to be Requesting Party's position), Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 15:**

Admit that the text "Advanced Pregnancy Test With Weeks Estimator" conveys the message that the Weeks Estimator can estimate how many weeks a woman has been pregnant.

**RESPONSE TO REQUEST FOR ADMISSION NO. 15:**

Responding party objects to this Request for Admission to the extent that the phrase "how many weeks a woman has been pregnant" is vague and uncertain.

Subject to and without waiving its objections, and reasonably construing the Request for Admission as seeking an admission that the text "Advanced Pregnancy Test With Weeks Estimator" conveys the message that the Weeks Estimator estimates how many weeks have passed since the first day of a woman's last menstrual period (which Responding Party understands to be Requesting Party's position), Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 16:**

Admit that SPD revised the box in which the Weeks Estimator has been sold (depicted in paragraph 26 of the Complaint) because the FDA expressed concerns that the box did not

comply with limitations set forth in the FDA's Clearance Letter.

**RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

Responding Party objects to the Request for Admission to the extent that it fails to specify any revisions to the Weeks Estimator box.

Subject to and without waiving its objections, and reasonably construing the Request for Admission as seeking an admission that SPD made changes to the Weeks Estimator box to correct non-compliance with limitations set forth in the FDA's Clearance Letter, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 17:**

Admit that the current product packaging for the Weeks Estimator conveys the message that the Weeks Estimator can estimate how many weeks a woman has been pregnant.

**RESPONSE TO REQUEST FOR ADMISSION NO. 17:**

Responding Party objects to this Request for Admission as seeking information not relevant to any claim or defense in the action and seeking admissible evidence nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to its objections, Responding Party responds: Responding Party lacks sufficient information or belief to admit or deny the Request for Admission and, on that basis denies the Request for Admission.

**REQUEST FOR ADMISSION NO. 18:**

Admit that the Commercial conveys the message that the Weeks Estimator can estimate how many weeks a woman has been pregnant.

**RESPONSE TO REQUEST FOR ADMISSION NO. 18:**

Responding party objects to this Request for Admission to the extent that the phrase "how many weeks a woman has been pregnant" is vague and uncertain.

Subject to and without waiving this objections, and reasonably construing the Request for Admission as seeking an admission that, the Commercial conveys the message that the Weeks Estimator estimates how many weeks have passed since a woman's last menstrual period (which Responding Party understands to be Requesting Party's position), Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 19:**

Admit that the Commercial conveys the message that the Weeks Estimator gives an estimate of how far along a woman is in her pregnancy that is equivalent to the estimate a doctor would give.

**RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

Responding Party objects to this Request for Admission to the extent that use of the term "estimate a doctor would give" is vague.

Subject to and without waiving its objections, and reasonably construing this Request for Admission as seeking an admission that the Commercial coveys the message that the Weeks Estimator gives an estimate of how far along a woman is in her pregnancy that is equivalent to the estimate any doctor would give under any circumstance, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 20:**

Admit that the Product Web Page conveys the message that the Weeks Estimator can estimate how many weeks a woman has been pregnant.

**RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

Responding party objects to this Request for Admission to the extent that the phrase "how many weeks a woman has been pregnant" is vague and uncertain.

Subject to and without waiving its objections, and reasonably construing the Request for

Admission as seeking admission that the Product Web Page conveys the message that the Weeks Estimator estimates how many weeks have passed since the first day of a woman's last menstrual period (which Responding Party understands to be Requesting Party's position), Responding party responds: DENIED.

**REQUEST FOR ADMISSION NO. 21:**

Admit that the text "Weeks Estimator is the FIRST and ONLY pregnancy test that not only tells you if you are pregnant but also estimates the number of weeks" conveys the message that the Weeks Estimator can estimate how many weeks a woman has been pregnant.

**RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

Responding party objects to this Request for Admission to the extent that the phrase "how many weeks a woman has been pregnant" is vague and uncertain.

Subject to and without waiving its objections, and reasonably construing the Request for Admission as seeking admission that the text "Weeks Estimator is the FIRST and ONLY pregnancy test that not only tells you if you are pregnant but also estimates the number of weeks" conveys the message that the Weeks Estimator estimates how many weeks have passed since the first day of a woman's last menstrual period (which Responding Party understands to be Requesting Party's position), Responding party responds: DENIED.

**REQUEST FOR ADMISSION NO. 22:**

Admit that the Retail Advertising conveys the message that the Weeks Estimator can estimate how many weeks a woman has been pregnant.

**RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

Responding party objects to this Request for Admission to the extent that the phrase "how many weeks a woman has been pregnant" is vague and uncertain.

Subject to and without waiving its objections, and reasonably construing the Request for

Admission as seeking admission that the Retail Advertising conveys the message that the Weeks Estimator estimates how many weeks have passed since the first day of a woman's last menstrual period (which Responding Party understands to be Requesting Party's position), Responding party responds: DENIED.

**REQUEST FOR ADMISSION NO. 23:**

Admit that the text "First pregnancy test to estimate weeks" conveys the message that the Weeks Estimator can estimate how many weeks a woman has been pregnant.

**RESPONSE TO REQUEST FOR ADMISSION NO. 23:**

Responding party objects to this Request for Admission to the extent that the phrase "how many weeks a woman has been pregnant" is vague and uncertain.

Subject to and without waiving its objections, and reasonably construing the Request for Admission as seeking admission that the text "First pregnancy test to estimate weeks" conveys the message that the Weeks Estimator estimates how many weeks have passed since the first day of a woman's last menstrual period (which Responding Party understands to be Requesting Party's position), Responding party responds: DENIED.

**REQUEST FOR ADMISSION NO. 24:**

Admit that the Internet Advertising conveys the message that the Weeks Estimator can estimate how many weeks a woman has been pregnant.

**RESPONSE TO REQUEST FOR ADMISSION NO. 24:**

Responding party objects to this Request for Admission to the extent that the phrase "how many weeks a woman has been pregnant" is vague and uncertain.

Subject to and without waiving its objections, and reasonably construing the Request for Admission as seeking admission that the Internet Advertising conveys the message that the Weeks Estimator estimates how many weeks have passed since the first day of a woman's last

menstrual period (which Responding Party understands to be Requesting Party's position), Responding party responds: DENIED.

**REQUEST FOR ADMISSION NO. 25:**

Admit that the text "Clearblue Advanced Digital Pregnancy Test with Weeks Estimator. Is there a baby on board? How far along? Find out!" conveys the message that the Weeks Estimator can estimate how many weeks a woman has been pregnant.

**RESPONSE TO REQUEST FOR ADMISSION NO. 25:**

Responding party objects to this Request for Admission to the extent that the phrase "how many weeks a woman has been pregnant" is vague and uncertain.

Subject to and without waiving its objections, and reasonably construing the Request for Admission as seeking admission that the text "Clearblue Advanced Digital Pregnancy Test with Weeks Estimator. Is there a baby on board? How far along? Find out!" conveys the message that the Weeks Estimator estimates how many weeks have passed since the first day of a woman's last menstrual period (which Responding Party understands to be Requesting Party's position), Responding party responds: DENIED.

**REQUEST FOR ADMISSION NO. 26:**

Admit that the statement concerning the Weeks Estimator that "it actually estimates how many weeks of pregnancy you're in" conveys the message that the Weeks Estimator can estimate how many weeks a woman has been pregnant.

**RESPONSE TO REQUEST FOR ADMISSION NO. 26:**

Responding party objects to this Request for Admission to the extent that the phrase "how many weeks a woman has been pregnant" is vague and uncertain.

Subject to and without waiving its objections, and reasonably construing the Request for Admission as seeking admission that the statement concerning the Weeks Estimator that "it

actually estimates how many weeks of pregnancy you're in" conveys the message that the Weeks Estimator estimates how many weeks have passed since the first day of a woman's last menstrual period (which Responding Party understands to be Requesting Party's position), Responding party responds: DENIED.

**REQUEST FOR ADMISSION NO. 27:**

Admit that the Weeks Estimator is capable only of (i) telling a woman whether she is pregnant and, (ii) if she is pregnant, estimating how many weeks have passed since she last ovulated.

**RESPONSE TO REQUEST FOR ADMISSION NO. 27:**

Responding Party objects to this Request for Admission to the extent that use of the term "only" renders it vague and uncertain. In particular, in light of the use of the term "only," the Request for Admission could be construed to mean that in estimating how many weeks have passed since a woman ovulated, the product cannot estimate how many weeks have passed since a woman's pregnancy started. Responding Party denies that assertion.

Subject to and without waiving its objections, Responding Party responds: ADMITTED.

**REQUEST FOR ADMISSION NO. 28:**

Admit that the Weeks Estimator is capable of estimating how many weeks a woman has been pregnant.

**RESPONSE TO REQUEST FOR ADMISSION NO. 28:**

Responding Party objects to this Request for Admission to the extent that use of the phrase "weeks a woman has been pregnant" renders it vague and uncertain.

Subject to and without waiving its objections, and reasonably construing this Request for Admission as seeking an admission that the Weeks Estimator is capable of estimating how many weeks have passed since a woman's pregnancy started, Responding Party responds:

ADMITTED.

