UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

CHURCH & DWIGHT CO., INC.,                     :

                                               :    14 Civ. 585 (AJN)

                   Plaintiff,                  :

                                               :

             v.                                :

                                               :

SPD SWISS PRECISION DIAGNOSTICS                :
GMBH,                                          :

                                               :

                   Defendant.                  :

                                               :

———————————————————— x


**DIRECT TESTIMONY OF
KEITH R. UGONE, PH.D.**

**CONTAINS HIGHLY CONFIDENTIAL AND CONFIDENTIAL INFORMATION**

## TABLE OF CONTENTS

I.    OVERVIEW OF ASSIGNMENT ............................................................. 1

II.    SUMMARY OF OPINIONS ................................................................. 2

     A. Evaluation Of Claimed Disgorgement Remedy Attributable To At-Issue Advertising................................................................. 3

       1. Calculation Of Weeks Estimator Profits Attributable To At-Issue Advertising During Periods Under Consideration................... 4

       2. The Transfer Prices Used By Dr. Bell Are Not Suited To Evaluating The Profits Attributable To The Weeks Estimator At A Product Level................................... 6

     B. Evaluation Of C&D's Claimed Lost Profits Attributable To At-Issue Advertising..... 7

       1. Economic Causation And First Response's Claimed Lost Profits Attributable To Weeks Estimator's At-Issue Advertising................. 7

       2. Calculations Of Claimed Lost Profits For First Response Attributable To At-Issue Advertising ................................................. 9

III.   QUALIFICATIONS AND EXPERIENCE ........................................ 12

IV.   FACTS, DATA, AND INFORMATION CONSIDERED ................. 13

V.    OVERVIEW OF RELEVANT PRODUCTS ..................................... 15

     A. First Response Pregnancy Products.................................... 17

     B. Clearblue Pregnancy Test Products.................................... 18

VI.   OVERVIEW OF SPD'S JOINT VENTURE .................................. 20

VII.   CONCEPTUAL FRAMEWORK FOR EVALUATION OF CLAIMED DAMAGES ATTRIBUTABLE TO AT-ISSUE ADVERTISING ............................. 21

VIII. EVALUATION OF CLAIMED DISGORGEMENT REMEDY ATTRIBUTABLE TO AT-ISSUE ADVERTISING ............................. 26

     A. Overview Of Financial Data Produced By SPD ........................ 29

     B. Overview Of Accounting Methods Used By SPD........................ 31

     C. Calculation Of Weeks Estimator Sales And Profits Attributable To At-Issue Advertising During Periods Under Consideration Using Management Accounting.. 33

     D. Using Transfer Prices As The Basis For A Disgorgement Analysis ......................... 42

       1. Overview Of Transfer Prices As Used By SPD......................... 43

       2. The Transfer Prices Used By Dr. Bell Are Not Suited For Evaluating Actual Profits Attributable To A Specific Product.......................... 45

IX.   ECONOMIC CAUSATION AND FIRST RESPONSE'S CLAIMED LOST PROFITS ATTRIBUTABLE TO WEEKS ESTIMATOR'S AT-ISSUE ADVERTISING ............................. 49

     A. First Response's Market Performance Since August 2013 Demonstrates The Limited Effect Of The Weeks Estimator On First Response Sales ......................... 50

    1.  █████████████████████████████████████████████████

    2.  Declines In First Response Market Share Following Weeks Estimator Launch Are Consistent With Historical Fluctuations .................................................. 52

  B.  Factors Unrelated To The Weeks Estimator Affected First Response Sales And Market Share Over The Damages Period .......................................................... 55

    1.  First Response Early Result Has Lost Sales To Clearblue Visual Due To Strong Competition On Price ...................................................................... 56

    2.  ██████████████████████████████████ Adversely Affected Sales Growth .......................................................................... 60

X.    **CALCULATIONS OF CLAIMED LOST PROFITS FOR FIRST RESPONSE ATTRIBUTABLE TO AT-ISSUE ADVERTISING ................................................ 64**

  A.  Evaluating Lost Profits Under A Market Share Allocation Approach Requires Appropriate Determinations Of Lost First Response Sales Caused By The At-Issue Advertising And Of Incremental Profitability .......................................... 65

    1.  Weeks Estimator Sales Must Be Apportioned To Only Those Sales Caused By The At-Issue Advertising ...................................................................... 67

    2.  ███████████████████████████████████ .......................................... 69

    3.  Calculations Based Upon A Market Share Allocation Approach Isolating Lost Sales Caused By At-Issue Advertising And Using A Correct Incremental Profit Margin_____ .................................................................... 73

