discounted cash flow analyses relating to projected future earnings streams.  During the course of my career, I have frequently performed economic analyses using large databases of information and complex computer models.  I have provided expert testimony in deposition and trial settings numerous times.

19.  I received my B.A. in Economics from the University of Notre Dame in 1977, my M.A. in Economics from the University of Southern California in 1979, and my Ph.D. in Economics from Arizona State University in 1983.  Attached as DTX 843 is a true and correct copy of my current resume.  A listing of publications I have authored is contained in my resume.  Attached as DTX 844 is a true and correct copy of a list of my trial and deposition testimony experience.  My business address is Analysis Group, Inc., Park Place Center, 2911 Turtle Creek Blvd., Suite 600, Dallas, Texas, 75219.

20.  AG is being compensated based upon hours incurred and the hourly rates of the personnel involved.  Payment to AG is not contingent upon my findings or the outcome of this matter.  AG is being compensated at a rate of $625 per hour for my time.  Hourly rates for other staff at AG assisting me with this matter range from $200 to $520 per hour, depending upon the level and experience of the staff involved.

## IV.   FACTS, DATA, AND INFORMATION CONSIDERED

21.  The facts, data, and information available to me in forming my opinions are contained in **Demonstrative, Ugone Exhibit 1** or elsewhere in my direct testimony (including exhibits).  Examples of the types of information available to me include the following:

> a.  legal documents (e.g., Opinion & Order dated July 1, 2015 (DTX 828); Court Order dated August 6, 2015; interrogatory responses);
>
> b.  deposition transcripts (e.g., deposition transcript of Wendy Bishop taken on February 22, 2017 ("Bishop Deposition" or "Bishop Dep.") (DTX 838); deposition transcript of Deborah Krall taken on February 21, 2017 ("Krall

Deposition" or "Krall Dep.") (DTX 840); deposition transcript of Cristobal Montero taken on February 16, 2017 ("Montero Deposition" or "Montero Dep."); deposition transcript of Ryan Daly taken on February 10, 2017("Daly Deposition" or "Daly Dep."); deposition transcript of Leah Wood Miramonti taken on April 5, 2017 ("Wood Deposition" or "Wood Dep."); deposition transcript of Simon Alaluf taken on April 11, 2017 ("Alaluf Deposition" or "Alaluf Dep."); deposition transcript of Dr. Tulin Erdem taken on May 11, 2017 ("Erdem Deposition" or "Erdem Dep.") (DTX 839); deposition transcript of Dr. Gregory Bell taken on May 3, 2017 ("Bell Deposition" or "Bell Dep.") (DTX 837); deposition transcript of Hal Poret taken on February 3, 2015 ("Poret Liability Deposition" or "Poret Liability Dep."); deposition transcript of Hal Poret taken on May 11, 2017 ("Poret Deposition" or "Poret Dep.") (DTX 841); deposition of Taylor Hoel taken on May 16, 2017 ("Hoel Deposition" or "Hoel Dep."));

c.   testimonies (e.g., Direct Testimony of Gregory K. Bell, Ph.D. dated August 25, 2017 ("Bell Direct Testimony"); Direct Testimony of Wendy Bishop dated August 18, 2017 ("Bishop Direct Testimony"); Direct Testimony of Deborah Krall dated August 24, 2017 ("Krall Direct Testimony"); Direct Testimony of Douglas E. Schoen dated September 7, 2017 ("Schoen Direct Testimony"); Direct Testimony of Simon Alaluf dated September 11, 2017 ("Alaluf Direct Testimony"); Direct Testimony of Cristobal Montero dated September 14, 2017 ("Montero Direct Testimony"); Direct Testimony of Leah Wood Miramonti dated September 12, 2017 ("Miramonti Direct Testimony"); Direct Testimony of Taylor Hoel dated September 13, 2017 ("Hoel Direct Testimony"); various testimonies from the liability phase of this trial);

d.   expert reports (i.e., Pregnancy Test Product Study Expert Report by Douglas E. Schoen dated March 21, 2017 ("Schoen Report") (DTX 816); Expert Report by Gregory K. Bell, Ph.D. dated March 24, 2017 ("Bell Report") (DTX 831); Damages Rebuttal Report by Tulin Erdem, Ph.D. dated April 21, 2017 ("Erdem Rebuttal Report") (DTX 836); Rebuttal Expert Report by Gregory K. Bell, Ph.D. dated April 21, 2017 ("Bell Rebuttal Report") (DTX 835); Rebuttal Expert Report by Hal Poret dated April 21, 2017 ("Poret Rebuttal Report") (DTX 834); expert reports from the liability phase);

