



## IX.   ECONOMIC CAUSATION AND FIRST RESPONSE'S CLAIMED LOST PROFITS ATTRIBUTABLE TO WEEKS ESTIMATOR'S AT-ISSUE ADVERTISING

58.  From an economic and conceptual perspective, C&D's lost profits associated with SPD's wrongful conduct are the additional profits (if any) that C&D would have made had SPD utilized non-misleading advertising regarding the functionalities of the Weeks Estimator. This is different from a calculation that evaluates the additional profits (if any) that C&D would have made had SPD not launched the Weeks Estimator at all.  Calculating lost profits in this matter requires demonstrating an economic causal link between the at-issue advertising and claimed C&D lost profits after accounting for all other market-related pressures (i.e., all other alternative reasons for movements in First Response sales).

59.  An evaluation of the claimed evidence regarding the general effect of Weeks Estimator sales (i.e., not only those sales attributable to the at-issue advertising) on First Response financials is presented below.  This evaluation suggests that the Weeks Estimator generally (and

Highly Confidential - Attorneys' Eyes Only (SPD)(nn. 153 & 154 only)

hence the at-issue advertising specifically) had a limited effect on the sales and profits of First

Response products, as demonstrated by at least the following observations.



b. Factors unrelated to the Weeks Estimator have affected sales and market
share for First Response pregnancy products during the damages period.

A.

Highly Confidential - Attorneys' Eyes Only (C&D)



Highly Confidential - Attorneys' Eyes Only (C&D)



---

162   The Pregnancy Pro was not sold until April 2016. ████ ██ ██

Confidential (Figure 1 + continuation of ¶61(b) only)
Highly Confidential – Attorneys' Only (C&D) (¶62 + notes only)

lost sales attributable to the Weeks Estimator generally or the at-issue advertising specifically, as seen from the following.

a. 

Confidential
Highly Confidential - Attorneys' Eyes Only (C&D) (¶62(a) only)



that wider market forces (that were in existence before the launch of the Weeks Estimator) likely continued to play a significant role in First Response market performance during the period the Weeks Estimator was sold.  Simple calculations that use a single



Highly Confidential - Attorneys' Eyes Only (C&D)

change in sales between periods to demonstrate or extrapolate claimed lost sales and lost profits likely would overstate actual lost profits attributable to the at-issue advertising by inappropriately attributing to the at-issue advertising sales changes that reflect (or at least include) general market variability caused by conditions unrelated to the wrongful conduct.

**B.** **Factors Unrelated To The Weeks Estimator Affected First Response Sales And Market Share Over The Damages Period**

64. Many factors unrelated to the Weeks Estimator have affected First Response sales and market share, █████████████████████████████████████████████████ are not attributable solely to the Weeks Estimator (let alone to the at-issue advertising).[172] ██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████    ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████ Such factors unrelated to the Weeks Estimator that impacted First Response sales and market share over the damages period include: (a) loss of sales to the Clearblue visual product due to pricing and promotions (which is unrelated to the wrongful conduct) and (b) ██████████████████████████ ████████████

---

■ ████████████████████████████████████████████████
████████████████
■ ████████████████████

Highly Confidential - Attorneys' Eyes Only (C&D)

### 1. First Response Early Result Has Lost Sales To Clearblue <u>Visual Due To Strong Competition On Price</u>[174]

65. Immediately prior to and throughout the damages period, Clearblue analog products were in strong price-based competition with First Response pregnancy products – both through price cuts and through promotional prices. ███████████████

████████████████████████████████████████

█████████████████

66. Clearblue's Rapid Detection product is an analog (or visual) product like the First Response Early Result product[176] ███████████████████

████████████████   Given the similar display technology (i.e., analog) and ███████

██████████   it is reasonable to conclude that Clearblue Rapid Detection competed directly with First Response analog products. ██████████████████████

████████████████████████████████████████

███████████████████████████

---

[174] ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

[175] Wood Direct Testimony at ¶ 50.  Clearblue visual product did well because SPD had reduced the price and put on the products.  The IRCs (discussed below) on SPD's visual/digital product have been shipping for approximately three and a half to four consecutive years.

[176] DTX 848 (First Response website, "Early Result Pregnancy Test." (http://www.firstresponse.com/en/Products/Pregnancy/Early-Result-Pregnancy-Test, viewed on February 2, 2017)).  *See also* DTX 849 (Clearblue website, "Rapid Detection Pregnancy Test."  (http://www.clearblueeasy.com/clearblue-plus-pregnancy-test.php, viewed on February 2, 2017)).

