**PROSKAUER ROSE LLP**
Richard M. Goldstein (RG 8329)
Michael T. Mervis (MM 0306)
Baldassare Vinti (BV 0080)
Jeffrey H. Warshafsky (JW 3035)
Q. Jennifer Yang (QY 1436)
Eleven Times Square
New York, NY 10036
Tel:  212.969.3000
Fax:  212.969.2900

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHURCH & DWIGHT CO., INC., <br><br>  Plaintiff, <br><br> v. <br><br> SPD SWISS PRECISION DIAGNOSTICS, GMBH, <br><br> Defendant. | Civil Action No. 14 CV 585 (AJN) <br><br> **CHURCH & DWIGHT CO., INC.'S DAMAGES PHASE PRETRIAL MEMORANDUM OF LAW** |

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT ...................................................................................................................................2

CONCLUSION ...............................................................................................................................13

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Bueno v. LR Credit 18, LLC*,
  No. 16-cv-4737 (WFK)(VMS), 2017 WL 3986577 (E.D.N.Y. Sept. 7, 2017) ..........................3

*Cohen v. Narragansett Bay Ins. Co.*,
  No. 14-cv-3623 (PKC), 2014 WL 4701167 (E.D.N.Y. Sept. 23, 2014).....................................3

*Hilton v. Int'l Perfume Palace, Inc.*,
  No. 12-cv-5074 (GRB), 2013 U.S. Dist. LEXIS 150278 (E.D.N.Y. Sept. 2,
  2013) ......................................................................................................................................13

*Koch v. Greenberg*,
  14 F. Supp. 3d 247, 278-79 (S.D.N.Y. 2014), *aff'd,* 626 F. App'x 335 (2d Cir.
  2015) ..................................................................................................................................2, 12

*Merck Eprova AG v. Brookstone Pharm., LLC*,
  920 F. Supp. 2d 404 (S.D.N.Y. 2013)......................................................................................2

*Merck Eprova AG v. Gnosis S.p.A.*,
  760 F.3d 247 (2d Cir. 2014)...............................................................................................2, 10

*Merck Eprova AG v. Gnosis S,p.A.*,
  901 F. Supp. 2d 436 (S.D.N.Y. 2012)................................................................................ passim

*Mobius Mgmt. Sys., Inc. v. Fourth Dimensions Software, Inc.*,
  880 F. Supp. 1005 (S.D.N.Y. 1994).........................................................................................2

*N.Y. Racing Ass'n v. Stroup News Agency Corp.*,
  920 F. Supp. 295 (N.D.N.Y. 1996)..........................................................................................3

*Tiffany & Co. v. Costco Wholesale Corp.*,
  No. 13-cv-1041 (LTS)(DCF), 2017 U.S. Dist. LEXIS 128946 (S.D.N.Y. Aug.
  14, 2017) .....................................................................................................................3, 12, 13

*Wilner v. Allstate Ins. Co.*,
  71 A.D.3d 155 (App. Div. 2010) .............................................................................................3

**STATUTES**

15 U.S.C. § 1117(a) .........................................................................................................................2

**PRELIMINARY STATEMENT**

Church & Dwight Co., Inc. ("Church & Dwight") respectfully submits this pre-trial brief to emphasize the need for enhanced damages in this case. Church & Dwight will demonstrate at trial that as a result of the false advertising by SPD Swiss Precision Diagnostics, GmbH ("SPD") of its Clearblue Advanced Digital Pregnancy Test with Weeks Estimator (the "Weeks Estimator" or the "Product"), SPD ▬▬▬▬▬▬▬▬ in profits and Church & Dwight lost ▬▬▬▬▬▬ in profits from diverted sales. But the Court should award a far greater sum to fully compensate Church & Dwight for its intangible losses, fully deprive SPD of its wrongfully gained intangible benefits attributable to its false advertising, and to deter SPD and others from engaging in willful false advertising.