**REQUEST FOR ADMISSION NO. 29:**

Admit that the Weeks Estimator is not capable of estimating how many weeks a woman has been pregnant.

**RESPONSE TO REQUEST FOR ADMISSION NO. 29:**

Responding Party objects to this Request for Admission to the extent that use of the phrase "weeks a woman has been pregnant" renders it vague and uncertain.

Subject to and without waiving its objections, and reasonably construing this Request for Admission as seeking an admission that the Weeks Estimator is not capable of estimating how many weeks have passed since a woman's pregnancy started, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 30:**

Admit that, at the time SPD disseminated the Challenged Advertisements, SPD knew that the Weeks Estimator was not capable of estimating how many weeks a woman has been pregnant.

**RESPONSE TO REQUEST FOR ADMISSION NO. 30:**

Responding Party objects to this Request for Admission on the ground that it presumes that the Weeks Estimator is not capable of estimating how many weeks have passed since the start of a woman's pregnancy. Responding Party denies that assertion.

Subject to and without waiving its objections, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 31:**

Admit that the Weeks Estimator is not capable of estimating gestational age.

**RESPONSE TO REQUEST FOR ADMISSION NO. 31:**

Responding Party objects to this Request for Admission to the extent that use of the term

"gestational age" renders it vague and uncertain.

Subject to and without waiving its objections, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 32:**

Admit that, at the time SPD disseminated the Challenged Advertisements, SPD knew that the Weeks Estimator was not capable of estimating gestational age.

**RESPONSE TO REQUEST FOR ADMISSION NO. 32:**

Responding Party objects to this Request for Admission on the ground that it presumes that the Weeks Estimator is not capable of estimating gestational age. Responding Party denies that assertion.

Subject to and without waiving its objections, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 33:**

Admit that the Weeks Estimator cannot be used to monitor the progression of pregnancy.

**RESPONSE TO REQUEST FOR ADMISSION NO. 33:**

Responding Party objects to this Request for Admission to the extent that use of the phrases "cannot be used" and "monitor the progression of pregnancy" renders it vague and uncertain.

Subject to and without waiving its objections, and reasonably construing this Request for Admission as seeking an admission that the FDA mandated that SPD not market the Weeks Estimator for the purpose of monitoring the progression of pregnancy, and that the Weeks Estimator should not be used as a substitute for monitoring the progression of pregnancy by a medical professional, Responding Party responds: ADMITTED.

**REQUEST FOR ADMISSION NO. 34:**

Admit that, at the time SPD disseminated the Challenged Advertisements, SPD knew that the Weeks Estimator could not be used to monitor the progression of pregnancy.

**RESPONSE TO REQUEST FOR ADMISSION NO. 34:**

Responding Party objects to this Request for Admission to the extent that use of the phrases "cannot be used" and "monitor the progression of pregnancy" renders it vague and uncertain.

Subject to and without waiving its objections, and reasonably construing this Request for Admission as seeking an admission that, at the time SPD disseminated the Challenged Advertisements, SPD knew that the FDA mandated that SPD not market the Weeks Estimator for the purpose of monitoring the progression of pregnancy, and that the Weeks Estimator should not be used as a substitute for monitoring the progression of pregnancy by a medical professional, Responding Party responds: ADMITTED.

**REQUEST FOR ADMISSION NO. 35:**

Admit that the Weeks Estimator is not capable of estimating how many weeks have passed since LMP.

**RESPONSE TO REQUEST FOR ADMISSION NO. 35:**

Responding Party objects to this Request for Admission to the extent that use of the phrase "is not capable of" renders it vague and uncertain.

Subject to and without waiving its objections, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 36:**

Admit that, at the time SPD disseminated the Challenged Advertisements, SPD knew that the Weeks Estimator was not capable of estimating how many weeks have passed since LMP.

**RESPONSE TO REQUEST FOR ADMISSION NO. 36:**

Responding Party objects to this Request for Admission to the extent that use of the phrase "was not capable of" renders it vague and uncertain.

Responding Party further objects to this Request for Admission on the ground that it

presumes that the Weeks Estimator is not capable of estimating how many weeks have passed since LMP. Responding Party denies that assertion.

Subject to and without waiving its objections, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 37:**

Admit that the Weeks Estimator is not capable of estimating how many weeks may have passed since the implantation of a fertilized egg in the lining of a woman's uterus.

**RESPONSE TO REQUEST FOR ADMISSION NO. 37:**

Responding Party objects to this Request for Admission to the extent that use of the phrase "is not capable of" renders it vague and uncertain.

Responding Party further objects to this Request for Admission as seeking information not relevant to any claim or defense in the action and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving its objections, Responding Party responds: DENIED

**REQUEST FOR ADMISSION NO. 38:**

Admit that, at the time SPD disseminated the Challenged Advertisements, SPD knew that the Weeks Estimator was not capable of estimating how many weeks may have passed since the implantation of a fertilized egg in the lining of a woman's uterus.

**RESPONSE TO REQUEST FOR ADMISSION NO. 38:**

Responding Party objects to this Request for Admission to the extent that use of the phrase "was not capable of" renders it vague and uncertain.

Responding Party further objects to this Request for Admission on the ground that it presumes that Weeks Estimator is not capable of estimating how many weeks may have passed since the implantation of a fertilized egg in the lining of a woman's uterus. Responding Party denies that assertion.

Responding Party further objects to this request as seeking information not relevant to any claim or defense in the action and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving its objections, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 39:**

Admit that many women do not read all of the information contained on the side panel of the box for the Weeks Estimator with care.

**RESPONSE TO REQUEST FOR ADMISSION NO. 39:**

Responding Party objects to this Request for Admission to the extent that use of the terms "many women," "all of," and "with care" renders it vague and uncertain.

Subject to its objections, Responding Party lacks sufficient information or belief to admit or deny the Request for Admission and, on that basis, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 40:**

Admit that, at the time SPD launched the Weeks Estimator, SPD knew that many women would not read all of the information contained on the side panel of the box for the Weeks Estimator with care.

**RESPONSE TO REQUEST FOR ADMISSION NO. 40:**

Responding Party objects to this Request for Admission to the extent that use of the terms "many women," "all of," and "with care" renders it vague and uncertain.

Responding Party further objects to this Request for Admission on the ground that it presumes that many women would not read the information contained on the side panel of the box for the Weeks Estimator with reasonable care.

Subject to and without waiving its objections, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 41:**

Admit that many women do not read all of the information contained in the package insert for the Weeks Estimator with care.

**RESPONSE TO REQUEST FOR ADMISSION NO. 41:**

Responding Party objects to this Request for Admission to the extent that use of the terms "many women," "all of," and "with care" renders it vague and uncertain.

Subject to and without waiving its objections, and reasonably construing this Request for Admission as seeking an admission that, a majority of women do not read substantially all the information contained in the package insert for the Weeks Estimator with reasonable care, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 42:**

Admit that, at the time SPD launched the Weeks Estimator, SPD knew that many women would not read all of the information contained in the package insert for the Weeks Estimator with care.

**RESPONSE TO REQUEST FOR ADMISSION NO. 42:**

Responding Party objects to this Request for Admission to the extent that use of the terms "many women," "all," and "with care" renders it vague and uncertain.

Responding Party further objects to this Request for Admission on the ground that it presumes that many women would not read all of the information contained in the package insert for the Weeks Estimator with care. Responding Party denies that assertion.

Subject to and without waiving its objections, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 43:**

Admit that there is a material difference between the 'weeks since ovulation' estimate given by the Weeks Estimator and the dating of pregnancy by medical professionals.

**<u>RESPONSE TO REQUEST FOR ADMISSION NO. 43</u>:**

Responding Party objects to this Request for Admission to the extent that use of the phrases "the dating of pregnancy by medical professionals" and "material difference" renders it vague and uncertain.

Subject to and without waiving its objections, and reasonably construing this Request for Admission as seeking an admission that, there is a material difference between the 'weeks since ovulation' estimate given by the Weeks Estimator and the dating of pregnancy by any medical professionals, Responding Party responds: DENIED.

**<u>REQUEST FOR ADMISSION NO. 44</u>:**

Admit that there is substantial consumer demand for a pregnancy test that can estimate how many weeks a woman has been pregnant.

**<u>RESPONSE TO REQUEST FOR ADMISSION NO. 44</u>:**

Responding Party objects to this Request for Admission to the extent that use of the phrases "substantial consumer demand" and "pregnant" renders it vague and uncertain.

Subject to and without waiving its objections, and reasonably construing this Request For Admission as seeking an admission that, there is substantial consumer demand for a pregnancy test that can estimate how many weeks have gone by since a pregnant woman ovulated, Responding Party responds: ADMITTED.

**<u>REQUEST FOR ADMISSION NO. 45</u>:**

Admit that there is minimal consumer demand for a pregnancy test that can estimate how many weeks may have passed since a woman last ovulated.

**<u>RESPONSE TO REQUEST FOR ADMISSION NO. 45</u>:**

Subject to and without waiving its objections, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 46:**

Admit that consumer demand for a pregnancy test that estimates how many weeks a woman has been pregnant exceeds consumer demand for a pregnancy test that estimates how many weeks may have passed since a woman last ovulated.