    4.  Additional Evidence Demonstrates That This Lost Profits Measure Is A Conservatively High Estimate Of C&D's Lost Profits.......................................... 75

  B.  Calculations Based Upon ████████████████████████ .......................................... 78

  C.  Calculations Based Upon First Response Sales During Period Weeks Estimator Was Unavailable ............................................................................................ 80

  D.  Summary Of Lost Profits Damages .............................................................. 86

I, Keith R. Ugone, hereby declare as follows:

## I.   OVERVIEW OF ASSIGNMENT

      1. I have been retained as an economics and damages expert for SPD Swiss Precision Diagnostics GmbH ("SPD" or "Defendant") in the matter of *Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics GmbH.* SPD is a joint venture between Alere, Inc. ("Alere") and the Procter & Gamble Co. ("Procter & Gamble" or "P&G"). I understand that this matter was bifurcated and that liability on false advertising claims has already been determined and that the case is proceeding to trial on damages only. It is my understanding that Church & Dwight Co., Inc. ("Church & Dwight," "C&D," or "Plaintiff") pursued claims of false advertising against SPD's "Clearblue Advanced Pregnancy Test with Weeks Estimator" ("Weeks Estimator") product. Weeks Estimator provided (a) an indication of whether a woman was pregnant and (b) if pregnant, an estimate of how many weeks have passed since ovulation.[1] Generally, in the liability phase, C&D contended "that the product's name and advertising convey the false message that the product tells a woman how many weeks pregnant she is consistent with how a doctor would estimate weeks pregnant."[2]

      2. I understand that following a trial on liability, the Court determined that SPD engaged in false advertising relating to the Weeks Estimator and that C&D was entitled to a permanent injunction, *inter alia.*[3] On November 16, 2016, SPD formally withdrew the Weeks

---

[1]  *See, e.g.* Opinion & Order, Church & Dwight Co., Inc., v. SPD Swiss Precision Diagnostics, GmbH, July 1, 2015 ("July 2015 Decision") (DTX 828), at 1.

[2]  July 2015 Decision (DTX 828), at 1. I understand that C&D argued that this message was false "because doctors estimate pregnancy duration based on how many weeks have passed since a woman's last menstrual period – not weeks since ovulation."

[3]  July 2015 Decision DTX 828), at 1 – 2.

Estimator from the marketplace.[4]  As a consequence of SPD's at-issue advertising, C&D is seeking damages in the form of a disgorgement of SPD's profits or C&D's lost profits attributable to the at-issue advertising.

3.  I submitted an expert report on March 24, 2017 (the "Ugone Report") wherein I provided an independent evaluation of C&D's damages in this matter.  In response to an expert report issued by Dr. Gregory Bell on March 24, 2017 (the "Bell Report") (DTX 831),[5] I issued a rebuttal expert report on April 21, 2007 (the "Ugone Rebuttal Report").  Dr. Bell also issued a rebuttal expert report on April 21, 2007 (the "Bell Rebuttal Report") (DTX 835).  On August 25, 2017, Dr. Bell submitted his direct testimony in support of C&D's claimed disgorgement remedy and claimed lost profits damages in this matter ("Bell Direct Testimony").

4.  I have been asked by counsel for SPD to (a) evaluate the economic harm suffered by C&D based upon the Court's findings of fact and conclusions of law and (b) evaluate the economic, disgorgement, and damages-related opinions contained in the Bell Direct Testimony. My opinions and the bases for my opinions are contained in the remainder of this direct testimony.

## II.    SUMMARY OF OPINIONS[6]

5.  My evaluation of C&D's claimed damages is based upon (a) my economics and damages quantification training and experience, (b) documentary evidence, (c) deposition testimony as offered at trial through deposition designations, (d) direct testimony declarations of SPD's witnesses in this damages phase, (e) direct testimony declarations offered in the liability

---

[4]   JX 49, at SPD-NY-D-001792.

[5]   Dr. Bell submitted an errata letter to the Bell Report on April 20, 2017 ("Bell Errata Letter") (DTX 833).

[6]   This Summary of Opinions is intended to be an overview.  A full description of my opinions is contained throughout the narrative to this direct testimony and the associated exhibits.

phase, (f) direct testimony declarations of C&D's witnesses in this damages phase, (g) my review of the reports and direct testimony of C&D's experts, and (h) standard damage quantification techniques. A summary of my opinions with regard to C&D's claimed disgorgement remedy and claimed lost profit damages attributable to the at-issue advertising is provided below.