e.   documents produced by Church & Dwight (e.g., sales and financial data; market research; Nielsen data; email communications; business presentations);

f.   documents produced by SPD (e.g., financial statements; Weeks Estimator sales and costs data; business presentations; media spending; invoices underlying various expenses; product specifications; presentations; print and online advertisements); and

g.   information independently obtained (e.g., SEC filings; information from C&D's website; information from SPD's website).

22.   Contained in **Demonstrative, Ugone Exhibit 2** are the names, positions, and company affiliations of each of the deponents whose deposition transcripts are cited in the text of my direct testimony.  In addition, during the preparation of my Report and Rebuttal Report, my staff and I held discussions with SPD personnel as presented in **Table 3**.

**Table 3**
**Interviews and Discussions**

| Name | Position | Topic(s) |
|---|---|---|
| Cristobal Montero | Chief Financial Officer, SPD | Weeks Estimator financial data; documents containing Weeks Estimator revenues and costs |
| Ryan Daly | SPD Commercial Director for Clearblue for the Americas, Alere | Clearblue sales process; Clearblue promotions; competition among pregnancy test products |
| Bria Monaldo | Senior Category Account Executive for Clearblue, Alere | Clearblue sales process; Clearblue promotions; competition among pregnancy test products |
| Leah Wood Miramonti | Brand Manager for Clearblue, P&G | Marketing expenses associated with Weeks Estimator |
| Peggy Meinhardt | Clearblue Marketing Specialist, P&G | Marketing expenses associated with Weeks Estimator |
| Simon Alaluf | Finance Director, SPD Development Company Limited | R&D expenses associated with Weeks Estimator |

## V.   OVERVIEW OF RELEVANT PRODUCTS

23.   Home pregnancy test kits offered for sale can be categorized according to their method of displaying test results.  Consequently, home pregnancy test kits can be placed into two primary categories: analog and digital (with combination products available that contain both a digital test and an analog test).[12]  The two categories of tests (analog/visual and digital) operate in the same manner – by measuring a specific hormone – with the only difference being the display

---

[12]   Ms. Bishop testified that she views the category as being split into three segments: analog, digital, and combos, which contain both an analog and a digital product.  (Bishop Dep. (DTX 838) at 32.)

screen.[13]  Digital tests are more expensive than analog tests[14] due to a display screen that displays words rather than symbols to show results.[15]

24.  From an economic perspective, the various home pregnancy test kits available for purchase in the U.S. can be grouped into three categories of brands: market-leading premium brands, value brands, and private label products.  (See **Demonstrative, Ugone Exhibit 3** and JX 32 for retail sales of products within each brand from the Nielsen data available for the period from April 24, 2011 through February 11, 2017.)

a.  Premium Brands.[16]  Church & Dwight and SPD produce the two leading premium brands of U.S. home pregnancy test kits, First Response and Clearblue (respectively).  In addition, e.p.t. (manufactured (but not marketed or distributed) by SPD) is a premium brand and has the third-highest sales in the U.S. home pregnancy test kit market (after First Response and Clearblue).  *See* **Demonstrative, Ugone Exhibit 4**; *see also* JX 32.

b.  Value Brands.  Lower-priced products are offered for sale from various "value brands"[17] such as Answer (produced by C&D),[18] First Signal (produced by Inverness Medical LLC ("Inverness"), which is now Alere U.S.),[19] Accu-Clear (sold by SPD),[20] and Fact Plus (sold by SPD).[21]  *See* **Demonstrative, Ugone Exhibit 5**; *see also* JX 32.  Each of the value brands sold only analog products during the period with available Nielsen data (i.e.,

---

[13]  DTX 845 ("How To Choose The Best Pregnancy Test For You" (https://www. whattoexpect.com/wom/preconception/how-to-choose-the-best-pregnancy-test-for-you.aspx, viewed on August 28, 2017)).

[14]  Bishop Dep. (DTX 838) at 40.