█ ████████████████████████████████████
█ █████████████████████████████

Highly Confidential - Attorneys' Eyes Only (C&D)

a. <u>Walmart Price Reductions Beginning Around The Launch Of The Weeks Estimator</u>.   Beginning in August 2013, Walmart (one of the largest pregnancy test retailers[179]) decreased its retail price for the two-count package of Clearblue visual[180]

██████ ; *see also* JX 33.  Due to the magnitude of Clearblue sales made at Walmart, ████████████████████████

████████████████████████  Such price decreases likely increased sales of Clearblue visual at Walmart at the expense of other products. ████████

████████████████

b. <u>Clearblue Analog Coupons Started Around The Launch Of The Weeks Estimator</u>.  SPD also implemented instantly redeemable coupons ("IRCs") on the Clearblue analog product for approximately the entire period over which C&D claims damages.  From July to November 2013, SPD ran promotions on the Clearblue two-count and three-count visual product with a $1 IRC.[182]  In November 2013, SPD increased the value of the IRCs offered for its Clearblue visual products to $2 on its two-count packages and $3 on its three-count packages.[183]  The $2 and $3 IRCs continue through present.[184]  A graphical representation of the promotions and retail sales of the First Response Early Result and Clearblue analog product can be seen in **Demonstrative, Ugone Exhibit 18**; *see also* JX 32.

████████████████████████

████████████████████████

---

[179] Walmart was the leading receiver of Clearblue customer shipments in the 2015 fiscal year.  *See* DTX 280 at SPD-NY-D-000807 (Clearblue MDM Meeting, April 17, 2015).

[180] The two-count package of Clearblue visual is the package size with the highest sales.  (*See*, *.e.g.*, **Demonstrative, Ugone Exhibit 3.)**

[181] Wood Direct Testimony at ¶ 50 (Walmart dropped Clearblue analog price in August 2013) and ¶ 18 (Weeks Estimator launched in August 2013).

[182] Wood Direct Testimony at ¶ 51. ████████████
████████████████████████

[183] DTX 305 ("All Customers – Cases" tab). ████████
████████████████████████

[184] Wood Direct Testimony at ¶ 51 ████████████
████████████████████████

Confidential (¶66a. only)
Highly Confidential - Attorneys' Eyes Only (SPD) (n.184 only)
Highly Confidential - Attorneys' Eyes Only (C&D) (¶67, nn.182 - 183 only)



Highly Confidential - Attorneys' Eyes Only (C&D)





Highly Confidential - Attorneys' Eyes Only (C&D)



Highly Confidential - Attorneys' Eyes Only (C&D)



Highly Confidential - Attorneys' Eyes Only (C&D)

attempts at innovation.   Church & Dwight's limited and unsuccessful



C&D has launched two attempted innovations: (1) the "Comfort Sure" redesign for the Early Result product and (2) the Pregnancy Pro product that links to the consumer's phone.

- 62 –

Highly Confidential - Attorneys' Eyes Only (C&D)



- <u>The Early Result "Comfort Sure" Redesign</u>.  In May 2015, C&D launched a redesigned version of the First Response Early Result product that included a new curved handle and Church & Dwight referred to it as the Comfort Sure design[210] or the twist design.[211]



- <u>Pregnancy Pro</u>.  In April 2016, C&D released the Bluetooth-capable Pregnancy Pro product[215]



---

209 

210 DTX 850 ("First Response Unveils the New Look of AT-Home Pregnancy Tests with a Redesigned Stick," May 26, 2015.   (http://www.prnewswire.com/news-releases/first-response-unveils-the-new-look-of-at-home-pregnancy-tests-with-a-redesigned-stick-300088173.html, viewed on March 7, 2017)).  *See also* Bishop Dep. (DTX 838) at 199 – 200.

211 Bishop Dep. (DTX 838) at 148 – 149.

215 DTX 851 ("First and Only Bluetooth Enabled Pregnancy Test Now Available Nationwide, From the Makers of First Response, April 18, 2016 (http://www.prnewswire.com/news-releases/first-and-only-bluetooth-enabled-pregnancy-test-now-available-nationwide-from-the-makers-of-first-response-300252571.html, viewed on March 7, 2017)).  *See also*, Bishop Dep. (DTX 838) at 50.

Highly Confidential - Attorneys' Eyes Only (C&D)



224

## X.   CALCULATIONS OF CLAIMED LOST PROFITS FOR FIRST RESPONSE ATTRIBUTABLE TO AT-ISSUE ADVERTISING

69.   The facts and circumstances of this matter allow for lost profits to be calculated based upon a variety of approaches, including at least: (a) a market share allocation approach where Weeks Estimator sales attributable to the at-issue advertising are allocated based upon First Response's (adjusted) market share; (b) ████████████████████████████



Highly Confidential - Attorneys' Eyes Only (C&D)