At every stage, from before the Product was cleared by the Food and Drug Administration (the "FDA") until the Court's Permanent Injunction went into effect, SPD has consistently demonstrated its disdain for the consuming public, the law, the Court, the FDA and Church & Dwight. Under the Lanham Act and New York law, the Court has wide discretion to fashion a damages award that will not only fully compensate Church & Dwight, but that will also deter SPD, and other malicious actors, from calculating that it pays to engage in false advertising and then seek to avoid the repercussions with scorched earth litigation tactics and false testimony under oath. Merely taking away SPD's profits or awarding Church & Dwight damages for diverted sales will not serve this goal. Otherwise, a well-funded and highly profitable company like SPD might decide it is worth the risk of at most relinquishing its direct profits—and only if a competitor prevails after a protracted legal battle—given the potential upside of enhancing its brand's reputation and goodwill through false advertising. Thus, for the reasons that follow,

Church & Dwight respectfully submits that the Court should award five times SPD's estimated profits, for a total damages award of ▮▮▮▮▮▮▮▮ plus attorneys' fees and costs.

## ARGUMENT

The Lanham Act explicitly contemplates an award of damages beyond the amount of profits proven to have been gained by the defendant or lost by the plaintiff.  15 U.S.C. § 1117(a).  An award of defendant's profits may be enhanced *with no limit* to deter a defendant that willfully violated the Lanham Act and to account for intangible benefits of false advertising to the defendant and intangible harm to the plaintiff.  *Merck Eprova AG v. Gnosis S,p.A.*, 901 F. Supp. 2d 436, 460 (S.D.N.Y. 2012) ("*Merck I*"); *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 262 (2d Cir. 2014) ("*Merck II*").  The Court may also treble a plaintiff's lost profits under similar rationales.  *Mobius Mgmt. Sys., Inc. v. Fourth Dimensions Software, Inc.*, 880 F. Supp. 1005, 1025-26 (S.D.N.Y. 1994); *Merck Eprova AG v. Brookstone Pharm., LLC*, 920 F. Supp. 2d 404, 430 (S.D.N.Y. 2013).  In short, the Court has broad discretion to fashion a damages award that will meet the Lanham Act's goals of compensating the plaintiff while deterring the defendant and preventing its unjust enrichment.  *Merck II*, 760 F. 3d at 261-63.  "[W]hat sum the district court finds to be 'just, according to the circumstances of the case,' is a case-specific inquiry." *Id.* at 263 (quoting 15 U.S.C. § 1117(a)).

The Court also has broad authority under New York law—given its finding that SPD violated N.Y. G.B.L. § 349—to award punitive damages on top of the losses the plaintiff has proven if there is a need for deterrence.  *Koch v. Greenberg*, 14 F. Supp. 3d 247, 278-79 (S.D.N.Y. 2014), *aff'd,* 626 F. App'x 335 (2d Cir. 2015) (awarding punitive damages for a N.Y. G.B.L. § 349 violation in twice the amount of plaintiff's damages because "[t]o deter individuals in [the] rarefied class [of high end wine auction participants], a punitive damages award less than

or equal to the compensatory figure would likely have limited deterrent effect"); *Tiffany & Co. v. Costco Wholesale Corp.*, 2017 U.S. Dist. LEXIS 128946, at *18-22 (S.D.N.Y. Aug. 14, 2017) (awarding $8.25 million in punitive damages under New York law on top of trebled profits under the Lanham Act); *N.Y. Racing Ass'n v. Stroup News Agency Corp.*, 920 F. Supp. 295, 304 (N.D.N.Y. 1996) (doubling the already-trebled awards of plaintiff's lost profits and defendant's profits under the Lanham Act to sanction defendant for its conduct, and "to deter [defendant] and others who may have incentives to infringe trademarks knowingly and deliberately in the future").[1]