**RESPONSE TO REQUEST FOR ADMISSION NO. 46:**

Responding Party objects to this Request for Admission to the extent that use of the term "pregnant" renders it vague and uncertain.

Responding Party further objects to this Request for Admission on the ground that it presumes that there is a material difference between a pregnancy test that estimates how many weeks a woman has been pregnant and a pregnancy test that estimates how many weeks may have passed since a woman last ovulated. Responding Party denies that assertion.

Subject to and without waiving its objections, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 47:**

Admit that consumers have purchased the Weeks Estimator because of its purported ability to estimate how many weeks a woman has been pregnant.

**RESPONSE TO REQUEST FOR ADMISSION NO. 47:**

Responding Party objects to this Request for Admission to the extent that use of the terms "purported ability," "pregnant" and "because" renders it vague and uncertain.

Subject to and without waiving its objections, and reasonably construing the Request For Admission as seeking an admission that consumers have purchased the Weeks Estimator at least in part because of its purported ability to estimate how many weeks have gone by since a pregnant woman ovulated, Responding Party responds: ADMITTED.

**REQUEST FOR ADMISSION NO. 48:**

Admit that it would pose a public health risk if women were to believe they could use the

Weeks Estimator to estimate how many weeks have passed since LMP.

**RESPONSE TO REQUEST FOR ADMISSION NO. 48:**

Responding Party objects to this Request for Admission on the grounds that it is speculative and lacks foundation.

Subject to and without waiving its objections, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 49:**

Admit that it would pose a public health risk if women were to believe they could use the Weeks Estimator as a substitute for a doctor's estimate of how far along a woman is in her pregnancy.

**RESPONSE TO REQUEST FOR ADMISSION NO. 49:**

Responding Party objects to this Request for Admission on the grounds that it is speculative and lacks foundation.

Responding Party further objects to this Request for Admission to the extent that use of the term "doctor's estimate" renders it vague and uncertain. Different types of doctors use different methods for estimating how far along a woman is in her pregnancy, depending on the circumstances.

Subject to and without waiving its objections, and reasonably construing this Request for Admission as seeking an admission that it would pose a public health risk if women were to believe they could use the Weeks Estimator as a substitute for the method of estimating how far along a woman is in her pregnancy used by some doctors based on LMP, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 50:**

Admit that it would pose a public health risk if women were to believe they could use the Weeks Estimator to estimate how far along they are in their pregnancy.

**RESPONSE TO REQUEST FOR ADMISSION NO. 50:**

Responding Party objects to this Request for Admission on the grounds that it is speculative and lacks foundation.

Subject to and without waiving its objections, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 51:**

Admit that advertising for a product that misleads and/or confuses women with respect to the length of their pregnancy poses a public health risk.

**RESPONSE TO REQUEST FOR ADMISSION NO. 51:**

Responding Party objects to this Request for Admission as overbroad, vague, and unintelligible including due to its use of "misleads and/or confuses."

Responding Party further objects to this Request for Admission to the extent that use of the phrase "with respect to the length of their pregnancy" renders it vague and uncertain.

Subject to and without waiving its objections, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 52:**

Admit that advertising for a product that misleads and/or confuses women with respect to the progression of their pregnancy poses a public health risk.

**RESPONSE TO REQUEST FOR ADMISSION NO. 52:**

Responding Party objects to this Request for Admission as overbroad, vague, and unintelligible including due to its use of "misleads and/or confuses."

Responding Party further objects to this Request for Admission to the extent that use of the phrase "with respect to the progression of their pregnancy" renders it vague and uncertain.

Subject to and without waiving its objections, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 53:**

Admit that SPD understood at the time it launched the Weeks Estimator that the

"intended use not identified in the proposed labelling" referenced in the Clearance Letter was the use of the Weeks Estimator to estimate how many weeks a woman has been pregnant.

**RESPONSE TO REQUEST FOR ADMISSION NO. 53:**

Responding Party objects to this Request for Admission to the extent that use of the term "pregnant" renders it vague and uncertain.

Subject to and without waiving its objections, and reasonably construing this Request for Admission as seeking an admission that, an estimate of how many weeks since the start of a woman's pregnancy is different from an estimate of how many weeks since ovulation, Responding Party responds: DENIED.

**REQUEST FOR ADMISSION NO. 54:**

Admit that SPD has disseminated the Challenged Advertisements to the public through commercial advertising and promotion, and thus caused the Challenged Advertisements to enter interstate commerce.

**RESPONSE TO REQUEST FOR ADMISSION NO. 54:**

Responding Party objects to this Request for Admission to the extent that use of the phrases "commercial advertising and promotion" renders it vague and uncertain.

Subject to and without waiving its objections, and reasonably construing this Request for Admission as seeking an admission that SPD has disseminated the Challenged Advertisements to the public through commercial advertising and promotion – where "commercial advertising and promotion" does not include retail advertising and any promotions not sponsored by Responding Party – and thus caused the Challenged Advertisements to enter interstate commerce, Responding Party responds: ADMITTED.

**REQUEST FOR ADMISSION NO. 55:**

Admit that Church & Dwight has performed all of its obligations under the Settlement

Agreement.

**RESPONSE TO REQUEST FOR ADMISSION NO. 55:**

Subject to and without waiving its objections, Responding Party responds: DENIED.

DATED: September 2, 2014

Respectfully submitted,

By: ______________________

COBLENTZ PATCH DUFFY & BASS LLP
Jeffrey G. Knowles*
Julia D. Greer*
David Mehretu (DM 1747)
One Ferry Building, Suite 200
San Francisco, CA 94111
Telephone: 415.391.4800
Facsimile: 415.989.1663
Email: ef-jgk@cpdb.com
ef-jdg@cpdb.com
ef-dxm@cpdb.com

* Admitted *Pro Hac Vice*

GOODWIN | PROCTER LLP
Ira J. Levy (IL 2632)
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: 212.459.7478
Facsimile: 212.355.3333
Email: ilevy@goodwinprocter.com

*Attorneys for Defendant*
SPD SWISS PRECISION DIAGNOSTICS GMBH

**VERIFICATION**

From October 2007 February until February 201.3, I was employed by SPD Swiss Precision Diagnostics GmbH ("SPD") as a Marketing Director, responsible for worldwide marketing related to the CLEARBLUE® range of home pregnancy and ovulation tests sold by SPD. From March 2013 to the present, I am employed by Alere, Inc. although my professional duties are exclusively dedicated to SPD. As Commercial Director of Americas responsible for marketing and sales of the CLEARBLUE® range of home pregnancy and ovulation tests in the Americas, including the United States of America, I am authorized to make this verification on behalf of SPD. I am familiar with the facts set forth in DEFENDANT SPD'S RESPONSE TO FIRST SET OF REQUESTS FOR ADMISSION PROPOUNDED BY DEFENDANT CHURCH & DWIGHT CO., INC., and state that, based on the information available to me, they are true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 1st day of September, 2014 at Newton, MA, USA.

Ryan Daly

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO**

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of San Francisco, State of California. My business address is One Ferry Building, Suite 200, San Francisco, CA 94111-4213.

On September 2, 2014, I served true copies of the following document(s) described as

**DEFENDANT SPD'S RESPONSE TO FIRST SET OF REQUESTS FOR ADMISSION PROPOUNDED BY DEFENDANT CHURCH & DWIGHT CO., INC.**

on the interested parties in this action as follows:

Richard M. Goldstein, Esq.
Lawrence I. Weinstein, Esq.
Michael T. Mervis, Esq.
Baldassare Vinti, Esq.
Jeffrey H. Warshafsky, Esq.
Jennifer Yang
Proskauer Rose LLP
11 Times Square
New York, NY 10036-8299
Tel: 212.969.3000
Fax: 212.969.2900
Emails: rgoldstein@proskauer.com
lweinstein@proskauer.com
mmervis@proskauer.com
bvinti@proskauer.com
jwarshafsky@proskauer.com
jyang@proskauer.com

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address dmehretu@coblentzlaw.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 2, 2014, at San Francisco, California.

David Mehretu

# Exhibit 57

JEFFREY G. KNOWLES*
JULIA D. GREER*
DAVID MEHRETU (DM 1747)
COBLENTZ PATCH DUFFY & BASS LLP
One Ferry Building, Suite 200
San Francisco, California 94111-4213
Telephone: 415.391.4800
Facsimile: 415.989.1663

*Admitted *Pro Hac Vice*

IRA JAY LEVY (IL 2632)
GOODWIN PROCTER, LLP
620 Eighth Avenue
New York, New York 10018
Telephone: 212.813.8800
Facsimile: 212.355.3333

Attorneys for Defendant
SPD SWISS PRECISION DIAGNOSTICS GmbH

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CHURCH & DWIGHT CO., INC.,

Plaintiff,

v.

SPD SWISS PRECISION DIAGNOSTICS GMBH,

Defendant.