A. **Evaluation Of Claimed Disgorgement Remedy Attributable To At-Issue Advertising**

6. It is my understanding that C&D is pursuing a disgorgement remedy in this matter. From an economic perspective, a proper evaluation of a disgorgement remedy attributable to the at-issue advertising requires the identification and evaluation of (a) the additional revenues earned because of the at-issue advertising and (b) the additional costs associated with the additional sales that were made because of the at-issue advertising. The "additional revenues" minus "additional costs" difference yields the incremental profits earned because of the at-issue advertising. The following facts and circumstances, both of which Dr. Bell fails to account for, should be considered in evaluating the aforementioned incremental profits in this matter.

  a. Isolation Of Incremental Profits Attributable To The At-Issue Advertising. From an economic perspective, evaluating a disgorgement remedy in this matter requires a determination of SPD's sales of the Weeks Estimator attributable to the at-issue advertising. In determining the portion of Weeks Estimator sales attributable to the at-issue advertising, I utilized the estimated percentages from the survey conducted by Mr. Poret (i.e., 21.9% for the launch package and 17.3% for the revised package). The Court relied upon these percentages when considering liability in this case.[7]

  b. Determination Of The Relevant Period For A Disgorgement Remedy. I have been advised by counsel that in the Southern District of New York, the use of disgorgement as a damages remedy under false advertising claims requires a finding of intentional deception. I understand that the Court made

---

[7] In the liability phase of this trial, the Court used the 21.9% figure as an estimate of the "number of [Poret survey] participants [who] understood the Launch Package to communicate the message that the Weeks Estimator provides an estimate of weeks pregnant that is consistent with the estimate a doctor would provide." (July 2015 Decision at 35.) The 17.3% figure is the analogous percentage for the revised package. (Deposition of Hal Poret, May 11, 2017 ("Poret Deposition" or "Poret Dep.")) (DTX 841) at 61-62; Poret Direct Testimony, February 3, 2015 (DTX 815), at 35.)

a finding of intentional deception with respect to the packaging and claims made at the launch of the Weeks Estimator, but that the Court declined to do so with respect to the subsequent revised packaging and claims associated with that product.   Hence, I understand that the relevant period for disgorgement analysis is the period that SPD sold Weeks Estimator with the launch package (which is assumed to be the period until June 2014).

7.   In contrast to the facts and circumstances described above, Dr. Bell performed no apportionment in his analysis.  Rather, Dr. Bell presented all Weeks Estimator revenues and did not limit his calculations to (a) only those sales attributable to the at-issue advertising and (b) only those sales for which there was a finding of intentional deception.

### 1.   Calculation Of Weeks Estimator Profits Attributable To At-Issue Advertising During Periods Under Consideration

8.   From an economic perspective and based upon legal representations made by counsel, the relevant measure of a disgorgement remedy in this matter is a calculation based upon only the incremental launch package sales that were sold because of the at-issue advertising.  This approach accounts for (a) the need to isolate profits attributable to the at-issue advertising and (b) the fact that the finding of intentional deception that is required for a disgorgement remedy was made only for the launch package.

9.   Based upon these considerations and the calculations described in detail in **Section VIII** and in the demonstrative exhibits to this direct testimony, from an economic perspective the appropriate measure of SPD profits resulting from a disgorgement analysis is that SPD incurred a ███████████   ██████████████████████████████████ ████████.  In other words, the incremental profits to SPD from sales of the launch package that were attributable to the at-issue advertising was a ████████████.

10.   Although this result is most relevant and appropriate from an economic perspective to a claimed disgorgement remedy, should the Court determine that (a) the relevant

- 4 –

time period for disgorgement damages is not limited to the launch package and/or (b) profits on all sales of the Weeks Estimator should be included in the disgorgement remedy, I have presented the following three additional alternative analyses ███████████████████████

██████████████████████

a. <u>Profits Associated With Launch And Revised Packages Attributable To At-Issue Advertising</u>. SPD had total incremental profits relating to sales of the Weeks Estimator launch and revised packages that were attributable to the at-issue advertising of ███████

b. <u>Profits Associated With All Sales Of Launch Package</u>. SPD had total losses relating to all sales of the Weeks Estimator launch package of ████████ There would be no profits to disgorge under this scenario.

c. <u>Profits Associated With All Sales Of Launch And Revised Packages</u>. SPD had total incremental profits relating to all sales of the Weeks Estimator launch and revised packages of ███████