[15]  Bishop Dep. (DTX 838) at 29.

[16]  ████████████████████████████████████████████

[17]  *See* DTX 814, at CHD00109685.

[18]  *See, e.g.*, DTX 795, at CHD00097370.

[19]  First Signal is produced by Inverness and only sold at Walmart.  Church & Dwight considers it an "extreme value player."  *See* DTX 814, at CHD00109687.  *See also* DTX 846 ("First Signal One-Step Pregnancy Test, 1ct" (https://www.walmart.com/ip/First-Signal-One-Step-Pregnancy-Test-1ct/17283605, viewed on February 2, 2017)).

[20]  Montero Direct Testimony at ¶ 6.

[21]  Montero Direct Testimony at ¶ 6.

Highly Confidential - Attorneys' Eyes Only (C&D) (nn.16 + 19 only)

the week ending April 30, 2011 through the week ending February 11, 2017).  *See* **Demonstrative, Ugone Exhibit 3**; *see also* JX 32.

c. 



A.  <u>**First Response Pregnancy Products**</u>

---

23   Montero Direct Testimony at ¶ 6.

24

– 17 –

**Table 4**



**B.  Clearblue Pregnancy Test Products**

27.  Clearblue[27] is a premium brand of pregnancy test products sold by SPD.



---

26 ████████████████████████████ ████ ██ ███

27  Clearblue is often referred to as "CBE" in C&D documents.  (Bishop Dep. (DTX 838) at 59.)

Confidential



28.   In an effort to expand upon Clearblue's analog, digital, and combination products, Clearblue launched the at-issue Weeks Estimator, also known internally at SPD as CB9, product in the U.S. in August 2013.  The Weeks Estimator product was a digital test that contained measurement strips of two different sensitivities in order to detect (a) whether the tester is pregnant and (b) if so, the number of weeks that have passed since ovulation.[29]  SPD used the initial launch package until January 2014 when SPD began shipment of the revised package.[30]  SPD stopped shipping the Weeks Estimator to its customers on July 2, 2015 following the Court's ruling of liability[31] but resumed shipping the Weeks Estimator on September 17, 2015 after the Second Circuit granted SPD's motion for a stay of an injunction.[32]  On September 9, 2016, the Second Circuit affirmed the injunction.  On September 12, 2016, SPD stopped shipping the Weeks Estimator to retailers.[33]  On November 16, 2016, SPD "issued a formal withdrawal of the Weeks

---

28   █████████████████████████████████████

29   DTX 847 (Clearblue website, "Pregnancy Test with Weeks Estimator," archived on December 5, 2013. (https://web.archive.org/web/20131205113049/http://www.clearblueeasy.com/advanced-pregnancy-test-with-weeks-estimator.php, viewed on February 2, 2017)).  The Weeks Estimator provided test results by displaying "Not Pregnant" for a negative result (i.e., no pregnancy) and either "Pregnant 1-2," "Pregnant 2-3," or "Pregnant 3+" for positive results, where the numbers following "Pregnant" indicate the number of weeks since ovulation.

30   ███████████████████████████████

31   JX 51; Wood Direct Testimony at ¶ 19.

32   DTX 303; Wood Direct Testimony at ¶ 19.

33   Wood Direct Testimony at ¶ 19; JX 52.

Confidential

Estimator from the marketplace."[34]  (*See* **Demonstrative, Ugone Exhibit 8** for a timeline of events

relating to the Weeks Estimator.)

## VI.    OVERVIEW OF SPD'S JOINT VENTURE



---

[34]    JX 49, at SPD-NY-D-001792; Wood Direct Testimony at ¶ 20.



## VII.   CONCEPTUAL FRAMEWORK FOR EVALUATION OF CLAIMED DAMAGES ATTRIBUTABLE TO AT-ISSUE ADVERTISING

32.   Church & Dwight is seeking a disgorgement remedy or lost profits damages relating to SPD's at-issue advertising associated with the Weeks Estimator product.[41]  From an economic perspective, evaluating claimed damages in this matter requires an analysis of economic causation, or a determination of SPD's sales of the Weeks Estimator (or C&D's lost sales of First Response products) attributable to (or caused by) the at-issue advertising.  Documentary evidence,

deposition and trial testimony, and survey results demonstrate the need to perform an
apportionment analysis to isolate the impact of the at-issue advertising.