██████████████████████████████████████████ and (c) comparisons of First Response sales between periods that the Weeks Estimator was available on the market and periods that it was not.  Although the market share allocation approach is my primary method of determining C&D's lost profits, the estimates based upon the other two approaches are similar in magnitude.  Dr. Bell also presented a claimed lost profits approach based upon a market share allocation of Weeks Estimator sales,[225] however, for reasons discussed below, his analysis significantly overstates the profits that C&D would have lost.  In light of my analyses and after review of the direct testimony, deposition testimony, and reports of C&D's personnel and experts, the following conclusions can be drawn regarding C&D's lost profits in this matter.

    a.   Evaluating lost profits under a market share allocation approach requires appropriate determinations of both (i) lost First Response sales caused by the at-issue advertising and (ii) First Response incremental profitability.  Dr. Bell's lost profits analysis is deficient in both aspects.  This is detailed in **Section X.A.** below.

    b.   Additional approaches to evaluating claimed lost profits in this matter yield lost profits damages consistent with the damages I determined under a market share allocation approach.  This is detailed in **Section X.B.** and **Section X.C.** below.

    **A.  Evaluating Lost Profits Under A Market Share Allocation Approach Requires Appropriate Determinations Of Lost First Response Sales Caused By The At-Issue Advertising And Of Incremental Profitability**

70.  Evaluating a claim of lost profits requires both (a) determining the portion of SPD's sales of the Weeks Estimator that were attributable to (i.e., caused by) the at-issue advertising relative to non-misleading advertising (and the impact of those sales on First Response sales) and (b) determining the incremental profits associated with First Response sales that were lost as a result of the at-issue advertising.  The necessity of each of these steps, and the impact of

---

[225]  Bell Direct Testimony at 11.

their omission on a lost profits calculation, can be seen from a comparison of the calculations for the market share allocation approach discussed below as compared with that performed by Dr. Bell.

71.  Generally, lost profits calculations under a market share allocation approach utilize as assumptions that (a) the sales attributable to (i.e., caused by) the wrongful act would have been made by other products in the market and (b) the party claiming lost profits would have achieved some of those sales in an amount proportional to their (adjusted) market share.[226, 227]  In other words, under a market share allocation approach, First Response's lost sales can be calculated by apportioning the Weeks Estimator sales attributable to the at-issue advertising using First Response's adjusted pregnancy test kit market share (i.e., First Response's market share after Weeks Estimator sales are removed from consideration).[228]  First Response's lost profits damages

---

[226]  This approach to calculating lost profits damages, apportionment according to adjusted market share, has been accepted by the courts in other settings such as patent infringement damages.  *See*, *e.g.*, *State Industries v. Mor-Flo Indus.*, 883 F.2d 1573 (Fed. Cir. 1989).

[227]  As discussed below, Dr. Bell assumed that all Weeks Estimator sales should be treated as sales attributable to the wrongful act whereas the calculations presented below assume that only 21.9% (for the launch package) to 17.3% (for the revised package) of sales were attributable to the at-issue advertising.  Under both calculations, First Response's pregnancy test kit market share is adjusted to exclude from consideration all Weeks Estimator products (and all combination products that include the Weeks Estimator).  When Weeks Estimator sales are apportioned by the 17.3% and 21.9% values, use of such an adjusted market share is based upon the assumptions that (a) Weeks Estimator purchases attributable to the at-issue advertising would not have been made had SPD used non-misleading advertising and (b) some of the Weeks Estimator purchases attributable to the at-issue advertising would have been sales of other Clearblue products had SPD used non-misleading advertising.  The former assumption is conservative, as the Schoen Survey shows that "[t]here is no statistically significant difference in the definite purchase intent between" (a) the group asked about a product measuring weeks pregnant using the same approach as a doctor and (b) the group asked about a product measuring weeks pregnant using a different approach from the doctor.  Schoen Direct Testimony at ¶ 20; DTX 816 at 11.

[228]  Church & Dwight also sells ovulation products under the First Response label.  I understand that ovulation products are intended to assist users in determining when they ovulate rather than testing whether the user is pregnant.  *See* Wood Direct Testimony at ¶ 7.  In light of the different natures of ovulation products and pregnancy test kits, ovulation products are omitted from this market share apportionment approach.

Highly Confidential - Attorneys' Eyes Only (C&D) (n.227 only)

can be calculated by applying a measure of First Response's profitability to those lost sales.  I discuss below: (a) the determination of lost sales caused by the at-issue advertising; (b) the determination of First Response's incremental costs, including marketing expenses; (c) results from a market share allocation approach that can be compared against Dr. Bell's lost profits calculation presented in his direct testimony; and (d) additional evidence demonstrating that my lost profits calculation based upon a market share allocation approach is conservatively high.