As in *Merck I*, where the court trebled the defendant's profits, SPD's "conduct during its advertising campaign and this litigation reveals its disdain for the law and this Court that is nothing short of appalling" and merits a damages award large enough to truly deter such egregious conduct. 901 F. Supp. 2d at 458. Indeed, the misconduct at issue here is significantly worse than that in *Merck I* and merits even greater enhancement of SPD's profits. As detailed below, in addition to the Court's findings that SPD's false advertising was intentional and that its witnesses provided false testimony, as in *Merck I*, SPD also misled the FDA in connection with the clearance process and continued its deceptive conduct well after the Court's strongly worded Liability Opinion.

---

[1] Although there is a line of cases holding that punitive damages under N.Y. G.B.L. § 349 are limited to $1,000, those cases are wrongly decided. *Bueno v. LR Credit 18, LLC*, 2017 WL 3986577, at *5 (E.D.N.Y. Sept. 7, 2017) ("On balance, the authority weighs in favor of Plaintiff's argument that section 349 of the GBL allows for recovery of punitive damages in excess of $1,000.00."); *Wilner v. Allstate Ins. Co.*, 71 A.D.3d 155 (App. Div. 2010). In short, the incorrectly decided line of cases "stemmed from [a] misreading of the statutory language with respect to treble damages, given that nothing in the statute 'govern[s] the award of punitive damages.'" *Cohen v. Narragansett Bay Ins. Co.*, 2014 WL 4701167, at *3 (E.D.N.Y. Sept. 23, 2014).

Long before the Product launched, "SPD was warned by the FDA, its U.S. Advisory Board, and in-house scientific staff about the possibility of consumer confusion." Liability Opinion [Dkt. 397] at 26. For example, as early as January 2012, SPD's scientific advisory board warned SPD that draft packaging for the Product failed to make clear that the Product's estimate was not based on the time from LMP. PTX 69 at 30 ("Need to be clear what this means i.e. from time of conception NOT LMP, *we are Not saying what we are doing*.") (emphasis added). But SPD ignored these warnings in pursuit of profit. "Rather than clarify its product advertising, SPD's staff sought to exploit the confusion." Liability Opinion at 19. Indeed, SPD *enhanced* the likelihood of confusion by placing the word "weeks" inside of the Product's display windows shown on the Product's eventual launch package. PTX 3.

SPD also ignored similar warnings from, and deliberately misled, the FDA. The FDA had informed SPD of its concern that users may "misinterpret the [Product's] weeks results to be a substitution for gestational age determination . . . ." PTX 191 at 3; *see also* PTX 63; Liability Trial Transcript ("Tr.") 367:11-20. Prior to clearance, the FDA specifically asked whether there might be confusion about the Product's weeks estimate and SPD answered that there was "no confusion" among consumers in other countries where the Product is sold. PTX 371 at 1923; Tr. 370:5-372:17. That was a lie. SPD's internal records—which it did not share with the FDA—reflected that consumers abroad had expressed precisely such confusion. E.g., PTX 66 at 18, 28, 174, 218; PTX 67 at 2.

Later, SPD submitted to the FDA a copy of the "final" Product packaging for clearance, but concealed the fact that it had already decided to modify the package to put the word "weeks" inside of the three "Pregnant" display windows shown on the Product's package. PTX 196; PTX 406 at 91; Tr. 320:5-339:4. SPD soon received clearance for the Product, but it never disclosed

4

to the FDA that it was really planning to market the Product using the revised launch package instead of the supposedly "final" labeling it had submitted to the FDA (which did not have the word "weeks" inside the display windows). PTX 409. SPD correctly anticipated that the FDA would not approve of such labeling. *See* PTX 412; Tr. 347:1-22.