Case No. 14-CV-585 (AJN)

**SPD SWISS PRECISION DIAGNOSTICS GMBH'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS**

**TO BE FILED UNDER SEAL: CONTAINS CONFIDENTIAL AND/OR HIGHLY CONFIDENTIAL INFORMATION.**

The Hon. Alison J. Nathan
Trial Date: None Set

# TABLE OF CONTENTS

**Page**


INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................3

A. The Weeks Estimator Product Is A Medical Device Regulated By The U.S. Food and Drug Administration. ....................................................3

B. The FDA Applied Enhanced Scrutiny Over The Approval And Labeling For The Weeks Estimator Due To Its Finding Of A Heightened Risk Of Off-Label Use By Consumers. ....................................4

C. The FDA Approves The Labeling And Marketing Of the Weeks Estimator Product. ....................................................................................7

D. The FDA's 2013-2014 Instructions To Modify Advertising. ......................7

E. C&D's False Advertising Action ..............................................................8

ARGUMENT ....................................................................................................9

I. The Legal Standard For A Motion To Dismiss Under Rule 12(b)(6)......................9

II. C&D's Lanham Act Claims Are Precluded Because They Seek To Enforce The FDCA And Undermine FDA Decisions. ....................................................9

III. C&D's Lanham Act Claims Are Barred Under The Doctrine Of Primary Jurisdiction. ....................................................................................16

IV. C&D's State Law Cause Of Action Is Based On The Same Factual Allegations, And Suffers From The Same Deficiencies, As Its Lanham Act Claim. ....................................................................................19

V. If The Court Dismisses C&D's Lanham Act Claim, It Should Decline To Exercise Supplemental Jurisdiction Over C&D's State Law And Breach of Contract Claims. ....................................................................................19

CONCLUSION ....................................................................................................20




**TO BE FILED UNDER SEAL: CONTAINS CONFIDENTIAL AND/OR HIGHLY CONFIDENTIAL INFORMATION.**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Home Products Corp. v. Johnson & Johnson*
672 F. Supp. 135 (S.D.N.Y 1987)....12, 13, 15

*Avon Products, Inc. v. S.C. Johnson & Son, Inc.*
984 F. Supp. 768 (S.D.N.Y. 1997)....19

*Bernhardt v. Pfizer, Inc.*
2000 U.S. Dist. LEXIS 16963 (S.D.N.Y. Nov. 16, 2000)....17

*Braintree Labs., Inc. v. Nephro-Tech, Inc.*
96-2459-JWL, 1997 WL 94237 (D. Kan. Feb. 26, 1997)....10, 12

*Carnegie-Mellon Univ. v. Cohill*
484 U.S. 343 (1988)....19

*Chambers v. Time Warner, Inc.*
282 F.3d 147 (2d Cir. 2002)....9

*Cytyc Corp. v. Neuromedical Systems, Inc.*
12 F. Supp. 2d 296 (S.D.N.Y. 1998)....12, 15

*Ellis v. Tribune TV Co.*
443 F.3d 71 (2d Cir. 2006)....16

*Frank v. Delta Airlines Inc.*
314 F.3d 195 (5th Cir. 2002)....18

*Gordon v. Church & Dwight Co.*
2010 U.S. Dist. LEXIS 32777 (N.D. Cal. Apr. 2, 2010)....18

*Gottlieb Dev. LLC v. Paramount Pictures Corp.*
590 F. Supp. 2d 625 (S.D.N.Y. 2008)....19

*Healthpoint Ltd. v. Stratus Pharm., Inc.*
2001 U.S. Dist. LEXIS 22229 (E.D. Tex. June 1, 2001)....16

*Heller v. Coca-Cola Co.*
646 N.Y.S.2d 524 (N.Y. App. Div. 1996)....17

*Israel v. Baxter Lab., Inc.*
466 F.2d 272 (D.C. Cir. 1972)....16



**TO BE FILED UNDER SEAL: CONTAINS CONFIDENTIAL AND/OR HIGHLY CONFIDENTIAL INFORMATION.**

*Kolari v. New York-Presbyterian Hosp.*
455 F.3d 118 (2d Cir. 2006)....................20

*Mrs. W. v. Tirozzi*
832 F.2d 748 (2d Cir. 1987)....................16, 17

*Mut. Pharm. Co. v. Watson Pharm. Co.*
2009 WL 340117 (C.D. Cal. 2009)....................17

*Nat'l Communs. Ass'n v. AT&T*
46 F.3d 220 (2d Cir. 1995)....................17

*PDK Labs, Inc. v Friedlander*
103 F.3d 1105 (2d Cir. 1997)....................11

*PhotoMedex, Inc. v. Irwin*
601 F.3d 919 (9th Cir. 2010) ....................11, 13

*Pom Wonderful LLC v. Coca-Cola Co.*
679 F.3d 1170 (9th Cir. 2012) *cert. granted*, 134 S. Ct. 895 (2014) ....................10, 11, 13, 15

*Quick v. Thompkins*
425 F.2d 260 (5th Cir. 1970) ....................18

*Rita Medical Systems, Inc. v. Resect Medical, Inc.*
2006 U.S. Dist LEXIS 52366 (N.D. Cal. 2006) ....................12

*Roche v. Adkins*
998 F.2d 1016 (7th Cir. 1993) ....................9

*Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*
902 F.2d 222 (3d Cir. 1990)....................10, 11

*Schiller v. Tower Semiconductor, Ltd.*
449 F.3d 286 (2d Cir. 2006)....................17

*SmithKline Beecham v Johnson & Johnson*
1996 U.S. Dist. LEXIS 7257 (S.D.N.Y 1996)....................12

*Subaru Distributors Corp. v. Subaru of America, Inc.*
425 F.3d 119 (2d Cir. 2005)....................9

*Summit Tech., Inc. v. High-Line Med. Instruments Co.*
933 F. Supp. 918 (C.D. Cal 1996) ....................12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
551 U.S. 308 (2007)....................9



**TO BE FILED UNDER SEAL: CONTAINS CONFIDENTIAL AND/OR HIGHLY CONFIDENTIAL INFORMATION.**

*U. S. v. Philadelphia Nat'l Bank*
374 U.S. 321 (1963)....................16

*U.S. v. Western Pac. RR Co.*
352 U.S. 59 (1956)....................16

**Statutes**

21 C.F.R. section 10.25(a) ....................10, 18

21 C.F.R. section 10.30....................10

21 C.F.R. section 807.81....................4

21 C.F.R. section 807.92....................4

21 C.F.R. section 810.10 *et seq.* ....................10, 16

21 U.S.C section 301 *et seq.* ....................9

21 U.S.C. section 321(m)....................6

21 U.S.C section 332 ....................10, 16

21 U.S.C. section 333 ....................10, 16

21 U.S.C. section 334 ....................10, 16

21 U.S.C. section 360c(i)(1)(E) ....................6, 13, 18

21 U.S.C. section 360c(a), *et seq.*....................3

21 U.S.C. section 372 ....................9

28 U.S.C. section 1367 ....................19

Federal Food, Drug, and Cosmetic Act .................... *passim*

Federal Food, Drug, and Cosmetic Act section 337 ....................10

Federal Food, Drug, and Cosmetic Act section 513(i) ....................6, 7

Federal Food, Drug, and Cosmetic Act section 513(i)(1)(E)....................5, 6

Federal Rule of Civil Procedure 12(b)(6) ....................1, 9, 12

Lanham Act.................... *passim*

New York General Business Law section 349 ....................8, 19, 20



**TO BE FILED UNDER SEAL: CONTAINS CONFIDENTIAL AND/OR HIGHLY CONFIDENTIAL INFORMATION.**

## INTRODUCTION

The complaint of plaintiff Church & Dwight Co., Inc. ("C&D") should be dismissed for failure to state a claim. The product at issue here – Clearblue Advanced Pregnancy Test with Weeks Estimator (the "Weeks Estimator" or the "Product") – is a device regulated by the U.S. Food & Drug Administration ("FDA"). The Product is a home pregnancy test that, in addition to informing a woman whether she is pregnant, also estimates (in the case of a positive result) a range of weeks since she last ovulated. That is, it estimates when she conceived and therefore when pregnancy began.

During FDA's clearance process for the Weeks Estimator, FDA reviewed the Product's packaging and approved it, subject to certain limitations and disclosures aimed at avoiding confusion over differences in methods for estimating when pregnancy begins. After the Product was launched in August 2013, the FDA contacted SPD Swiss Precision Diagnostics GmbH ("SPD") with issues about whether SPD was complying with the FDA's requirements, and thereafter engaged in a second review of the Product's packaging and other advertising materials. After that review, the FDA approved revised packaging for the Weeks Estimator, as well as a mitigation plan for the various issues raised by the FDA.

C&D's complaint is based on the allegation that the Weeks Estimator is not capable of estimating how many weeks a woman has been pregnant because, according to C&D, the FDA "specifically directed that the Product not be marketed for that use." Indeed, C&D maintains that the date of a woman's last menstrual period, and not the date of ovulation, is the only medically accepted reference point for determining when pregnancy begins. (Compl. ¶ 18.) C&D challenges various advertising materials on this theory.