**Table 1**
**Summary of Weeks Estimator Profits Calculations[8]**

| Description Of Calculation | WE Profits / (Losses) |
|---|---|
| **Relevant Measure of WE Profits for Disgorgement Remedy** | |
| Profits on <u>At-Issue Sales</u> of the <u>Launch Package only</u> | ████ |
| **Alternative Measures of WE Profits for Disgorgement Remedy** | |
| Profits on <u>At-Issue Sales</u> of <u>Launch and Revised Packages</u> | ████ |
| Profits on <u>All Sales</u> of <u>Launch Package only</u> | █████ |
| Profits on <u>All Sales</u> of <u>Launch and Revised Packages</u> | ████ |

---

[8] I understand that after September 2016 (i.e., the end of the period for which the Weeks Estimator's

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████

Highly Confidential - Attorneys' Eyes Only (SPD)

2.



Highly Confidential - Attorneys' Eyes Only (SPD)



### B. Evaluation Of C&D's Claimed Lost Profits Attributable To At-Issue Advertising

12.  It is my understanding that C&D also is pursuing a lost profits remedy in this matter.  From an economic and conceptual perspective, C&D's lost profits associated with SPD's wrongful conduct are the additional profits (if any) that C&D would have earned had SPD utilized non-misleading advertising regarding the functionalities of the Weeks Estimator.  This is different from a calculation that evaluates the additional profits (if any) that C&D would have made had SPD not launched the Weeks Estimator at all.  Evaluating lost profits in this matter requires demonstrating an economic causal link between the at-issue advertising and C&D's claimed lost profits after accounting for other market-related pressures that would have affected sales of C&D's competing product – First Response (i.e., after accounting for alternative reasons for movements in First Response sales).  A summary of my evaluation of C&D's claimed lost profits is presented below.

#### 1. Economic Causation And First Response's Claimed Lost Profits Attributable To Weeks Estimator's At-Issue Advertising

13.  A claim of lost profits requires a demonstration of economic causation between the at-issue conduct and the diminished profits of the plaintiff.  In the present matter, claimed lost profits require a demonstration that the at-issue conduct caused C&D to achieve lower profits than it would have if SPD had used non-misleading advertising.  The following evidence demonstrates

Highly Confidential - Attorneys' Eyes Only (SPD)

the limited general effect of the portion of Weeks Estimator sales attributable to the at-issue advertising on First Response's commercial performance.

a. 

b. <u>Factors Unrelated To The Weeks Estimator Affected First Response Pregnancy Sales And Market Share Over The Damages Period</u>.   Many factors unrelated to the Weeks Estimator have affected First Response sales and market share, and hence declining sales for the Early Result product are not attributable solely to the Weeks Estimator (let alone to the at-issue advertising).

i. <u>Price Competition From Clearblue Analog Products</u>.   Immediately prior to and throughout the damages period, Clearblue analog products (i.e., the non-digital pregnancy test products that display one or two lines to indicate whether a woman is pregnant or not, often referred to as "visual") were in strong price-based competition with First Response products – both through price cuts and through promotional pricing.



- 8 –

Highly Confidential - Attorneys' Eyes Only (C&D)

**2.  Calculations Of Claimed Lost Profits For First Response Attributable To At-Issue Advertising**

14.  The facts and circumstances of this matter allow for lost profits to be calculated based upon a variety of approaches, including at least (a) a market share allocation approach where Weeks Estimator sales attributable to the at-issue advertising are allocated based upon First Response's (adjusted) market share, (b) ███████████████████████████████████████ ████████████████████████████████████, and (c) comparisons of First Response sales between periods that the Weeks Estimator was available on the market and periods that it was not.  Although the market share allocation approach is my primary method of calculating lost profits damages, the estimates based upon the other two approaches are similar in magnitude. Dr. Bell used the same market share allocation methodology to calculate lost profits, with two important differences from my approach (discussed in detail below): (a) he failed to apportion lost profits only to those sales attributable to the at-issue advertising and (b) he used a First Response profit margin that exceeded the measure used by C&D for internal measurements of the impact of Weeks Estimator sales.