    a.  <u>Commercial Success Of The International Product Version Demonstrates
Demand For The Product Independent Of The At-Issue Advertising</u>.
Between 2009 and 2014, SPD launched in over 30 countries an international
version of what in the U.S. was launched as the Weeks Estimator product.[42]
The international product did not utilize the at-issue advertising and hence
generally would not have misled consumers in the manner the Court found
the at-issue advertising to be misleading.  The international product was a
commercially successful product.[43]  The success of the international product
version without use of the at-issue advertising demonstrates that sales of the
Weeks Estimator (and their impact on First Response sales) were not solely
or primarily driven by the at-issue advertising.

    b.



    c.  <u>Survey Results Demonstrate The Limited Effect Of The At-Issue
Advertising On Sales</u>.  Evidence from surveys performed both by C&D and
SPD demonstrates that the at-issue advertising had limited effect on SPD's
sales (and hence likely had limited effect on First Response sales).  The

---

[42]  Daly Direct Testimony, February 17, 2015, at 3.

[43]  Daly Direct Testimony, February 17, 2015, at 6 – 7.  (The international version of the Weeks Estimator
achieved a 31.6% revenue share in the United Kingdom and a 23.6% revenue share in Germany.  The
international product version sold "more than 31.5 million test kits … as of June 30, 2014.").

■ ████████████████████████████████████████████████████

■ ███████████████████████

Highly Confidential - Attorneys' Eyes Only (C&D)

results of these surveys provide insight as to the portion of SPD's sales of the Weeks Estimator that is attributable to the at-issue advertising.

   i.  <u>Survey Conducted By Hal Poret ("Poret Survey")</u>.  In December 2014 Mr. Poret, an expert in survey research, completed on behalf of C&D an "advertising comprehension survey"[46] of women 18 to 49 years old who would use a home pregnancy test kit if they thought they might be pregnant.[47]  The survey was designed to identify the portion of respondents that interpreted the messages on the Weeks Estimator packages (both the launch package and the revised package) as stating that the product provided the same measure as a doctor would provide.[48] The Court cited Mr. Poret in the Order instituting an injunction, stating for the launch package that "Mr. Poret concluded that 19.0% or 21.9%[49] (depending on the base used) of participants answered both that the product estimates the number of weeks a woman is pregnant and that the product's estimate of weeks is the same as a doctor's estimate of weeks pregnant."[50]  The Court used this figure (19.0% or 21.9%) as an estimate of the "number of participants [who] understood the Launch Package to communicate the message that the Weeks Estimator provides an estimate of weeks pregnant that is consistent with the estimate a doctor would provide."[51]  Mr. Poret found the analogous percentages of deceived consumers for the revised package to be 16.0% or 17.3%.[52]

   ii.  <u>SPD-Commissioned Survey Conducted By Douglas E. Schoen ("Schoen Survey")</u>.[53]  A survey completed by Douglas E. Schoen, LLC, on behalf of SPD in March 2017 attempted to determine the percentage of possible Weeks Estimator buyers that would purchase a product in two scenarios: (1) if the product showed the conventional measure of weeks pregnant as measured by a doctor and (2) if the product showed the number of weeks since ovulation.[54]  Survey respondents were screened to be those

---

[46]  DTX 206; DTX 834, at 4.

[47]  Direct Testimony of Hal Poret, February 3, 2015, (DTX 815) at 3.

[48]  Direct Testimony of Hal Poret, February 3, 2015, (DTX 815) at 2.  *See also* Poret Rebuttal Report (DTX 834) at 4 – 5.

[49]  Mr. Poret calculated various measures to determine the percentage of consumers deceived by the packaging, using 19.0% and 21.9% for the launch package as the most conservative measures. However, his ultimate conclusion is based upon these figures, as is the Court's Opinion, and as such, I use them (and the analogous 16.0% or 17.3% for the revised package) herein and going forward.

[50]  July 2015 Decision (DTX 828), at 34 – 35.

[51]  July 2015 Decision (DTX 828), at 35.

[52]  Direct Testimony of Hal Poret, February 3, 2015, (DTX 815) at 35.

[53]  DTX 816 at 1; Schoen Direct Testimony at ¶ 3.