### 1.  Weeks Estimator Sales Must Be Apportioned To Only Those Sales Caused By The At-Issue Advertising

72.  In order to determine the lost profits because of the specific unlawful conduct of a competitor, a lost profits analysis must isolate the impact of that conduct on sales performance. Economic evidence presented above demonstrates that the Weeks Estimator product with non-misleading advertising and labeling would have impacted First Response sales.  As discussed above, (a) the commercial success of the international product version, (b) Church & Dwight's anticipated need to defend against the Weeks Estimator, and (c) the results of surveys conducted for the parties to this litigation (i.e., the Poret Survey and the Schoen Survey) all demonstrate that not all Weeks Estimator sales were attributable to (i.e., caused by) the at-issue advertising.  (*See* **Section VII**.)

73. However, contrary to this evidence, Dr. Bell assumed in his calculation of claimed lost profits damages that all claimed lost First Response sales were attributable solely to the at-issue advertising.  Dr. Bell stated that he based his "lost profit analysis on the assumption that, but for the false and misleading advertising, a Weeks Estimator product, if launched, would not have had an incremental effect on First Response stick sales."[229]  Dr. Bell did not perform any

---

[229]   Bell Direct Testimony at 10 – 11.

analysis of economic causation that would support this assumption,[230] which is contrary to the evidence presented above. Indeed, Dr. Bell did not analyze or address causation at all; rather, he assumed (without basis) that all sales of the Weeks Estimator were attributable to the at-issue advertising.

74.   Additionally, deposition testimony from Dr. Erdem (who C&D offers as an expert in marketing) demonstrates that Dr. Bell's assumption was inappropriate.  For example, Dr. Erdem testified that she could not say that every person who purchased the Weeks Estimator was misled or even purchased the Weeks Estimator because they believed it provided the same estimate as a doctor.[231]  Specifically, Dr. Erdem testified that "[y]ou cannot make this all nonqualifying statement" regarding "every single person who bought this product."[232]  Similarly, regarding First Response's losses in market share, Dr. Erdem testified that in addition to the at-issue advertising, "there could be always some other contributing factors like promotional activity" and that she had not performed any statistical analysis to determine the relationship between the at-issue advertising and First Response's share loss.[233]

75.   Such concessions demonstrate that the Weeks Estimator, in conjunction with non-misleading advertising, would have affected sales of First Response products.  Dr. Bell's assumption (without supporting analyses[234]) that the impact of the Weeks Estimator on sales of

---

[230]   *See*, *e.g.*, Bell Dep. (DTX 837) at 192.

[231]   *See* Erdem Dep. (DTX 839) at 40 – 41.  Dr. Erdem also testified that consumers purchase pregnancy tests for a variety of reasons and that "consumer interest in the Weeks Estimator's alleged ability to estimate the number of weeks pregnant" "wasn't the only factor" underlying consumer purchases in the market.  (Erdem Deposition (DTX 839) at 55 – 56).  Dr. Erdem later testified that she "already said not every single person would buy a Weeks Estimator for the false advertising."  (Erdem Dep. (DTX 839) at 137).

[232]   Erdem Dep. (DTX 839) at 41.

[233]   Erdem Dep. (DTX 839) at 51 – 52.

[234]   Bell Dep. (DTX 837) at 192.

First Response products is solely attributable to the at-issue advertising is contrary to this evidence. Hence, Dr. Bell's assumption overstates the effect of the at-issue advertising on sales of First Response.  Given the conservative assumption that the results of the Poret survey demonstrate the portion of Weeks Estimator sales attributable to the at-issue advertising, Dr. Bell's failure to isolate the lost sales caused by the at-issue advertising (or to attempt any measurement of causation at all – as I understand from counsel to be plaintiff's burden on a lost sales analysis) results in an overstatement of lost sales by factors of 4.6 (launch package) to 5.8 (revised package).[235]

## 2. Marketing Expenses Represent Incremental Costs When Evaluating Lost Profits Attributable To The At-Issue Advertising

76.  From an economic perspective, whether any specific cost category represents an incremental cost in a lost profits calculation may depend upon the extent of the claimed lost sales.[236]  For example, if C&D only claimed to have lost one stick in sales, it is likely C&D would not have had to spend more to market First Response products in order to achieve that incremental sale.  However, if C&D claimed to have lost half of its annual sales of First Response products, it is likely C&D would have had to spend more to market First Response products in order to achieve those incremental sales.

---

[235]   Calculations: $1 \div 21.9\% = 4.566$.   $1 \div 17.3\% = 5.780$.

[236]   *See*, *e.g.*, Bell Dep. (DTX 837) at 210 – 211.

[237]   Bell Direct Testimony at 14.

Highly Confidential - Attorneys' Eyes Only (C&D)



Highly Confidential - Attorneys' Eyes Only (C&D)



Highly Confidential - Attorneys' Eyes Only (C&D)



Highly Confidential - Attorneys' Eyes Only (C&D)