As the Court found, the evidence was overwhelming that SPD's executives made a calculated decision to advertise the Product in a way that they knew would deceive consumers. Liability Opinion at 19-27. Indeed, SPD's Chief Compliance Officer, Mark Gittins, one of SPD's executives who approved the Product's launch package (PTX 196; Tr. 271:3-5), was unable to explain to the Court during the liability trial how a consumer viewing that package would understand the word "weeks" on the Product's display window to mean "weeks pregnant since ovulation," given that the word "ovulation" appeared nowhere on the package. Tr. 274:25-275:3, 277:2-15. The truth, of course, is that SPD knew consumers would not make that connection. On the contrary, SPD anticipated that consumers who saw "estimates weeks" in conjunction with the words "Pregnant 1-2 Weeks" on the image of the results display window would "put it together" and think the Product estimates weeks of pregnancy. PTX 214. In other words, consumers would take away exactly the message the FDA (and SPD's own advisory board) had admonished it not to convey. But despite warnings that its advertising "was very likely to also confuse consumers" (PTX 52), SPD launched a massive campaign focused on the false "weeks pregnant" message. Liability Opinion at 11.

SPD's disdain for honesty in advertising was done for more than just short term profits. It was intended to generate a lasting halo effect by making SPD's Clearblue brand appear more innovative than Church & Dwight's First Response brand. Liability Opinion at 47. As the Court recognized, "innovation is a key distinguisher between the First Response and Clearblue brands."

5

*Id.* Once consumers have it engrained it their minds that Clearblue is synonymous with "innovation," it is very difficult to dislodge that notion. This alone warrants awarding more than just SPD's direct profits from sales of the Weeks Estimator.

SPD's advertising campaign succeeded in delivering the false message that SPD knew would cause widespread consumer confusion. When a CBS affiliate in Los Angeles ran a story about emotional distress and anxiety suffered by pregnant women as a result of their belief that the Product provided an estimate of weeks pregnant that was consistent with a doctor's estimate, SPD did nothing to alter its advertising. PTX 119; PTX 120; PTX 226A; Tr. 1097:1-21. Rather, SPD's PR agency recommended that SPD make "no proactive statement at this time and let the story fade away." PTX 226A.

Once the FDA became aware of the advertising and package that SPD actually released (as opposed to the "final" package sent to the FDA before the launch), it notified SPD that it had violated the FDA's clearance letter limitations. PTX 157. But rather than proposing a new package design that would make clear that the Product's estimate of weeks is different from a doctor's estimate of weeks pregnant, SPD proposed a revised version of the Product's package that it believed communicated the *same message as the launch package.* Tr. 721:21-722:15; PTX 373 at No. 8.[2]

The manner in which SPD defended itself in this case further revealed its disregard for Church & Dwight and the Court, let alone the judicial process, highlighting the need for deterrence. Immediately after SPD launched the Product with false and misleading advertising and packaging, Church & Dwight wrote SPD, as required pursuant to a previous settlement

---

[2] Although SPD added the words "since ovulation" to the revised package, it purposefully obscured them, placing them in dark blue, non-bold font against a silver background (PTX 4), despite that every other SPD home pregnancy test (including the launch package), fertility test, and ovulation test product package contains a yellow banner background to contrast the dark blue text. PTX 449-450; Tr. 1054:23-1057:3.

6

agreement between the parties, to provide notice of its intent to challenge SPD's advertising. PTX 34; PTX 38 at Ex. B.  SPD delayed responding to that letter for as long as possible and then claimed any challenge was barred under the settlement agreement (PTX 35), thus forcing Church & Dwight to commence arbitration to resolve the issue of whether the challenge it wanted to pursue was barred by the settlement agreement.  *See* PTX 38.  This tactical move delayed Church & Dwight's ability to bring suit for five months—five months more that SPD's false advertising could remain on the market without legal challenge—until the arbitrator ruled in no uncertain terms that SPD's claim that the prior settlement agreement barred this litigation was completely without merit.  Although the Court determined SPD did not breach the settlement agreement by forcing the arbitration, it is nonetheless clear that SPD gave "short shrift" to Church & Dwight's concern that SPD's advertising was false and harmful, particularly given the evidence that SPD already knew that its advertising was likely to deceive consumers.  *See Merck I*, 901 F. Supp. 2d at 458.  SPD erected every possible obstacle to delay Church & Dwight's challenge and was successful in its litigation strategy of keeping the Product on the market for more than 3 years after Church & Dwight sent its letter notifying SPD that its advertising would confuse consumers, as SPD already knew.