Assuming these false allegations were true, as one is required to do on a motion to dismiss under Rule 12(b)(6), C&D's claims are nonetheless barred because they constitute an



**TO BE FILED UNDER SEAL: CONTAINS CONFIDENTIAL AND/OR HIGHLY CONFIDENTIAL INFORMATION.**

impermissible attempt to circumvent the FDA's decision to approve the marketing of the Weeks Estimator product – including approval of labeling essentially identical to what C&D is challenging here. Indeed, pursuant to its statutory authority under the federal Food, Drug, and Cosmetic Act ("FDCA"), the FDA ***already considered*** the precise "risks" exaggerated in C&D's complaint before the FDA cleared the Weeks Estimator to be marketed in the U.S. in accordance with the claims and disclosures on the product's labeling. All of the challenged advertising comports substantively with statements approved as accurate by the FDA.

Courts, including this one, have repeatedly held that private parties are not permitted to undermine the FDA's considered judgments through private litigation under the Lanham Act. Here, the questions implicated by C&D's complaint – whether ovulation marks the beginning of pregnancy; whether the FDA-mandated disclosures are effective to avoid misunderstandings by its users; whether any potential health risks due to "off-label" use of the Product are outweighed by the Weeks Estimator's benefits to consumers; and whether SPD has marketed the Weeks Estimator consistently with the FDA-imposed restrictions – are not appropriate for private adjudication under the Lanham Act. Rather, they are regulatory enforcement and technical expertise issues falling squarely within the exclusive purview of the FDA to regulate home pregnancy test products.

According to C&D's own allegations, adjudicating whether SPD's marketing of the Weeks Estimator violates the Lanham Act necessarily requires a determination that SPD's labeling and marketing of the Weeks Estimator contravenes the limitations imposed by the FDA. Indeed, C&D's complaint asks this Court to reverse the FDA's determination that the statements and labeling it ***approved*** for the Weeks Estimator are nonetheless insufficient to protect users from confusion and harm. The appropriate forum for C&D's complaint, if anywhere, is before the FDA, not a court. If the FDA shares C&D's wildly inflated concerns, or wishes to reconsider

its approval of the Weeks Estimator labeling, it can act. But C&D's complaint should be dismissed.

## BACKGROUND

C&D and SPD are competitors in the market for home pregnancy test kits. (Compl. ¶ 2.) C&D markets products under the First Response brand, among others. SPD markets its products under the Clearblue brand, among others. (Compl. ¶ 15.) In August 2013, SPD launched the Clearblue Advanced Digital Pregnancy Test With Weeks Estimator" (the "Weeks Estimator" or the "Product") in the U.S. (Compl. ¶ 2.) Like other home pregnancy tests, SPD's Weeks Estimator is designed to tell a woman whether she is pregnant. But unlike all other home pregnancy tests, the Weeks Estimator also tells a woman, if she obtains a pregnant result, how many weeks may have passed since she ovulated (in 3 result categories: 1-2, 2-3 and 3+ weeks) by measuring levels of human chorionic gonadotropin ("hCG"), a pregnancy-related hormone. (*See* Compl. ¶¶ 3, 17.)

### A. The Weeks Estimator Product Is A Medical Device Regulated By The U.S. Food and Drug Administration.

The FDCA, as amended by the Medical Devices Amendments of 1976, separates medical devices into three categories for purposes of the level of regulatory scrutiny they receive. "Class I" devices present "no unreasonable risk of illness or injury" and therefore are subject to minimal regulation. "Class II" devices present greater potential risk of harm and are therefore subject to somewhat greater regulatory scrutiny. "Class III" devices either "present a potential unreasonable risk of illness or injury" or are "purported or represented to be for use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health." Class III devices are subject to the strictest regulatory scrutiny. *See generally*, 21 U.S.C. § 360c(a), *et seq*.

Home pregnancy tests, such as the Weeks Estimator, are considered Class II medical devices. (Compl. ¶ 20.) The FDA does not permit a new home pregnancy test to be marketed unless the manufacturer has received clearance by the agency for the product to be marketed for a particular "intended use." (*Id.*) The review process for a new home pregnancy test product is commenced by the filing of a premarket notification submission to the FDA (known as a 510(k) submission). 21 C.F.R. § 807.81. The 510(k) submission provides a description of the new device, and a description of the intended use of the product, including "a general description of the diseases or conditions that the device will diagnose, treat, prevent, cure, or mitigate, including a description, where appropriate, of the patient population for which the device is intended." 21 C.F.R. § 807.92. (Compl. ¶ 20.)

The 510(k) application is intended to demonstrate to the FDA that the device is at least as safe and effective as – i.e., "substantially equivalent" or "SE" to – a legally marketed predicate device. 21 C.F.R. § 807.92. Hence, before marketing a Class II device, the submitter must receive a letter from the FDA that finds the device to be substantially equivalent, and states that the device can now be marketed in the US. This "clears" the device for commercial distribution, and so is generally referred to as a "clearance letter" or "SE letter." (Request for Judicial Notice In Support of Motion to Dismiss ("RJN"), ¶ 1, Exh. A.) On December 10, 2012, SPD received a clearance letter following submission of a 510(k) for the Weeks Estimator. (Compl., Exh. A [the FDA's December 10, 2012 Clearance Letter] (the "Clearance Letter").)

### B. <u>The FDA Applied Enhanced Scrutiny Over The Approval And Labeling For The Weeks Estimator Due To Its Finding Of A Heightened Risk Of Off-Label Use By Consumers.</u>

In the course of the FDA's review of the Product, the FDA's Office of In Vitro Diagnostics and Radiological Health ("OIVD") identified a concern over the proposed labeling of the Product: that women would misinterpret the product's results. (*See* Clearance Letter, p. 1.;



**TO BE FILED UNDER SEAL: CONTAINS CONFIDENTIAL AND/OR HIGHLY CONFIDENTIAL INFORMATION.**

Compl. ¶ 22.) The FDA's articulated concerns paralleled some of those asserted in C&D's Complaint. (*Id.*) The FDA noted that the Weeks Estimator result "is not aligned with gestational aging done by healthcare professionals (i.e., it will under-estimate gestational age by an average of 2 weeks)." (RJN, ¶ 2, Exh. B [Sept. 12 FDA Hold Letter] (the "Hold Letter").) In particular, the FDA's concern was that users may:

> misinterpret weeks results to be a substitution for gestational age determination or may misinterpret weeks results to mean they are pregnant and their pregnancy is progressing in a healthy manner (e.g., because they are moving from 1-2 weeks to 2-3 weeks to 3+ weeks according to device results). These misinterpretations may cause the user to delay or forego necessary care by a healthcare professional. For example, uses may not recognize symptoms of ectopic pregnancy because of improper assumptions based on this device output and may not seek appropriate medical care.

(*Id.*)

The FDA was clear about how its concerns over user misinterpretation of the Weeks Estimator results should be resolved: after noting that the existing Indications for Use ("IFU") described in SPD's 510(k) submission and labeling were inadequate to guard against such misinterpretations, it concluded that "[d]elay in appropriate care in these situations is a harmful health impact ***that may be prevented given adequate device labeling.***" (*Id.* (emphasis added).)

The FDA then invoked Section 513(i)(1)(E) of the FDCA, a specific statutory procedure under which the FDA evaluates a new Class II medical device with heightened scrutiny. If it then clears the subject device to be marketed, its clearance letter is referred to as a "SE With Limitations" (i.e., "substantial equivalence" *with limitations*) instead of the usual "SE" clearance letter. In particular, Section 513(i)(1)(E) gives the FDA Director who is responsible for the division governing the product at issue – in this case the FDA's Office of In Vitro Diagnostics



**TO BE FILED UNDER SEAL: CONTAINS CONFIDENTIAL AND/OR HIGHLY CONFIDENTIAL INFORMATION.**

and Radiological Health (OIVD) – additional power to control the actual labeling and other advertising for the product.[1] 21 U.S.C. §360c(i)(1)(E). Section 513(i) provides that "when determining that a device can be found substantially equivalent to a legally marketed device" – *i.e.*, cleared for sale – "the . . . Director . . . may require a statement in labeling that provides appropriate information regarding a use of the device not identified in the proposed labeling if . . . the Director determines and states in writing – (I) that there is a reasonable likelihood that the device will be used for an intended use not identified in the proposed labeling for the device," *i.e.*, an off-label use, and "(II) that such use could cause harm." *Id.* Section 513(i) then instructs the Director to, *inter alia*, "*specify the limitations* on the use of the device. . ." and "find the device substantially equivalent" if it meets the general requirements for SE clearance *and* "conforms with the specified limitations." *Id.* (emphasis added). The Director is not permitted to delegate this responsibility. *Id.* An SE With Limitations, therefore, *obligates* the FDA's Director to specify limitations, most often in the form of language on product labeling and in advertising, that will prevent consumers from using the device in an off-label way that could cause harm. (*See* RJN, ¶ 3, Exh. C.)

In invoking Section 513(i)(1)(E) of the FDCA, the FDA issued what is known as a hold letter. (*See* RJN, ¶ 2, Exh. B.) The Hold Letter in this case notified SPD that the FDA would place the 510(k) submission for the Weeks Estimator on hold pending receipt of certain additional information, and directed SPD to submit updated proposed labeling containing a revised IFU statement. (*Id.*)

---

[1]The term "labeling" under the FDCA means all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article. 21 U.S.C. § 321(m).