15.  In light of my analyses and after review of the direct testimony, deposition testimony, and reports of C&D's personnel and experts, the following conclusions can be drawn regarding C&D's lost profits in this matter.

    a.  <u>Primary Approach: Calculations Of Lost Profits Based Upon Market Share Allocation</u>.  A market share allocation approach to evaluating lost profits (such as that used by Dr. Bell) requires (a) determining the portion of SPD's sales of the Weeks Estimator that were attributable to (i.e., caused by) the at-issue advertising relative to non-misleading advertising (and the impact of those sales on First Response sales) and (b) determining the incremental profits associated with First Response sales that were lost as a result of the at-issue advertising.

        i.  <u>Weeks Estimator Sales Must Be Apportioned To Only Those Sales Caused By The At-Issue Advertising</u>.  In order to determine the lost

profits because of the specific unlawful conduct of a competitor, a lost profits analysis must isolate the impact of that conduct on sales performance.   However, contrary to available evidence, Dr. Bell assumed in his calculation of claimed lost profits damages that all claimed lost First Response sales associated generally with the Weeks Estimator product were attributable solely to the at-issue advertising. Dr. Bell's assumption overstates the effect of the at-issue advertising on sales of First Response.   Given the conservative assumption that the results of the Poret survey demonstrate the portion of Weeks Estimator sales attributable to the at-issue advertising, Dr. Bell's failure to isolate the lost sales caused by the at-issue advertising results in an overstatement of lost sales by factors of 4.6 (launch package) to 5.8 (revised package).

ii.  ████████████████████████████████████  When Evaluating Lost Profits Attributable To The At-Issue Advertising.  From an economic perspective, whether any specific cost category represents an incremental cost in a lost profits calculation may depend upon the extent of the claimed lost sales. ████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

iii.  Calculations Based Upon A Market Share Allocation Approach Isolating Lost Sales Caused By At-Issue Advertising And Using A Correct Incremental Profit Margin.  Dr. Bell inappropriately (a) assumed that the impact of the Weeks Estimator on First Response sales is solely attributable to the at-issue advertising and (b) ███████████████████████████████████.   The impact on C&D's claimed lost profits from these decisions made by Dr. Bell can be demonstrated through an adjustment to Dr. Bell's calculations that accounts for these flaws (i.e., by apportioning Weeks Estimator sales using the results from the Poret Survey and ████████████████████████████████ ████████████  After making these adjustments, Dr. Bell's measure

– 10 –

Highly Confidential - Attorneys' Eyes Only (C&D)

of claimed lost profits damages is reduced to approximately ▮▮▮▮
▮▮▮▮

iv. <u>Additional Evidence Demonstrates That This Lost Profits Measure Is Conservative</u>.  A market share allocation approach calculates lost sales in an amount proportional to First Response's market share. ▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In addition, an adjustment to Dr. Bell's regression analysis[11] suggests that a market share allocation approach overstates the impact of the Weeks Estimator on First Response sales.  Therefore, the lost profits calculations presented above yield a conservatively high measure of the impact of the at-issue advertising on First Response profits.

b. <u>Alternative Calculations Of Lost Profits Based Upon C&D's Own Annualized Estimates Of Lost Profits Following Launch Of Weeks Estimator</u>.  Although the lost profits measure based upon the market share allocation approach above represents my primary approach to determine lost profits damages in this matter, alternative calculations of First Response's lost sales (and hence lost profits) caused by the at-issue advertising can be performed using C&D's approach to evaluating the impact of the Weeks Estimator in the period following its launch.



d. <u>Summary Of Lost Profits Damages</u>.  A summary of C&D's lost profits damages under each of the above approaches is presented in **Table 2**.

---

[11] Dr. Bell did not use the regressions to determine the claimed lost profits figure.  Rather, Dr. Bell only used the regressions to claim that a market share allocation approach is conservative from his perspective.

Highly Confidential - Attorneys' Eyes Only (C&D)



## III.   QUALIFICATIONS AND EXPERIENCE

16.  I am a Managing Principal at Analysis Group, Inc. ("AG").  AG provides economic, financial, and business strategy consulting to its clients and specializes in the interpretation of economic and financial data and the development of economic and financial models. Internationally, AG consists of approximately 600 professionals who specialize in, among other things, the fields of economics, accounting, finance, statistics, and strategy consulting.

17.  My primary responsibility at AG is to provide economic, financial, and/or damages-related consulting services to clients.  Throughout my career I have provided these consulting services in intellectual property cases, false advertising cases, class certification cases, antitrust cases, breach of contract cases, fraud-related cases, business tort cases, business interruption cases, and securities-related cases, among others. I have provided expert testimony in deposition and trial settings numerous times.

18.  I specialize in the application of economic principles to complex commercial disputes, and I am generally retained in cases requiring economic, financial, and/or damages-related analyses.  Financial models I have constructed or evaluated in the past have contained as components revenue analyses, cost analyses, assessments of capacity, assessments of profitability, assessments of reasonable royalties, and assessments of the competitive business environment.  I also have evaluated various claims of economic value using peer group comparisons and/or

Highly Confidential - Attorneys' Eyes Only (C&D)