[54]  DTX 816 at 3; Schoen Direct Testimony at ¶ 3.

aged 18 to 49 years old who would use an at-home pregnancy test kit if they thought they might be pregnant. [55]  A description of the question for each scenario and the corresponding results are presented below.

- Sample A: Same Approach As A Doctor.  In the first sample, survey respondents were asked if they would "definitely purchase" a product estimating "how many weeks have passed since the first day of [their] last menstrual period."[56]  81% of the sample answered this question in the affirmative.

- Sample B: Different Approach From A Doctor.  In the second approach, survey respondents were asked if they would "definitely purchase" a product estimating "how many weeks have passed since [they] ovulated," which is "different than the conventional approach used by doctors to date pregnancy."[57]  84% of the sample answered this question in the affirmative.

The Schoen Survey demonstrates that consumers who were exposed during a concept test to the allegedly false messaging were equally likely to purchase a product as consumers who were exposed to messaging regarding the actual way the Weeks Estimator functioned.  These results directly rebut the C&D experts' unsupported contentions that no consumer would have purchased a product had it been exposed to messaging that it measured weeks since ovulation.  Although the Poret Survey provided several measures and characterized the 19% – 21.9% and 16.0% – 17.3% measures as the minimum impact of the at-issue advertising, the measured effect was on consumer understanding and not consumer purchase decisions.  In contrast, the Schoen Survey focused on likely consumer purchase decisions and demonstrated that the results of the Poret Survey likely overstate the impact that the at-issue advertising had on sales of the Weeks Estimator.  Given these results, I conservatively assume for damages calculation purposes that the at-issue advertising led to approximately 21.9% of sales of the Weeks Estimator when sold with the original launch packaging and 17.3% of sales of the Weeks Estimator when sold with revised packaging.

33.  The evidence discussed above demonstrates that factors other than the at-issue advertising impacted sales of and demand for the Weeks Estimator.  In light of such evidence,

---

[55]   DTX 816 at 7; Schoen Direct Testimony at ¶¶ 8-9.

[56]   DTX 816 at 8; Schoen Direct Testimony at ¶¶ 13, 15.

[57]   DTX 816 at 9; Schoen Direct Testimony at ¶¶ 13, 15.

calculations of either disgorgement of profits attributable to the at-issue advertising or of lost profits attributable to the at-issue advertising would require an analysis of economic causation and an apportionment to only the sales attributable to the at-issue advertising.  In other words, determining a claimed disgorgement remedy or claimed lost profits damages would require a determination of the specific portion of Weeks Estimator sales gained (or First Response sales lost) because of the at-issue advertising.

34. Dr. Bell testified at his deposition that he generally "did not disagree" with a statement that "evaluating claimed damages in this matter requires a determination of SPD sales of the Weeks Estimator attributable to the at-issue advertising." [58]   However, despite this acknowledgment, Dr. Bell did not perform an analysis of economic causation for either of his calculations (i.e., not for his disgorgement calculations[59] nor for his lost profits calculation[60]). Instead, Dr. Bell argued that (a) retailers would not have made the same decisions about the Weeks Estimator in terms of stocking it, shelf space, and location and that (b) "to the extent a consumer saw through SPD's false advertising and understood the truth about what the product is capable of doing, there is no reason to assume the consumer would have purchased it."[61]  However, each of these entirely speculative arguments is flawed.

      a. Retailer Decisions Would Be Based Upon Consumer Demand.  Dr. Bell argued that "[i]t is not apparent to [him] that retailers would have stocked the Product at all in the absence of SPD's false advertising, much less that they would have given the Product equivalent shelf space."[62]  However, retailers would make such decisions based upon consumer demand – if consumers demanded a product such as the Weeks Estimator, retailers

---

[58]   Bell Dep. (DTX 837) at 27 – 28.

[59]   Bell Dep. (DTX 837) at 38 – 42.

[60]   Bell Dep. (DTX 837) at 192.

[61]   Bell Direct Testimony at 10.