Once the litigation was underway, SPD's bad faith conduct and scorched earth tactics continued.  SPD repeatedly withheld inculpatory documents that should have been produced early in discovery, such as its advisory board meeting minutes and communications with the FDA, and prolonged the lawsuit by forcing Church & Dwight to move to compel their production.  *See* Dkt. 33; Dkt. 123; Dkt. 156; Dkt. 173; Dkt. 184; Dkt. 212; Dkt. 463; Dkt. 465. SPD also committed a blatant discovery violation by attempting to hide a key document, only for its deceit to be revealed in the middle of trial when SPD's former counsel accidentally provided

Church & Dwight's counsel with a copy of the document that SPD had withheld.  Tr. 1283:7-1289:16.

Further, much like the defendant in *Merck I*, SPD attempted to cover up its misdeeds with false testimony.  For example, one of the clearest documents evidencing SPD's understanding that its advertising would deceive consumers was an email sent by Dr. Pike, in which she wrote:

> We should not suggest in US that the product tells you 'Weeks Pregnant' when we have been constrained by FDA to say 'weeks since ovulation'. Indeed, even outside of US, this product doesn't tell you weeks pregnant — if you are 1-2 weeks by [the Weeks Estimator] then you are 3-4 weeks pregnant because the universal convention for dating pregnancy is from the LMP not from ovulation. . . . I think FDA would NOT approve if we used `Weeks Pregnant' in any materials and we are very likely to also confuse consumers and might end up with challenge/complaint.

PTX 52.  Rather than admitting to the obvious meaning of this email, SPD and Dr. Pike chose to lie about it, claiming in her sworn written testimony that she was merely conveying the FDA's views.  However, "[t]he email considered as a whole—particularly the statement that the convention for dating pregnancy is from LMP even outside the FDA's jurisdiction—belie[d] this explanation."  Liability Opinion at 20.  The Court also saw through Dr. Pike's claim that she was being hyperbolic in an effort to kill an advertisement she did not like for other, unrelated reasons.  *Id.*  "[Dr. Pike's] email was candid.  Her testimony about the email was not."  *Id.*

Similarly, many documents established that SPD "was clearly aware that LMP is the metric used by doctors."  2d Cir. Opinion at 34; *see also* Liability Opinion at 19-21.  Nevertheless, SPD's witnesses, including Dr. Pike, refused to concede that this was the universal medical convention.  Liability Opinion at 19-20.  In fact, showing a complete disregard for honesty, Dr. Pike initially refused to acknowledge that fact on cross-examination despite calling it exactly that in her own email.  Tr. 1165:23-1166:5.  Only under questioning from the Court did Dr. Pike finally relent:

8

> After one such longwinded explanation, the Court pointedly asked Dr. Joanna Pike, SPD's Senior Global Pregnancy Product Manager, 'If someone says to you or you read somewhere I am four weeks pregnant without any further explanation, what would you assume that means?' Tr. 1184:2-4. Dr. Pike, withdrawing deeper into her chair, provided a convoluted answer before finally acknowledging that 'I think in general you may — you may — this, it is time since LMP because it is widely used,' which she hesitantly admitted was '[t]he truth.' Tr. 1184:22-1185:3. The truth it was.

Liability Opinion at 19-20.