**C. The FDA Approves The Labeling And Marketing Of the Weeks Estimator Product.**

After FDA invoked its special authority under Section 513(i), FDA and SPD engaged in a detailed dialogue about the limitations and disclosures to be required for the Weeks Estimator package and product insert. (*See* RJN, ¶¶ 4-6, Exhs. D, E, F.) Then, on November 27, 2012, FDA sent an email to SPD indicating that the labeling SPD had provided to FDA in response to the Hold Letter "appears to meet our requests." (RJN, ¶ 7, Exh. G.) On December 10, 2012, the FDA issued its Clearance Letter, an SE With Limitations, clearing SPD to begin marketing the Weeks Estimator. The Clearance Letter specified essentially the same limitations on the Product's box and the package insert (as well as other marketing materials) as those that had been communicated in the Hold Letter and subsequent correspondence. (Clearance Letter, pp. 1, 3; Compl. ¶ 17.)

**D. The FDA's 2013-2014 Instructions To Modify Advertising.**

On November 12, 2013, SPD received an email from FDA, stating that "[i]t has come to our attention that SPD is marketing the 'Clearblue Advanced Pregnancy Test with Weeks Estimator' device in violation of the limitations in the FDA's clearance letter." (RJN, ¶ 8, Exh. H.) The email did not state how this issue came to FDA's attention, but FDA requested a teleconference "to communicate our concerns and receive further clarifications." (*Id.*)

The concerns the FDA outlined in the teleconference paralleled certain aspects of the challenges C&D advances in its complaint. (*Id.*) With respect to the Product carton, the FDA expressed concern about the insertion of the word "weeks" in the depicted display window and required that it be removed and replaced with the words "weeks along" outside the window – acknowledging and repeating that it had approved the latter phrase in the clearance process. (*Id.*) Notably, the stated basis of the FDA's concern about the use of the word "weeks" inside the



TO BE FILED UNDER SEAL: CONTAINS CONFIDENTIAL AND/OR HIGHLY CONFIDENTIAL INFORMATION.

display window was that the Product window itself does not literally display the word "weeks" when it returns a positive result, and so the windows on the package did not accurately reflect the actual windows on the test sticks. (*Id.*)

On November 22, 2013, SPD submitted an overall mitigation plan and drafts of packaging that removed the word "weeks" from the display windows and replaced it with the words "weeks along" beneath the display windows as originally approved by the FDA. Except to request a revision to the font size of the phrase "weeks along," and to request an asterisk directing consumers to the IFU on the side of the pack, the FDA approved the packaging. (RJN, ¶ 9, Exh. I.)

**E. <u>C&D's False Advertising Action</u>**

On January 29, 2014, C&D filed this Action, alleging that SPD's marketing of the Weeks Estimator constitutes false advertising under the Lanham Act and Section 349 of the New York General Business Law. (Compl. ¶¶ 63-70, 71-75.) The complaint also includes a cause of action for breach a settlement agreement between C&D and SPD related to prior false advertising and patent litigation between the parties. (Compl. ¶¶ 76-81.)

The gravamen of C&D's false advertising claims is the allegation that the labeling of the Weeks Estimator (and certain other advertising) falsely communicates that the Product estimates how long a woman has been pregnant in violation of purported FDA constraints. According to C&D, only the date of a woman's last menstrual period – not the date of ovulation – is a medically accepted reference point for estimating when pregnancy begins.

Even assuming the truth of these allegations (they are, however, false), C&D has failed to state actionable claims under the Lanham Act or New York law because a determination of its claims invades the exclusive domain of the FDA to regulate home pregnancy tests under FDCA. Accordingly, C&D's false advertising claims should be dismissed.



**TO BE FILED UNDER SEAL: CONTAINS CONFIDENTIAL AND/OR HIGHLY CONFIDENTIAL INFORMATION.**

13277.008 2734593v1

**ARGUMENT**

## I. The Legal Standard For A Motion To Dismiss Under Rule 12(b)(6)

Rule 12(b)(6) allows dismissal of a claim when the pleadings fail to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In order to survive dismissal, a plaintiff must assert a cognizable cause of action and allege facts that, if true, would support the claim. *Subaru Distributors Corp. v. Subaru of America, Inc.*, 425 F.3d 119, 122 (2d Cir. 2005). Dismissal is warranted where the complaint states no "actionable" grounds for relief. *Roche v. Adkins*, 998 F.2d 1016 (7th Cir. 1993).

In determining the adequacy of the complaint, a court may consider "any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, documents upon which the complaint relies and which are integral to the complaint," *Subaru Distributors Corp. v. Subaru of America, Inc.*, 425 F.3d 119, 122 (2d Cir. 2005), as well as matters of which judicial notice may be taken. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Even if a document is not incorporated by reference, the court may nevertheless consider it, without converting a Rule 12(b)(6) motion into one for summary judgment, where the "complaint relies heavily upon its terms and effect." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quotations omitted).[2]

## II. C&D's Lanham Act Claims Are Precluded Because They Seek To Enforce The FDCA And Undermine FDA Decisions.

The FDCA comprehensively regulates medical devices. 21 U.S.C § 301 *et seq.* The FDA is charged with investigating potential violations, *id.* §372, and has a number of

[2] SPD submits that, without referencing any facts beyond the complaint and clearance letter, the Court can and should determine that this action is barred under authorities cited below. That is, while SPD believes that the other documents are judicially noticeable, they are not *necessary* to reach the conclusion that the case must be dismissed. *See* SPD's accompanying RJN filed concurrently herewith.

enforcement powers. These range from injunction proceedings, to civil monetary penalties, product seizure, and recalls. *See* 21 U.S.C §§332-334; 21 C.F.R. § 810.10 *et seq.* (*e.g.*, the FDA has authority to order recalls of medical devices if it "finds that there is a reasonable probability that a device intended for human use would cause serious, adverse health consequences or death."). In addition, citizens may petition the FDA to take action. 21 C.F.R. §§10.25(a), 10.30. Under section 337 of the FDCA, however, enforcement power resides *exclusively* with the FDA and the U.S. Department of Justice. There is no private right of action to enforce the FDCA. *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 231 (3d Cir. 1990).

Against this statutory background, courts have consistently rejected attempts to circumvent the prohibition on private enforcement – or to undermine the FDA's exclusive authority – by the assertion of a Lanham Act challenge that would have such an effect. *See, e.g*, *Braintree Labs., Inc. v. Nephro-Tech, Inc.*, 96-2459-JWL, 1997 WL 94237 (D. Kan. Feb. 26, 1997) ("[B]ecause no private right of action exists under the FDCA, a plaintiff may not use the Lanham Act as an alternative vehicle by which to seek redress for an FDCA violation."). The judiciary has been especially reluctant to tread in the FDA-dominated areas of product labeling and medical devices. For example, in *Pom Wonderful LLC v. Coca-Cola Co.*, 679 F.3d 1170, 1177 (9th Cir. 2012) *cert. granted,* 134 S. Ct. 895 (2014), the Ninth Circuit affirmed summary judgment barring a Lanham Act challenge to the labeling on a juice product. After noting that this is an area subject to extensive regulation by the FDA, the Court explained its ruling:

> Despite speaking extensively to how prominently required words or statements must appear, the FDA has not (so far as we can tell) required [what the challenger claims is necessary to avoid deception]. . . If the FDA believes that more should be done to prevent deception, or that [the advertiser's label] misleads consumers, it can act. But under our precedent, for a court to act when the FDA has not – despite regulating extensively in the area – would risk undercutting the FDA's expert judgments and authority.

*Id.* at 1117.

The *Pom Wonderful* decision relied heavily on the Ninth Circuit's earlier decision in *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919 (9th Cir. 2010), which is especially apt here. There, a Class II medical device manufacturer, PhotoMedex, brought a Lanham Act claim against a competitor, Ra Medical Systems, alleging that Ra was misleading consumers about whether Ra's product had received a 510(k) clearance from the FDA. While Ra had received a clearance for an earlier version of the pertinent product, PhotoMedex contended that the new version of the product had been modified to a degree that a new clearance was necessary.

PhotoMedex contacted the FDA repeatedly, demanding "immediate enforcement action against Ra Medical." The FDA responded only that it would "evaluate" the matter to determine whether enforcement action was appropriate." *Id.* at 926. But the agency "never reached the conclusion sought by PhotoMedex."

The Ninth Circuit affirmed summary judgment in favor of Ra. In a passage of particular application here, the court explained:

> The statute assigns to the FDA the responsibility for taking enforcement action against Defendants. The FDA action could have taken different forms, including a clear statement that the Pharos was not covered by the prior clearance of the SurgiLight laser, an effort to stop Defendants from marketing their Pharos device, or action to impose a civil monetary penalty. The FDA did none of those things, however.