[62]   Bell Direct Testimony at 10.  (Bracketed text added for clarification.)

would be incentivized to provide shelf space for it in order to increase their sales.  Because final consumers ultimately provide demand for the product (and hence lead to demand from retailers), the issue of whether retailers would have provided such space depends upon whether there would have been consumer demand for the product absent the at-issue advertising.  The evidence presented above demonstrates that there would have been consumer demand for a product like the Weeks Estimator absent the at-issue advertising (and hence retailers would have provided shelf space for the Weeks Estimator).

b.  The Evidence Presented Above Demonstrates That Consumers Would Have Purchased The Weeks Estimator Absent The At-Issue Advertising.  Dr. Bell stated "to the extent a consumer saw through SPD's false advertising and understood the truth about what the product is capable of doing, there is no reason to assume the consumer would have purchased it."[63]  However, Dr. Bell's statement is contrary to the evidence presented above which demonstrates that consumers would have had demand for and would have purchased a product like the Weeks Estimator had it been advertised in a non-misleading way.  Given such evidence, Dr. Bell's failure to apportion to the sales attributable to the at-issue advertising is inappropriate and leads to overstated measures of claimed damages.

## VIII.  EVALUATION OF CLAIMED DISGORGEMENT REMEDY ATTRIBUTABLE TO AT-ISSUE ADVERTISING

35.  Dr. Bell presented in his direct testimony calculations of a disgorgement remedy that C&D is pursuing in this matter.  A proper analysis for a disgorgement of profits attributable to a given act requires the calculation of incremental profits attributable to that act.  Hence, an evaluation of a disgorgement remedy attributable to the at-issue advertising requires the identification and evaluation of (a) the additional revenues earned because of the at-issue advertising and (b) the additional costs associated with the additional sales that were made because of the at-issue advertising.  This is an incremental-based analysis.

36.  Given the details of the case, the following facts, which Dr. Bell does not take into account, need to be considered in evaluating the relevant incremental profits in this matter.

---

[63]   Bell Direct Testimony at 10.

a. Isolation Of Incremental Profits Attributable To The At-Issue Advertising. From an economic perspective, evaluating a disgorgement remedy in this matter requires a determination of SPD's sales of the Weeks Estimator attributable to the at-issue advertising. However, Dr. Bell assumed, contrary to documentary evidence available in this matter, that all Weeks Estimator sales are attributable to the at-issue advertising. As discussed above, the results of the Poret Survey can reasonably be assumed to represent the portion of additional sales made because of the at-issue advertising for the launch package (i.e., 21.9% of sales) and for the revised package (i.e., 17.3% of sales).[64] Therefore, the relevant measure of profits for a disgorgement remedy is the difference between (i) the additional revenues SPD earned from the 21.9% (or 17.3%) of sales attributable to the at-issue advertising and (ii) the additional costs incurred to make the 21.9% (or 17.3%) of sales attributable to the at-issue advertising.

b. Determination Of The Relevant Period For A Disgorgement Remedy. I have been advised by counsel that in the Southern District of New York, the use of disgorgement as a remedy under false advertising claims requires a finding of intentional deception. I understand that the Court made a finding of intentional deception with respect to the packaging and claims made at the launch of the Weeks Estimator (i.e., the launch package), but that the Court declined to find the same with respect to the subsequent packaging and claims associated with that product (i.e., the revised package).[65] Hence, I understand that the relevant period for disgorgement analysis is the period that SPD sold Weeks Estimator with the launch package (which is assumed to be the period until June 2014).[66]

37. Given these two considerations (i.e., the isolation of profits attributable to the at-issue advertising and the period during which intentional deception was found), the relevant and only appropriate measure of a disgorgement remedy from an economic perspective is the calculation based upon only the launch package sales that were sold because of the at-issue

---

[64] July 2015 Decision at 34 – 35. *See also* Direct Testimony of Hal Poret, February 3, 2015, (DTX 815) at 35.

[65] *See, e.g.*, July 2015 Decision (DTX 828) at 1 – 2 for the Court's finding of intentional deception.

[66] SPD stopped shipping Weeks Estimator with the launch package in January 2014.

Highly Confidential - Attorneys' Eyes Only (SPD) (n.66 only)

advertising.  This calculation would isolate the sales (and profits) that are attributable to the at-issue advertising and that occurred during the period in which intentional deception was found.[67] Hence, the analyses presented below focus on determining this relevant amount of profits earned from these sales of the Weeks Estimator.  (Although this is the appropriate measure of damages when evaluated in light of those considerations, should the Court determine that those considerations are not relevant, alternative calculations of SPD's incremental profits associated with the Weeks Estimator product also are presented.)