Another SPD employee "who exhibited such disregard for truthful advertising" was Ryan Daly, SPD's marketing director for the Clearblue brand. Liability Opinion at 23. As the Court also found, he displayed a similar disregard for truthful testimony. *Id.* at 22, n.9. The centerpiece of SPD's marketing campaign, which Mr. Daly oversaw, was its television commercial that unambiguously communicated the message that the Product's estimate was consistent with a doctor's estimate. *Id.* at 37. Although they knew it would deceive consumers, Mr. Daly and his team decided to air the commercial anyway, figuring that the "super" (the disclaimer text at the bottom of the screen) "[would] cover us." *Id.* at 22 (quoting PTX 211 at). Of course, the super provided no such "cover." Not only did SPD hide the commercial's "super" at the bottom of the screen in "small, whitish font that blends in to the white background such that even the Court failed to notice it upon first viewing." *Id.* at 38. It also "intentionally omitted language from the super clarifying that the estimate of pregnancy duration from a doctor is different from the Weeks Estimator's result." *Id.*

What "[kept Mr. Daly] up at night" was not that consumers might be deceived—that was his aim, after all—but rather that TV networks might not air the commercial if they read the full Indications For Use disclosing that the Product's estimate of 'weeks' is different from the doctor's estimate. *Id.* To avoid that risk, "[r]ather than give the networks the full Indications for Use statement, which is less than a page long, SPD gave the networks a substantially truncated

9

version" that omitted the key part which clarified that the Product's estimate is not a substitute for a doctor's estimate. *Id.* at 22-23.  When confronted about this at trial, "Mr. Daly provided a farfetched explanation for this email, unconvincingly stating that it expressed his concern about overwhelming the networks with too much information: 'We have technical people who will sometimes provide hundreds of pages of information when you only really need one page.'" *Id.* at 23 (quoting Tr. 718:3-8).[3]

Despite the Court's extensive findings in its Liability Opinion that SPD's conduct was "intentional" and "egregious," SPD has remained undeterred since then.  Although "Mr. Daly's lack of credibility revealed itself repeatedly" at trial (*id.*), he remained in charge of marketing Clearblue products in the U.S.  PTX 667 (Daly Deposition Transcript) at 21:18-22:3.  Further, SPD immediately sought a stay of the Injunction so that it could continue selling the Product in its misleading revised package.  While SPD of course was not obligated to replace Mr. Daly, and was entitled to appeal the Court's decision and seek a stay, a defendant that had learned its lesson would have taken steps to ameliorate the confusion generated by its advertising.  Instead, even though "it must have been obvious to [SPD], a seasoned manufacturer of home pregnancy tests, that many women are not aware that the medical profession measures pregnancy as starting approximately two weeks prior to ovulation and fertilization" (2d Cir. Opinion at 38), SPD continued to sell the deceptive revised package for more than a year after the Permanent Injunction was entered.  This strongly evidences the need for deterrence.  *See Merck I*, 901 F. Supp. 2d at 458-59; *Merck II*, 760 F.3d at 263.

So, too, does SPD's efforts to mischaracterize the Court's Liability Opinion and Injunction so it could continue to capitalize on the confusion it had sown and maintain the

---

[3] Mr. Daly's disdain for providing full and complete information to regulators and broadcasters was best captured by his characterization of a prior instance where the "technical people" supplied such information as the "Bedford puke." *Id.* at 22, n.9.

appearance that the Weeks Estimator was an innovative product and Clearblue an innovative brand. SPD falsely informed its retailers that the Court found no issue with the Product's "function" (JX 50; JX 51), despite the Court explicitly finding that SPD had falsely advertised the Product's "weeks estimating function." Liability Opinion at 41. ███████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████████████████

    ███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████

    ███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

██████████████████████████████████  ████████  █
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████

While the Court found that SPD's post-trial conduct did not violate the letter of the Injunction or require it to be modified, the Court should take this bad faith conduct into account when determining an appropriate damages award. SPD's post-trial conduct is further evidence that it has no intention to be forthright with consumers and retailers and did not care about the risk of continued consumer deception, and thus highlights the need for a damages award that will have a strong deterrent effect.