*Id.* at 928; *see also*, *Pom*, 679 F.3d 1170 ("PhotoMedex teaches that courts must generally prevent private parties from undermining, through private litigation, the FDA's considered judgments"); *PDK Labs, Inc. v Friedlander*, 103 F.3d 1105 (2d Cir. 1997) (claim barred because it seeks to privately enforce the FDCA); *Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 230-32 (3d Cir. 1990) (denying request for preliminary injunction; Lanham Act challenge to cough syrup label as misleading was barred because issue of whether an ingredient

is "inactive" was the subject of an FDA regulation and it is inappropriate for a federal court to use the Lanham Act "to determine preemptively how a federal administrative agency will interpret and enforce its own regulations"); *Rita Medical Systems, Inc. v. Resect Medical, Inc.*, 2006 U.S. Dist LEXIS 52366 (N.D. Cal. 2006) (preliminary injunction denied because Lanham Act claim would require court to evaluate whether the challenged claims are consistent with the 510(k) clearance for the medical device); *Braintree Laboratories*, 1997 U.S. Dist. LEXIS 2372 (motion to dismiss for failure to state a claim granted because Lanham Act claims "that require direct interpretation and application of the FDCA are not properly recognized because such matters are more appropriately addressed by the FDA"); *Summit Tech., Inc. v. High-Line Med. Instruments Co.,* 933 F. Supp. 918 (C.D. Cal 1996) (motion to dismiss Lanham Act claim regarding medical device granted because "the FDA has not yet determined how it will interpret and enforce its own regulations with regard to this question, and the Court must therefore decline to usurp the FDA's authority").

This Court, too, has repeatedly declined to allow a Lanham Act claim to proceed when it would risk substituting the Court's discretion for that of the FDA. In *Cytyc Corp. v. Neuromedical Systems, Inc.*, 12 F. Supp. 2d 296, 302 (S.D.N.Y. 1998), this Court dismissed a Lanham Act claim under Rule 12(b)(6) because advertising representations "that comport substantively with statements approved as accurate by the FDA cannot supply the basis" for such a claim. *See also SmithKline Beecham v Johnson & Johnson*, 1996 U.S. Dist. LEXIS 7257 (S.D.N.Y 1996) (preliminary injunction denied because challenged advertising was based on labeling approved by the FDA).

In *American Home Products Corp. v. Johnson & Johnson*, 672 F. Supp. 135, 145 (S.D.N.Y 1987), McNeilab, maker of Tylenol, claimed that American Home Products, maker of Anacin and Advil, engaged in false advertising under the Lanham Act. The FDA had mandated

that the packaging for Anacin contain a warning concerning the serious and even fatal risks of Reye Syndrome from giving Anacin to children and teenagers to treat symptoms of influenza and chicken pox. *Id.* The labeling on packaging for Anacin, however, contained the word "SAFE" in prominent letters on the front of the package with the FDA-required warning regarding the risks of Reye Syndrome relegated to the "fine print" on the back. Granting American Home Products' motion for summary judgment, the court explained:

> It is true that the [Reye Syndrome] warning is buried in the fine print on the back of the Anacin package, while the front bears in large block letters the legend "SAFE, FAST PAIN RELIEF." This obviously creates the possibility that Anacin could be administered to a child or teenager with flu or chicken pox by a parent who perceived only a message of safety without being alerted to the danger, or taken by such a youngster on his or her own initiative without any suspicion of hazard. ***The consequences of such a mistake may be serious or even fatal. But <u>this is a problem to be addressed by the FDA</u> and not by the courts in a Lanham Act suit***. Indeed, it is a problem which the FDA has already addressed, when it specifically approved the Anacin label in its entirety. There is no apparent reason why McNeil cannot ask the FDA to reconsider that approval in light of the survey evidence it has presented here to show the message users take from the Anacin package.

*American Home*, 672 F. Supp. at 145 (all emphasis added).[3]

According to *American Home Products*, a competitor is precluded from challenging the sufficiency of a product's label and marketing claims when the FDA has already approved those claims fully cognizant the risk of potential harm (including death) resulting from consumer misunderstanding about the IFU and performance of the product.

As in *American Home Products*, as well as *PhotoMedex*, and *Pom Wonderful*, C&D's

[3] C&D may argue that some these cases are inapposite because they involve pharmaceuticals, over which FDA *usually* has more power to regulate specific advertising language than over medical devices. But in this case, FDA was issuing an SE with limitations, which, pursuant to 21 U.S.C. §360c(i)(1)(E), gives FDA not just the right but the *obligation* to dictate advertising language protective of consumers. These cases are therefore directly on point.

allegations fall squarely within the prohibition against circumventing the rule against private enforcement of the FDCA. C&D's complaint is littered with admissions that the Weeks Estimator is regulated by the FDA, and indeed relies on the contention that SPD's has failed to comply with the FDA's mandates:

- "SPD has falsely advertised the Product as being capable of estimating how many weeks a woman has been pregnant, notwithstanding . . . that the ***[FDA], which regulates home pregnancy tests, specifically directed*** that the Product not be marketed for that use." (Compl. ¶ 2.)[4]
- "The ***FDA cleared*** the Product to be marketed for the former use, but ***expressly prohibited SPD*** from marketing the Product as a means for estimating the length of pregnancy." (Compl. ¶ 3.)
- "The FDA explicitly warned SPD . . . and in unmistakable and forceful language, ***prohibited SPD*** from marketing the Product . . ." (*Id.*)
- "By opting to begin marketing the Product pursuant to the FDA's clearance letter, SPD accepted the ***restrictions and limitations*** contained therein." (Compl. ¶ 4.)
- "The FDA determined that it ***cannot be marketed*** for that purpose. . ." (Compl. ¶ 5.)
- "[H]ome pregnancy test kits are considered to be medical devices and are ***regulated by the FDA***. The ***FDA does not permit*** a new home pregnancy test kit to be marketed unless the manufacturer has received clearance by the agency for the product to be marketed for a particular 'intended use.'" (Compl. ¶ 20.)
- "When the ***FDA decides to clear*** a home pregnancy test kit . . ." (Compl. 21.)
- "The [FDA's] Clearance Letter ***directs*** that 'Weeks Estimator' Results should not be expressed as 'weeks pregnant' and should only be explained as the number of weeks that may have passed since ovulation." (Compl. ¶ 22.)
- "The [FDA's] Clearance Letter also instructs that '[p]erformance of the Weeks Estimator should not be displayed on [the] box labeling . . . " (*Id.*)
- "The Clearance Letter also ***requires*** that the Product's 'indications for us' statement 'must be prominently displayed in all labeling, including puch box, and carton labels . . . " (Compl. ¶ 23.)
- "SPD has completely defied the FDA's instructions . . ." (Compl. ¶ 24.)
- SPD "in ***direct contravention of the FDA's restrictions*** and limitations in the Clearance Letter and in violation of the Lanham Act and related state law –

[4] The emphasis in the following experts from C&D's complaint has been added.



TO BE FILED UNDER SEAL: CONTAINS
CONFIDENTIAL AND/OR HIGHLY CONFIDENTIAL INFORMATION.

consistently advertised it as being capable of estimating how many weeks a woman has been pregnant." (Compl. ¶ 25.)

- "In ***violation of the FDA's directives*** . . ." (Compl. ¶ 27.)
- "Notably, the ***FDA-mandated*** indications for use statement does not appear at all." (Compl. ¶ 34.)
- "In ***violation of the FDA's instructions*** in the Clearance Letter, it is neither in close proximity to the trade name nor in same font size or in bold font." (Compl. ¶ 38.)
- "Nor do they contain the ***FDA-mandated*** indications of use statement." (Compl. ¶ 40.)
- "[I]n ***clearing the Product, the FDA expressly found*** that it cannot be used to estimate how many weeks a woman has been pregnant. The FDA's finding in this regard is correct: the medical profession dates pregnancy from a woman's last menstrual period, not from ovulation." (Compl. ¶ 42.)

These allegations make clear that C&D's Lanham Act claims are precluded.

First, a determination that the Product labeling and related marketing claims for the Weeks Estimator are prohibited as false under the Lanham Act will undermine the FDA's determination that SPD *could* market the Weeks Estimator *using these claims*, or those that "comport substantively" with the claims "approved as accurate by the FDA." *Cytyc,* 12 F. Supp. 2d at 302. Second, *even if* SPD had "defied" the FDA's restrictions and requirements in marketing the Weeks Estimator, as C&D also alleges, enforcement of the FDA's decisions and regulations rests exclusively with the FDA, not C&D or this Court in a private Lanham Act action. Finally, if C&D's allegations concerning the state of the medical science – *i.e.*, that a woman's last menstrual period, not ovulation, is the only appropriate method for determining gestational age, "there is no apparent reason why [C&D] cannot ask the FDA" to take action. *American Home*, 672 F. Supp. at 145. If the FDA agrees, and concludes that "more should be done to prevent deception, or that [SPD] misleads consumers, it can act." *Pom Wonderful*, 679 F.3d at 1177. Indeed, FDA took steps with respect to the very advertising C&D is challenging (perhaps, for all we know, at the prompting of C&D) but required none of the remedies C&D

seeks in its complaint – even though it has the power to impose them. (RJN, ¶ 9, Exh. I.); 21 U.S.C §§332-334; 21 C.F.R. § 810.10 *et seq.* This Court simply cannot adjudicate C&D's claims without treading in exclusive FDA territory.