38.  In contrast to the method described above, Dr. Bell performed no apportionment in his analysis.  Dr. Bell included in his disgorgement calculations an estimate of all Weeks Estimator revenues, implicitly assuming that all Weeks Estimator sales are attributable to the at-issue advertising.  Further, Dr. Bell did not isolate the revenues associated with the launch package (i.e., the package where the Court found intentional deception).  As a result, Dr. Bell overstated the revenues that would be available under a disgorgement remedy.

39.  The evaluation of the claimed disgorgement figures as discussed above is presented in detail below as follows:

    a.   an overview of financial data produced by SPD (**Section VIII.A**);

    b.   an overview of the different accounting methods used by SPD (**Section VIII.B**);

    c.   calculation of Weeks Estimator incremental profits attributable to the at-issue advertising during the periods under consideration using management accounting (**Section VIII.C**); and

    d.   an evaluation of the use of transfer prices (i.e., those used by Dr. Bell) as the basis of a disgorgement analysis (**Section VIII.D**).

---

[67] ███████████████████████████████████████████████████

Confidential (n.67 only)

A. **Overview Of Financial Data Produced By SPD**





Highly Confidential - Attorneys' Eyes Only (SPD)



42.   The information provided by Mr. Montero served as a basis for understanding the various revenues and costs associated with selling the Weeks Estimator product.  The relevant costs as produced by SPD that need to be considered in determining the profitability of the Weeks Estimator can be placed into one of the following categories.  *See* **Demonstrative, Ugone Exhibit 9**; *see generally* Montero Direct Testimony ¶¶ 24-33.

    a.  <u>Line Items That Are Directly Transcribed From Underlying Documents</u>. Certain of the costs described by Mr. Montero are directly observed in the underlying documentary evidence produced by SPD.

    b.  <u>Line Items That Are Directly Computed From Underlying Documents</u>.  A second set of costs described by Mr. Montero are calculated by aggregating various underlying documents into a single figure, which then is presented in the analysis.  For example, for line items such as the cost of Weeks Estimator sticks, the price per stick obtained from one document is multiplied by number of sticks sold obtained from a separate source document.

    c.  <u>Line Items That Are Derived From Allocations</u>.  Another set of costs are derived in many instances from allocations based upon <u>net outside sales</u> (i.e., gross revenue less any customer invoice deductions such as volume or product placement incentives).  For such line items, a source document (or documents) provided the total expense for SPD U.S.  That total amount was then allocated to the Weeks Estimator based upon the listed measure (as presented in the analysis).  In many cases, expenses are allocated based upon net outside sales – in other words, the expenses are multiplied by the ratio of Weeks Estimator net outside sales to all SPD U.S. net outside sales.[73]







### C. Calculation Of Weeks Estimator Sales And Profits Attributable To At-Issue Advertising During Periods Under Consideration Using Management Accounting

47.   While the profitability for all Weeks Estimator sales can be determined, from an economic perspective the appropriate disgorgement remedy in this matter is the measure of SPD's profits attributable to the at-issue advertising during the intentional deception period (i.e., the launch package).  In determining the portion of Weeks Estimator sales attributable to the at-issue advertising, I utilized the estimated percentages from the Poret Survey.  Therefore, I assumed for the purpose of calculating the relevant disgorgement figure that approximately 21.9% of sales of the Weeks Estimator when sold with the original launch package and 17.3% of sales of the Weeks Estimator when sold with revised package are attributable to the at-issue advertising.[80]

48.   Creating a P&L statement that determines the profits attributable to the at-issue advertising for disgorgement purposes requires calculating (a) the incremental revenues SPD earned on sales attributable to the at-issue advertising and (b) and the incremental costs incurred to make sales attributable to the at-issue advertising (during the relevant periods).

a.   Revenues Earned On Sales Attributable To At-Issue Advertising.  As noted, for Weeks Estimator products with the launch package, the incremental revenues attributable to the at-issue advertising were calculated as 21.9% of

the total net outside sales. For the alternate calculation that includes sales of the revised package (in addition to the launch package), the additional incremental revenues attributable to the at-issue advertising were calculated as 17.3% of total net outside sales of Weeks Estimator products with the revised package.