In formulating the damages award, the Court also should take into account that SPD—jointly owned Procter & Gamble and Alere[4]—is a highly profitable company, with net sales of over ████████ in each fiscal year from 2014-2016. PTX 636 at 3; JX 54 at 3; JX 56 at 3. *See Koch*, 14 F. Supp. 3d at 275 ("The wealth of the defendant is also relevant, because a defendant's ability to pay impacts whether [punitive] damages are sufficient to function as a punishment and a deterrent); *Tiffany & Co.*, 2017 U.S. Dist. LEXIS 128946 at *21 (same). Merely disgorging SPD's profits would, for a company of its size, be a slap on the wrist, one that would send the wrong message to other major consumer product companies weighing whether it pays to flout consumer protection laws, not to mention the judicial process.

As discussed in Church & Dwight's Proposed Findings of Fact and Conclusions of Law, SPD has gained and will continue to gain intangible benefits and Church & Dwight has suffered and will continue to suffer intangible harm as a result of the false advertising's impact on consumers' and retailers' perceptions of the Clearblue and First Response brands. To fully

---

[4] Alere was recently purchased by Abbott Laboratories for over $4 billion.

compensate Church & Dwight, and to send a message to SPD and other bad actors that lying to consumers, retailers, regulators and the courts is not worth the potential to enhance their brand's goodwill, the Court should award five times the ▮▮▮▮▮▮▮▮ in estimated profits SPD earned from direct sales of the Product, for a total damages award of ▮▮▮▮▮▮▮▮.

As noted, an award of this magnitude is justified under the Lanham Act, since it does not place any limit on the Court's discretion to enhance a disgorgement award, as well as under New York law, which makes substantial punitive damages available in cases like this one. *See Merck I*, 901 F. Supp. 2d at 461 (trebling disgorgement award because, "while an award under the Lanham Act must promote a compensatory and not punitive purpose, it is no small matter that [the defendant] may be deterred from again engaging in such brazen behavior by being required to fully account for its actions."); *Hilton v. Int'l Perfume Palace, Inc.*, 2013 U.S. Dist. LEXIS 150278, at *14 (E.D.N.Y. Sept. 2, 2013) (awarding 10 times the defendant's estimated profits); *Tiffany & Co.*, 2017 U.S. Dist. LEXIS 128946 at *18-22 (awarding $8.25 million in punitive damages, on top of trebled profits, in light of "evidence of the conduct and attitude of Costco's senior executives towards use of the 'Tiffany' mark and the lawsuit, customer confusion, and marketing strategies designed to invoke an association with Tiffany").

## **CONCLUSION**

In sum, SPD made the calculated decision that it was worth the risk to engage in a massive false advertising scheme—and then persist as long as possible—even in the face of a finding by this Court that its conduct egregiously violated the law. The law vests this Court with broad discretion to fashion a judgment that will not only compensate Church & Dwight, but will also completely deter SPD and other major consumer product companies from thinking that such

conduct may be a profitable endeavor. Thus, the Court should exercise that discretion to award

Church & Dwight ███████ plus attorneys' fees and costs.

| | |
|---|---|
| Dated: November 13, 2017<br>New York, NY | By: /s/ Michael T. Mervis<br>**PROSKAUER ROSE LLP**<br>Richard M. Goldstein<br>Michael T. Mervis<br>Baldassare Vinti<br>Jeffrey H. Warshafsky<br>Q. Jennifer Yang<br>Eleven Times Square<br>New York, NY 10036<br>Tel. (212) 969-3000<br>Fax (212) 969-2900<br>rgoldstein@proskauer.com<br>mmervis@proskauer.com<br>bvinti@proskauer.com<br>jwarshafsky@proskauer.com<br>jyang@proskauer.com<br><br>Attorneys for Plaintiff<br>Church & Dwight Co., Inc. |