## III. C&D's Lanham Act Claims Are Barred Under The Doctrine Of Primary Jurisdiction.

A related body of law, establishing the "primary jurisdiction" doctrine, calls for "judicial abstention in cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." *U. S. v. Philadelphia Nat'l Bank,* 374 U.S. 321, 353 (1963). It "is used to fix forum priority when the courts and an administrative agency have concurrent jurisdiction over an issue." *Mrs. W. v. Tirozzi*, 832 F.2d 748, 758-759 (2d Cir. 1987) (citing *Far E. Conf. v. United States*, 342 U.S. 570, 574-75 (1952)). The aim of the primary jurisdiction doctrine is to "promot[e] proper relationships between the courts and administrative agencies charged with particular regulatory duties" and "to allocate initial decisionmaking responsibility between courts and agencies" so as "to ensure that they do not work at cross-purposes." *Ellis v. Tribune TV Co.*, 443 F.3d 71, 81 (2d Cir. 2006) (citations and quotations omitted). Importantly, it enables the resolution of technical questions of fact through the specialized expertise of the relevant agency *before* judicial adjudication of legal claims. *See U.S. v. Western Pac. RR Co.*, 352 U.S. 59, 64 (1956).

Thus, the doctrine properly applies where – as here – "enforcement of the claim requires resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *U.S. v. Western Pac. RR Co.*, 352 U.S. at 64.

Courts applying the primary jurisdiction doctrine regularly defer to the FDA. *See, e.g., Israel v. Baxter Lab., Inc.*, 466 F.2d 272, 281 (D.C. Cir. 1972) (deferring where "enforcement of claims involves. . . a function clearly within the 'specific competence' of the FDA"); *Healthpoint*



**TO BE FILED UNDER SEAL: CONTAINS CONFIDENTIAL AND/OR HIGHLY CONFIDENTIAL INFORMATION.**

13277.008 2734593v1

*Ltd. v. Stratus Pharm., Inc.*, 2001 U.S. Dist. LEXIS 22229, *26 (E.D. Tex. June 1, 2001) (finding claims of false and misleading advertising of drug "too close to the exclusive enforcement domain of the FDA"); *Heller v. Coca-Cola Co.*, 646 N.Y.S.2d 524 (N.Y. App. Div. 1996) (same, involving challenge to product labeling), *Bernhardt v. Pfizer, Inc.*, 2000 U.S. Dist. LEXIS 16963, at *6-8 (S.D.N.Y. Nov. 16, 2000) (same re: failure to disclose negative clinical results); *Mut. Pharm. Co. v. Watson Pharm. Co.*, 2009 WL 340117, at *5 (C.D. Cal. 2009) (finding disputes regarding product labels and inserts fall "squarely within the primary jurisdiction of the FDA").

While "[n]o fixed formula has been established" with respect to the doctrine's application, *Nat'l Communs. Ass'n v. AT&T*, 46 F.3d 220, 223 (2d Cir. 1995), the doctrine "potentially applies when federal courts have original jurisdiction to hear the claim and the claim requires the resolution of issues placed within the special competence of an administrative body." *Mrs. W.*, 832 F.2d at 758 (citing *United States v. Western Pac. Ry. Co*., 352 U.S. at 63-64). Courts generally consider the following four factors when determining whether the doctrine applies:

> (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;
>
> (2) whether the question at issue is particularly within the agency's discretion;
>
> (3) whether there exists a substantial danger of inconsistent rulings; and
>
> (4) whether a prior application to the agency has been made.

*Schiller v. Tower Semiconductor, Ltd.*, 449 F.3d 286, 295 (2d Cir. 2006).

The basis for C&D's claim here are the allegations that (a) the Weeks Estimator does not estimate how long a woman has been pregnant because ovulation is not a legitimate reference point for such an estimate; and (b) the FDA prohibited SPD from communicating any message

inconsistent with C&D's view of the science. Both propositions are clearly matters for FDA decision-making – the first is a question of science and medicine, not of law, and the second is an issue the FDA is uniquely suited to resolve for obvious reasons. In other words, C&D's claim invokes the expertise of those at the FDA in the OIVD in the Center for Devices and Radiological Health ("CDRH"), who are charged with review of medical devices, and in particular, over-the-counter pregnancy tests. Under the SE With Limitations process, OIVD/CDRH has both the right and the responsibility to review and approve advertising language for the Weeks Estimator product. 21 U.S.C. §360c(i)(1)(E). It has done so. (Clearance Letter, p.1.) There is, then, a risk of the court issuing an order at odds with the FDA's determination of language that renders the Product "safe and effective."

C&D recently invoked this doctrine to secure the dismissal of a false advertising claim directed to the FDA-regulated label of one of its Trojan brand condom products. In *Gordon v. Church & Dwight Co.*, 2010 U.S. Dist. LEXIS 32777, 4 (N.D. Cal. Apr. 2, 2010) C&D correctly and successfully argued that a claim like the one it advances now must be dismissed. The principles C&D vindicated there apply with greater force here.

If C&D takes issue with FDA's decisions, C&D has recourse with the FDA: it may file a citizen's petition seeking further the FDA action. 21 C.F.R. §§10.25(a) ("An interested person may petition the Commissioner to issue, amend, or revoke a regulation or order, or to take or refrain from taking any other form of administrative action"); *Quick v. Thompkins*, 425 F.2d 260, 261 (5th Cir. 1970) (Recourse must first be sought through administrative channels where allegations are mattes of internal prison administration); *Frank v. Delta Airlines Inc.*, 314 F.3d 195, 201 (5th Cir. 2002) (alleged victims of improper drug testing by airline must first avail themselves of recourse through an administrative procedure under the FAA before seeking review in federal court). Under the SE With Limitations process, the advertising language C&D



**TO BE FILED UNDER SEAL: CONTAINS CONFIDENTIAL AND/OR HIGHLY CONFIDENTIAL INFORMATION.**

challenges is squarely within the purview of the FDA, and should stay there.

## IV. C&D's State Law Cause Of Action Is Based On The Same Factual Allegations, And Suffers From The Same Deficiencies, As Its Lanham Act Claim.

C&D bases its cause of action under Section 349 of the New York General Business Law upon the same factual allegations as its Lanham Act claim – that SPD's marketing of the Weeks Estimator constitutes false or misleading advertising. (Compl. ¶¶ 71-75.) Section 349 of the New York General Business Law provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y. Gen. Bus. Law § 349. The pleading standard for a Section 349 claim is "substantially the same" as that for pleading a Lanham Act cause of action. *Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 636 (S.D.N.Y. 2008).

For the same reasons that C&D is barred from making its Lanham Act claim – because doing so seeks enforcement of the FDCA and intrudes into the exclusive domain of the FDA to regulate the labeling and marketing of medical devices such as the Weeks Estimator – C&D's state-law false advertising claim must also be dismissed. *Avon Products, Inc. v. S.C. Johnson & Son, Inc.*, 984 F. Supp. 768, 800 (S.D.N.Y. 1997) (denying false advertising claim under Section 349 "for the same reasons" as denying false advertising claim under the Lanham Act, noting that the standards under the Lanham Act are "substantially the same" as those applied to Section 349 of the New York General Business Law).

## V. If The Court Dismisses C&D's Lanham Act Claim, It Should Decline To Exercise Supplemental Jurisdiction Over C&D's State Law And Breach of Contract Claims.

Where all federal-law claims are eliminated before trial, a district court should decline to exercise supplemental jurisdiction over the remaining state-law claims. 28 U.S.C. § 1367; *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

If the Court dismisses C&D's Lanham Act claim – as it should, for the reasons stated

herein – the Court should decline to exercise supplemental jurisdiction over C&D's remaining state law claims. Doing so, given that this Action remains in its incipiency, will promote judicial economy, convenience, fairness, and comity. *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006).

**CONCLUSION**

For the foregoing reasons, C&D's false advertising claims under the Lanham Act and Section 349 of the New York General Business Law should be dismissed *with prejudice*. C&D's claim for breach of settlement agreement should be dismissed.



**TO BE FILED UNDER SEAL: CONTAINS CONFIDENTIAL AND/OR HIGHLY CONFIDENTIAL INFORMATION.**

DATED: March 4, 2014

Respectfully submitted,

By: ______________________________

COBLENTZ PATCH DUFFY & BASS LLP
Jeffrey G. Knowles*
Julia D. Greer*
David Mehretu (DM 1747)
One Ferry Building, Suite 200
San Francisco, CA 94111
Telephone: 415.391.4800
Facsimile: 415.989.1663
Email: ef-jgk@cpdb.com
ef-jdg@cpdb.com
ef-dxm@cpdb.com

* Admitted *pro hac vice*

GOODWIN | PROCTER LLP
Ira Levy (IL 2632)
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
T: (212) 459-7478
F: (212) 355-3333
ilevy@goodwinprocter.com

*Attorneys for Defendant*
SPD SWISS PRECISION DIAGNOSTICS GMBH