b. <u>Costs Incurred To Make Sales Attributable To At-Issue Advertising</u>. The incremental costs utilized for the disgorgement calculation are the additional costs incurred to make the (21.9% or 17.3% of) sales attributable to the at-issue advertising. These costs were calculated by identifying the fixed costs incurred by SPD (which would not be deducted from the identified revenues) and the variable costs incurred by SPD to sell the Weeks Estimator (which would be deducted from the identified revenues).

  i. <u>Fixed Costs</u>. Fixed costs are costs that would be incurred in full even if SPD had not made the sales that are attributable to the at-issue advertising (i.e., 21.9% or 17.3% of sales). For example, R&D expenses still would have been incurred in full even if SPD had not made the 17.3% to 21.9% of sales attributable to the at-issue advertising. In other words, these costs are a fixed amount, regardless of whether more or less products are sold.

  ii. <u>Variable Costs</u>. Variable costs are costs that would be reduced by the appropriate amount if SPD had not made the sales attributable to the at-issue advertising. An example of a variable cost would be the cost of the Weeks Estimator sticks, which are on a per-item basis. If sales were reduced by 17.3% to 21.9%, total stick costs would also be reduced by the same percentage because SPD would have bought fewer sticks. In other words, these costs vary depending on the quantity of product produced.

49. 











- **Shelf Talkers**.  Shelf talkers are a form of advertising used to display product information near the shelf.[104]  I understand that generally a shelf talker is a sign displayed on or near the shelf that provides a shopper with information regarding the product.[105]





50. Given the above categorizations of costs as either fixed or variable, I have calculated the profits appropriate under a disgorgement remedy.[115] As previously discussed, in calculating the profits appropriate for a disgorgement remedy, fixed costs were excluded (i.e., are not deducted) from the disgorgement figure because these costs would not have changed had SPD sales been limited 17.3% of sales in the launch period or 21.9% of sales with the revised package. Variable costs always were deducted in the calculation of the profits appropriate in a disgorgement remedy.

51. Contained in **Table 6** below are the Weeks Estimator profits under various scenarios. From an economic perspective and based upon legal representations made by counsel, the relevant measure of a disgorgement remedy in this matter is a calculation based upon only the incremental launch package sales that were sold because of the at-issue advertising. This approach accounts both for (a) the need to isolate profits attributable to the at-issue advertising and (b) the fact that the finding of intentional deception that is required for a disgorgement remedy was made only for the launch package. Based upon the calculations described above and in the exhibits to this direct testimony, under this economically appropriate approach, SPD's incremental profits



from sales of the launch package that were attributable to the at-issue advertising was a loss of

███████ (i.e., there were no profits to disgorge when limiting the analysis to launch package sales

that were sold because of the at-issue advertising). ████████████████████████████

Alternatively, should the Court determine that (a) the relevant time period for a disgorgement

remedy is not limited to the launch package and/or (b) profits on all sales of the Weeks Estimator

should be included in the disgorgement remedy, I have presented the following three additional

alternative analyses.

a. <u>Profits Associated With Launch And Revised Packages Attributable To At-Issue Advertising</u>. Profits under this analysis were calculated by deducting costs that were variable with respect to only a portion of Weeks Estimator sales in each period. SPD had total incremental profits relating to sales of the Weeks Estimator launch and revised packages that were attributable to the at-issue advertising of ████████████████████████████████ ██

b. <u>Profits Associated With All Sales Of Launch Package</u>. Profits under this analysis were calculated by deducting costs that were variable to all sales of the launch package. In addition to general variable costs, this would include costs such as Central Marketing for CB9 which were incurred only for the launch package (e.g., costs to design the launch package) but would not include fixed costs such as R&D. SPD had total losses relating to all sales of the Weeks Estimator launch package of ██████████ There would be no profits to disgorge under this scenario. ████████████████████████ ██

c. <u>Profits Associated With All Sales Of Launch And Revised Packages</u>. Profits under this analysis were calculated by deducting costs that were variable with respect to SPD's decision to develop and launch the Weeks Estimator generally, including R&D costs (which would not have been occurred had SPD not launched the Weeks Estimator product). SPD had total incremental profits relating to all sales of the Weeks Estimator launch and revised packages of ████████████████████████████



Highly Confidential - Attorneys' Eyes Only (SPD)













