UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Church & Dwight Co., Inc.,

Plaintiff,

—v—

SPD Swiss Precision Diagnostics GmbH,

Defendant.

14-CV-585 (AJN)

OPINION & ORDER

---

ALISON J. NATHAN, District Judge:

Plaintiff Church & Dwight Co. ("C&D") and Defendant SPD Swiss Precision Diagnostics, GmbH ("SPD") are manufacturers of home pregnancy tests. Following a bench trial on liability in 2015, the Court found that SPD engaged in false advertising in violation of the Lanham Act with respect to its "Clearblue Advanced Pregnancy Test with Weeks Estimator" (the "Product" or "Weeks Estimator"), that SPD engaged in intentional deception, and that C&D was entitled to a permanent injunction.

Now before the Court is the issue of appropriate monetary damages, the determination of which had been bifurcated from liability at the parties' joint request. In December 2017, the Court presided over a three-day bench trial solely on damages. Following this trial, and with the benefit of post-trial briefing, the Court makes the following findings of fact and conclusions of law, which are explained below: (1) C&D has proved causation of damages; (2) C&D has proved that its estimate of its own lost profits is fair and reasonable; (3) disgorgement of SPD's profits is unwarranted because the lost profits award is both adequate compensation and adequate deterrence; (4) awarding treble damages, punitive damages, attorneys' fees and costs, or

1

prejudgment interest is not warranted because SPD's actions were not "egregious" nor is this case "exceptional."

For the reasons that follow, the Court enters judgment for Plaintiff Church & Dwight in the amount of $9,955,018.

## I.    Procedural History

The history of the facts and prior proceedings in this matter is voluminous. For present purposes, the Court offers the following summary.

Shortly after this action commenced in early 2014, C&D moved for a preliminary injunction and SPD moved to dismiss; the Court denied the motion to dismiss and consolidated the preliminary injunction with a bench trial on liability. Dkt. No. 93. At the parties' request, the Court also bifurcated liability and damages. Dkt. No. 42.

On July 1, 2015, the Court issued its Opinion & Order on the liability phase. The standard convention in the medical community for expressing the duration of a woman's pregnancy is in terms of the number of weeks that have passed since a woman's last menstrual period ("LMP"). SPD's "Weeks Estimator" test, the product at issue here, provides an estimate of the number of weeks that have passed since a woman last ovulated, which is, on average, two weeks after a woman's LMP. The Court found that SPD "recognized and understood that the Weeks Estimator's result did not align with how doctors express pregnancy duration and that this misalignment could confuse consumers. Rather than clarify its product advertising, SPD's staff sought to exploit the confusion." *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH*, No. 14-CV-585 (AJN), 2015 WL 4002468, at *12 (S.D.N.Y. July 1, 2015) [hereafter, "Liability Op."], *aff'd* 843 F.3d 48 (2d Cir. 2016). Accordingly, the Court held that Plaintiff had established its false advertising claim under the Lanham Act under both literal falsity and implied falsity theories, and with respect to the launch package, the revised package, and

2

television and other advertising. *See generally id.* at \*17–24. The Court also determined that "C&D provided evidence showing a logical causal connection between SPD's false advertising and its own sales position," thus establishing injury for the purposes of liability under the Lanham Act. *See id.* at \*25–28. Based on these findings and others, the Court later entered a permanent injunction, requiring, among other things, that the Product could only be sold with package labels containing specific language spelled out in the Court's Order. *Id.* at \*28–32; Dkt. No. 423. SPD filed an interlocutory appeal challenging the Court's decision on liability, and the Second Circuit granted SPD a temporary stay of the permanent injunction pending determination of the motion. In light of that stay, the Court also stayed the damages phase of the action. Dkt. No. 437.

On December 14, 2016, the Second Circuit affirmed the Court's decision, finding no fault in the Court's conclusion "that Plaintiff suffered a likelihood of loss of sales of its product, attributable to Defendant's false concealment that its Product gave information about the advancement of a pregnancy that was inconsistent with the information that the medical profession would give." *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH*, 843 F.3d 48, 72 (2d Cir. 2016); Dkt. No. 449.

Following the Circuit's affirmance, the Court's injunction took effect immediately. Less than three weeks later, C&D filed a motion to hold SPD in contempt for violating the injunction. Dkt. Nos. 480–84. C&D complained that SPD had subverted the terms of the injunction through conduct undertaken both before the injunction took final effect and conduct undertaken after the issuance of the Court of Appeals' mandate. On July 26, 2017, the Court denied C&D's motion, finding that "no proof has been put before this Court that demonstrates a reasonable certainty that a violation of the Injunction occurred." Dkt. No. 475 at 12 (internal quotation and

alterations omitted). The Court also denied C&D's request for supplemental injunctive relief.
*Id.*

In advance of the damages trial, C&D moved to exclude the testimony of SPD's expert, Dr. Keith R. Ugone, and SPD moved to exclude the testimony of C&D's experts, Dr. Gregory Bell and Dr. Tulim Erdem, under the standards set forth in *Daubert* and Federal Rule of Evidence 702. *See* Dkt. Nos. 497, 500, & 506. C&D also moved to preclude evidence about "economic causation" that it deemed "irrelevant." *See* Dkt. No. 509. On December 1, 2017, the Court reserved judgment on these four motions *in limine*, Dkt. No. 555 at 1–2, and they are resolved here. However, the Court did resolve one motion *in limine* prior to trial, granting C&D's motion to preclude the introduction and use of certain evidence contained within the direct testimony of Dr. Ugone and Cristobal Montero, SPD's Chief Financial Officer regarding so-called "true up payments" as well as returns. *See id.* at 2–4. In brief, because SPD had not produced evidence about these payments or returns to C&D, SPD's use of this information was barred by Federal Rules of Civil Procedure 26 and 37. *Id.*

The Court held a three-day bench trial beginning on December 11, 2017 in accordance with its Individual Practices in Civil Cases for non-jury proceedings. Prior to trial, the parties submitted declarations of direct and rebuttal testimony as well as copies of anticipated exhibits and deposition designations that they intended to use at trial. The parties also submitted proposed findings of fact and conclusions of law. At trial, the parties called only those witnesses whom they intended to cross-examine and read into the record deposition designations and counter-designations for all other witnesses. In all, the Court received testimony from 12 witnesses, 7 of whom provided live testimony, and admitted roughly 680 exhibits from both

parties. Following trial, the parties submitted post-trial memoranda of law and updated proposed

findings of fact and conclusions of law that were fully submitted on February 9, 2018.[1]

Finally, on March 30, 2018, C&D moved to reopen the record of the trial to introduce

new evidence of what it deems "continued public display of advertising" for the Weeks

Estimator. *See* Dkt. No. 598. The motion was fully submitted on April 20, 2018, the evidence is

considered below, and the motion is resolved here.

## II.    Burden of Proof

When a plaintiff establishes a violation of the Lanham Act, the plaintiff is entitled,

"subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained

by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). Accordingly, the Second

Circuit has stated that "the statute's invocation of equitable principles as guideposts in the

assessment of monetary relief vests the district court with some degree of discretion in shaping

that relief." *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992).

Still, that discretion "must operate within legally defined parameters." *Id.*

---

[1] Both parties submitted post-trial proposed findings of fact and were provided an opportunity to respond to each other's proposed findings of facts with opposing record citations. *See* Dkt. Nos. 589, 590, 592, 593, 595, 596. The abbreviation "C&D FOF" represents Dkt. No. 589, which presents C&D's proposed findings of facts. The abbreviation "C&D COL" represents Dkt. No. 590, which presents C&D's proposed conclusions of law. The abbreviation "SPD FOF" represents Dkt. No. 592, which presents SPD's proposed findings of facts and responses to C&D's findings of fact. The abbreviation "SPD COL" represents Dkt. No. 593, which presents SPD's proposed conclusions of law. Finally, C&D responded to SPD's proposed conclusions of law and findings of fact. *See* Dkt. Nos. 595, 596 [hereafter respectively "Reply COL" and "Reply FOF"]. If a party did not oppose a proposed finding of fact with an appropriate record citation, and if that unopposed proposed finding of fact was supported by an appropriate record citation, the Court deemed that fact admitted and incorporates such unopposed facts as factual findings of the Court.

Additionally, both parties filed their post-trial submissions with certain redactions pursuant to the Court's Rule 4.B, and as described in the parties' joint letters of January 5, 2018, January 25, 2018, and February 9, 2018. *See* Dkt. Nos. 588, 591, 594. Having reviewed the proposed redactions pursuant to the criteria set forth in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2006), the Court finds that the proposed redactions are "narrowly tailored" to serve the parties' privacy interests in maintaining the confidentiality of their proprietary and competitively sensitive information. Some of the redactions concern information provided by The Nielsen Company that both parties are contractually obligated to treat as confidential, the redaction of which the Court also approves. Accordingly, the Court will file the unredacted pages under seal.

First, a plaintiff who establishes liability for false advertising "will be entitled only to such damages as were *caused by* the violation." *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 771 (2d Cir. 1984) (emphasis added). "While the plaintiff must prove causation, it does not have to negate every conceivable intervening factor which might have caused a decline in sales." *See* 5 McCarthy on Trademarks and Unfair Competition § 30:79 (5th ed.).

Second, while "causation must first be established," a court may engage in "some degree of speculation" in determining the *amount* of damages. *Burndy*, 748 F.2d at 771. "[T]he district court may take into account the difficulty of proving an exact amount of damages from false advertising, as well as the maxim that 'the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.'" *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 969 (D.C. Cir. 1990) (quoting *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 745 (7th Cir. 1985) (internal quotation omitted)).

Ultimately, a plaintiff only bears the burden of showing "that its damages calculation is a 'fair and reasonable approximation' of its lost profits." *Merck Eprova AG v. Brookstone Pharm., LLC*, 920 F. Supp. 2d 404, 428 (S.D.N.Y. 2013) (quoting *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 305 (S.D.N.Y. 2002)). The lost profits calculation "may be satisfied by circumstantial evidence from which a 'probable' or 'approximate' loss may be ascertained by 'reasonable inference.'" *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 490 (D.N.J. 2009) (quoting *Broan Mfg. Co. v. Associated Distrib., Inc.*, 923 F.2d 1232, 1236 (6th Cir. 1991)); *accord Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1110 (9th Cir. 2012). Moreover, "the methodology of assessing and computing damages is committed to the sound discretion of the district court." *King Instruments Corp. v. Perego*, 65 F.3d 941, 952 (Fed. Cir. 1995) (quoting *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1576–77 (Fed. Cir. 1989)).

Accordingly, when the Court considers the evidence presented during the damages trial and makes the following findings of fact, the task is framed by whether C&D has met its burden in presenting a reasonable calculation of damages in this fundamentally equitable proceeding.

## III.    Findings of Fact[2]

### A.    The Parties and the Market

As stated in the Court's prior opinion, "C&D and SPD are direct competitors in the U.S. Market for home pregnancy tests. C&D's leading home pregnancy test brand, First Response, has been the market leader for many years, and SPD's leading brand, Clearblue, has been First Response's primary competitor." Liability Op. at *3 (citations omitted).

SPD is a joint venture between Alere, Inc. ("Alere"), formerly known as Inverness Medical Innovations, Inc. ("Inverness"), and Proctor & Gamble Co. ("P&G"). Montero DT ¶¶ 5, 7.[3] ███████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████

Clearblue markets two types of pregnancy tests: "analog," which displays one or two lines to indicate whether or not a woman is pregnant, and "digital," which displays the words "pregnant" or "not pregnant." Wood DT ¶ 7. ████████████████████████████

---

[2] To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice versa.

[3] "DT" refers to direct testimony of a given witness, "RT" refers to rebuttal testimony, and exhibits are labeled "PTX" for Plaintiff's exhibit, "DTX" for Defendant's exhibit, and "JX" for joint exhibits.

███████████, while First Response, the market leader, derives more dollar sales from its analog products. *See* JX 32. Analog products are generally less expensive, and Clearblue digital tests, including the Weeks Estimator, are generally priced below First Response digital tests. Tr. (Bishop) 77:20–24; 78:24–79:2. The rest of the home pregnancy test market includes premium brand e.p.t. and value brands, and private label products. JX 32.

### B. The Weeks Estimator and the Liability Phase

The Weeks Estimator was a digital pregnancy test launched by SPD in the United States in August 2013. In January 2014, the original "launch" packaging was replaced at the FDA's insistence with a revised package with changes to the labeling and advertising. Wood DT ¶ 18. Television advertising was discontinued at that time, but the launch packaging remained on shelves at some retailers for up to six months thereafter. Wood DT ¶¶ 18, 31(a).

Unlike other pregnancy tests, which only inform a woman whether or not she is pregnant, SPD's Weeks Estimator also provided an estimate of the number of weeks that have passed since fertilization, which provides a proxy for the date of ovulation. The standard convention for *expressing* the duration of a woman's pregnancy is to state it in terms of the number of weeks since a woman's LMP. Liability Op. at *5. However, the Weeks Estimator provides an estimate of how many weeks have passed since ovulation, which is, on average, two weeks after a woman's LMP.

At the liability phase, the Court considered evidence presented at trial about the launch package and launch advertising for the Weeks Estimator, as well as the package and advertising as revised following feedback from the Food and Drug Administration (FDA). With respect to both the launch phase and revised phase, the Court found that SPD advertised the Weeks Estimator in "ways that were intended to obfuscate the distinction between the Weeks Estimator's result of weeks since ovulation and the estimate of pregnancy duration a doctor

would provide." Liability Op. at *14. The Court held that SPD's advertising was both literally and impliedly false, that the false representations were material because the weeks estimator was the key feature of the product, and that C&D had established "a logical causal connection between SPD's false advertising and its market harm." *Id.* at *17–28.

In finding that the packaging was impliedly false—that is, that it is likely to deceive or confuse consumers—the Court relied in part on consumer surveys presented by C&D's expert, Hal Poret. Mr. Poret concluded that around 20% of survey participants answered both that the product estimates the number of weeks a woman is pregnant *and* that the product's estimate of weeks is the same as a doctor's. *Id.* at *21.

Immediately after the Court's ruling on liability, on July 2, 2015, SPD notified retailers that it would cease shipping the Product. *See* Wood DT ¶ 19; JX 51. However, after the Second Circuit granted SPD's motion to stay the injunction, SPD resumed shipping the Weeks Estimator on September 17, 2015. Wood DT ¶ 20; DTX 303. After the Second Circuit affirmed the Court's decision, SPD again stopped shipping on September 12, 2016. Wood DT ¶ 20; JX 52.

### C. The Parties' Competing Lost Profits Analyses

At its core, the damages phase of this action centers on the analyses performed by two expert witnesses, Dr. Gregory Bell and Dr. Keith Ugone, whose respective assumptions and calculations are supported by testimony from other witnesses, including Dr. Tulim Erdem (C&D's marketing expert), Mr. Hal Poret (C&D's consumer survey expert), and Dr. Douglas Schoen (SPD's consumer survey expert).

The parties offer diverging perspectives about the relationship between the at-issue false advertising and the sales of the Weeks Estimator. This disagreement is fundamental to the larger arguments over the proper disgorgement and lost profits awards.

C&D's damages expert, Dr. Bell, counted all of SPD's sales of the Product in his damages estimates. Bell DT ¶¶ 19, 23; Bell RT ¶¶ 4, 29. For the calculation of lost profits, Dr. Bell applied a so-called "market share allocation" approach in order to account for the portion of those sales that had been diverted from C&D. He first determined how many Weeks Estimator sticks were sold by SPD throughout the damages period. Bell DT ¶ 24. Then he determined how many of those sales at retail would have gone to C&D's First Response brand pregnancy test sticks if the Weeks Estimator had not been sold. *Id.* ¶ 25. Dr. Bell assumed that sales of the Weeks Estimator impacted sales of First Response *proportionally* to First Response's relative share of the pregnancy test stick market for each quarter, an assumption Dr. Bell claims was confirmed by a regression analysis he performed. *Id.* at ¶ 25–27. Finally, by multiplying the share per quarter by the number of Weeks Estimator sticks sold each quarter and by First Response's per-stick incremental profit margin, Dr. Bell estimated C&D's total lost profits at $9,955,018. *Id.* ¶ 37.

Dr. Ugone agrees that a market share allocation approach is an established method to estimate lost profits and utilizes it himself as his primary approach to estimate C&D's lost profits. Ugone DT ¶¶ 69–71. However, he takes issue with Dr. Bell's analysis at each step— counting all of SPD's sales, the market share allocation, and the per-stick profit calculation. Utilizing the same basic approach and same data, Dr. Ugone calculated C&D's lost profits at only ▮▮▮▮▮. The large discrepancy from Dr. Bell's result was explained mostly by: (1) Dr. Ugone's use of the Poret Survey as a proxy for causation, and (2) Dr. Ugone's use of a lower per-stick profit margin for C&D's First Response brand test. Both differences are further discussed below, along with SPD's other criticisms of Dr. Bell's analysis. For sake of clarity, the Court discusses the three steps of Dr. Bell's analysis and SPD's relevant critiques in turn.

### 1. Causation and the Core Assumption of Dr. Bell's Analysis

In calculating lost profits, Dr. Bell starts with the assumption that *all* of the sales of the Weeks Estimator are connected to the false advertising of the product's key differentiating feature, or, to state the inverse, that there were no sales of the Weeks Estimator that happened independent of the false advertising. *See* Bell DT ¶ 23; Tr. (Bell) 9:6–10:11. This assumption governed Dr. Bell's analysis despite his admission that he cannot be sure that every person who bought the Weeks Estimator bought it because of the advertising. Tr. (Bell) 11:18–21. Moreover, to the extent that there were any customers who bought the product with a full understanding that the Weeks Estimator provided a measurement of pregnancy different from what a doctor provides, these sales would be included as well. Tr. (Bell) 12:20–13:8.

C&D argues that this assumption is warranted for a number of reasons. First, they contend that every consumer who bought the Product *was* exposed to at least part of SPD's marketing campaign. The Court, in its liability opinion, found that the Product's ability to estimate weeks "is the key feature that differentiates it from the many other home pregnancy tests on the market," and that the key message of SPD's marketing plan was to tell women that only this test could tell women how far along they are. Bell DT ¶ 17 (quoting and citing Liability Op. at *25–26). This message was transmitted both through advertising and through the packaging itself. Given that this was the key distinguishing feature between the Product and the less expensive Clearblue digital pregnancy test, C&D insists that there was no other reason for a consumer to buy the Product. Dr. Bell also notes that retailers' decisions about whether to stock the Product, how much shelf space to give the Product, and where to place the Product on store shelves likely were influenced by false advertising. *Id.* ¶ 23. Accordingly, C&D argues that even in the possible scenario in which some purchasers were unaffected directly by the falsity of the advertising, their purchase would still be affected indirectly through the decisions

11

of the retailers. Because Dr. Bell concludes that he is not aware of any sales of the Weeks Estimator that took place independent of the false advertising of the key feature, he assumes that but for that false advertising, the launch of the Weeks Estimator product "would not have had an incremental effect on First Response stick sales." *Id.* ¶ 23.

Through Dr. Ugone, and as elaborated in its motion *in limine*, SPD criticizes Dr. Bell for not having performed any economic analysis to support his assumptions that the Weeks Estimator would not have had an effect on First Response sales but for the false advertising and that the Product only gained shelf space because of the effect the false advertising had on retailers. SPD contends that there is ample reason to reject Dr. Bell's base assumption that all sales of the Weeks Estimator were attributable to the false advertising and should be included in the damages calculation. *See* Ugone DT ¶ 73.

However, and as further explained below, the Court is persuaded by C&D's proof that this is a reasonable assumption for Dr. Bell to have made. It was reasonable because this is a competitive market in which the parties own the top two brands; and there is one key distinguishing feature between the Product and similar test sticks—a feature that was the subject of false advertising directed at both consumers and retailers. It was also reasonable because the evidence suggesting that some subset of consumers were unaffected by the advertising was not persuasive.

Dr. Ugone, SPD's damages expert, criticizes Dr. Bell's assumption that all of the sales of Weeks Estimator are attributable to the false advertising, and points to a variety of evidence that he contends demonstrates that consumers wanted to buy the Weeks Estimator for reasons independent from the false advertising. Dr. Ugone therefore concludes that Dr. Bell needed to "isolate the impact of the at-issue advertising" in his calculations and did not. Ugone DT ¶ 32.

12

First, Dr. Ugone points to a survey conducted for SPD by Dr. Douglas Schoen in which prospective pregnancy test buyers were asked about their willingness to purchase two product concepts that Dr. Ugone claims correspond to how SPD falsely advertised the Product and how SPD could have truthfully advertised the Product. Based on this "concept survey," Dr. Schoen found that 81% of respondents would "definitely purchase" the product estimating pregnancy from the last menstrual period, and 84% of respondents would "definitely purchase" the product that estimates pregnancy from ovulation, which they understood to be different from a doctor's estimate. Schoen DT ¶¶ 18–19. According to SPD, the results of the Schoen Survey rebut C&D's contention that no women would purchase the Weeks Estimator if they understood its actual function. In other words, the key differentiating feature—the test's ability to estimate the number of weeks since ovulation—would still induce purchases even in the absence of false advertising.

C&D argues, and the Court agrees, that Dr. Schoen's survey proves nothing of the sort. First, the Schoen Survey used statements describing how the two products *measure* pregnancy duration, but not how they *express* that result. As discussed at length in the Court's decision at the liability stage, it is the difference between how the Weeks Estimator *expresses* pregnancy duration and the way a doctor would express it that is crucial. Second, Dr. Schoen only gave participants two extreme options—"would definitely purchase this product" and "would not purchase this product"—and showed each participant only one product description. Accordingly, unlike in the real world in which test-buying consumers are faced with a variety of choices that they can compare, the Schoen Survey simply asked whether consumers would purchase the hypothetical product being described. *See generally* Poret RT ¶¶ 24–48. It is not surprising, then, that for both hypothetical products over 80% of respondents indicated they

13

would purchase them. There is no reason for them not to say they would purchase this product, as they are not informed of their other choices.

Dr. Schoen describes the objective of his survey narrowly—"to gauge interest between two products, not to assess whether consumers would buy these products at shelf in the marketplace based on advertising claims"—and in light of this narrow objective, the Court denies the portion of C&D's motion *in limine* aimed at excluding the Schoen Survey. Nonetheless, given the wording and structure of the survey, the results do not plausibly measure the extent of the impact of the false advertising, as Dr. Ugone seems to suggest, *see* Ugone DT ¶ 32, and the results are also not persuasive with respect to SPD's argument about the need to distinguish the effect of the weeks estimator innovation itself from the false advertising used to explain and sell it.

Second, Dr. Ugone points to a variety of documents and testimony that he claims reflect, first, that international versions of the same product were successful absent the false advertising, and second, that C&D anticipated a need to defend against the launch of the Weeks Estimator apart from the false advertising. Ugone DT ¶ 32. Regarding the commercial success of the international version, Dr. Ugone relies on the liability phase testimony of Ryan Daly, SPD's marketing director for the Americas, who claimed that the Product's overseas "track record makes it apparent that there is a significant, continued and solid demand for a product that estimates weeks since ovulation/conception." Daly DT (Liability Phase), February 17, 2015, ¶ 9. However, while the international product was not advertised with the same packaging, commercials, and other advertisements found to be false by this Court, the absence of a formal finding of falsity by a court does not necessarily mean that the international advertising was not false or misleading. In fact, Dr. Ugone admitted at trial that he had not reviewed all of the international advertising or packaging, and that he was basing his argument on the fact that he

14

was "not aware of any claims of false advertising with the European product." Tr. (Ugone) 398:20–400:16. To be specific, while some international versions generally had more descriptive names—principally, "Clearblue Digital Pregnancy Test with Conception Indicator"—and/or contained a chart on the packaging that compared the product's measure of weeks since ovulation to a doctor's estimate, *see* DTX 271–72, other foreign advertising touted the product as being "As Accurate as a Doctor's Test" and featured language and imagery similar to those found misleading by this Court. *See* JX 39–40. Accordingly, comparisons to the commercial success of the product internationally only offer limited proof that the product would have had robust sales and induced higher consumer demand absent the false advertising.

As to C&D's own concerns regarding the launch of the Weeks Estimator, Dr. Ugone opined that internal C&D documents and the testimony of Ms. Wendy Bishop, the former Group Brand Manager of Women's Health for C&D, confirm that the innovative nature of the product had an impact separate and apart from the false advertising. Ugone DT ¶ 32.b. C&D responds by pointing out that C&D assumed at the time that the domestic advertising would be like the advertising for the "Conception Indicator" abroad. *See* Bishop RT ¶ 8. Accordingly, when placed in context, C&D argues that its documents and internal discussions reflect its fear of the commercial strength of the product *with* attendant misleading advertising. For the same above-stated reasons that the commercial strength of the product abroad offers limited support for SPD's argument, so too does C&D's anticipation of the commercial strength of the product.

Third, and most crucially, Dr. Ugone utilizes the December 2014 survey conducted during the liability phase by C&D's survey expert, Mr. Hal Poret, which was designed to identify the level of consumer confusion, as a measurement of the portion of SPD's sales of the Weeks Estimator that is attributable to the at-issue advertising. Putting aside whether the adoption of the exact percentages from the Poret Survey is a fair way to "apportion" SPD's sales, which is

15

discussed below, Dr. Ugone pointed to the Poret Survey as additional proof of his general point that the core assumption that all Weeks Estimator sales were attributable to false advertising was incorrect. For reasons elaborated below, while Dr. Ugone is likely correct that not each and every Weeks Estimator purchaser was misled by the false advertising, the Poret Survey is not intended to be used and cannot fairly be used to project how many actual buyers were deceived.

Ultimately, given that every purchaser and retailer was exposed to intentionally misleading advertising about the key differentiating feature of the Product, and that SPD's proffered evidence pointing to other reasons consumers might have purchased the Product is speculative, Dr. Bell's decision to begin his calculation by including all sales of the Weeks Estimator was entirely reasonable. Indeed, based on all of the evidence presented at trial including the Court's credibility assessments, the Court finds this was the most reasonable assumption.

### 2. The Alternative Assumption Presented by Dr. Ugone

As mentioned above, in addition to criticizing Dr. Bell's analysis, Dr. Ugone offers his own lost profits analysis. Dr. Ugone also utilizes the market share allocation approach. Ugone DT ¶¶ 69–71. However, although utilizing the same approach and the same data, Dr. Ugone estimated C&D's lost profits at ███████, the discrepancy with Dr. Bell's conclusion driven by two differences: (1) Dr. Ugone used results from the Poret Survey to attribute only 21.9% of Product sales in the Launch Package and 17.3% of Product sales in the Revised Package to SPD's false advertising; and (2) Dr. Ugone used a lower per-stick profit margin for First Response. *Id.* ¶¶ 15, 86.

Dr. Ugone's application of the Poret Suvey assumes that it serves as a valid proxy for tying false advertising to lost profits. This assumption is the single biggest driver of the

discrepancy between his proposed lost profits award—███████—and Dr. Bell's proposed lost profits award—$9,955,018—thus extensive analysis is warranted.

During the liability phase, the Court credited the Poret Survey in finding that both the launch packaging and revised packaging were likely to deceive consumers. Mr. Poret had conducted an "advertising comprehension survey" of women 18 to 49 years old who would use a home pregnancy test it if they thought they might be pregnant—that is, of prospective purchasers. The survey used the Product's packaging only, and not any other forms of advertising, and simply asked respondents about the message the package they were shown communicated to them. Respondents were classified as deceived only if they answered both that the product estimates the number of weeks a woman is pregnant and that the product's estimate is the same as a doctor's estimate of weeks pregnant. Liability Op. at *21.

Now in the damages phase, Dr. Ugone utilizes the minimum net deception rates from the Poret Survey to assume that only 21.9% and 17.3% of Weeks Estimators sales during what he described as the Launch Package period (August 2013 – June 2014) and Revised Package period (June 2014 – November 16, 2016), respectively, were attributable to SPD's false advertising. Ugone DT ¶¶ 36.a, 47, 71 n.227; Tr. (Ugone) 381:7–25.

Mr. Poret, who despite conducting hundreds of this type of survey said he has never taken the position that the results could be used to predict the percentage of actual purchasers who were deceived, Tr. (Poret) 181:2–17, criticized Dr. Ugone's use of his survey for numerous reasons. First, Poret noted that Dr. Ugone cannot treat *prospective* purchasers as if they were *actual* purchasers. Poret RT ¶ 6. For that reason, and as Dr. Ugone conceded at trial, it is possible, however unlikely, that 100% of the *actual* purchasers of the Weeks Estimator could have fallen within the 21.9% (or 17.3%) of *prospective* purchasers who were misled by the packaging according to the Poret Survey. Second, Poret testified that his survey did not account

17

for the impact of non-package advertising. Poret RT ¶¶ 7–8. And third, and most crucially, for a variety of compelling reasons, Poret testified that his survey likely understates the degree of deception among respondents. Poret RT ¶¶ 9–10. For example, the control package he used still identified the product as the "Clearblue Advanced Pregnancy Test with Weeks Estimator," and the inclusion of the term "weeks estimator" might have caused some respondents in the control group to wrongly assume that the Product estimates the number of "weeks pregnant" as a doctor would, even if another aspect of the control package attempted to clarify what the Product does. Accordingly, even if it were proper to utilize his survey in the way Dr. Ugone does—which it is not—the percentages used do not serve as a good proxy.

C&D moved to exclude SPD's use of the Poret Survey in this way through its "economic causation" motion *in limine*, citing to a number of cases in which courts have rejected evidence of infringement as evidence of damages. *See, e.g.*, *Adidas Am. Inc. v. Skechers U.S.A., Inc.*, No. 15-CV-1741 (MAH), 2017 WL 3319190, at *28 (D. Or. Aug. 3, 2017) (finding no support in the law for use of results from likelihood of confusion surveys to reduce trade dress infringer's profits in disgorgement context); *Brookstone*, 920 F. Supp. 2d at 419–20, 429–30 (while not presented with the question, court credited Poret's confusion survey but awarded lost profits calculated based on all of infringing defendant's sales). SPD points to two decisions by Judge Cote in which the court used survey results to measure damages causation in the absence of another reasonable estimate. But, in *River Light V, L.P. v. Lin & J International, Inc.*, a case in which the defendant was found to have intentionally infringed on Tory Burch's trademark in producing and selling counterfeit merchandise, Judge Cote accepted the plaintiffs' survey result as a proxy for how many of the defendant's purchasers would have otherwise purchased equivalent products from Tory Burch. No. 13-CV-3669 (DLC), 2015 WL 3916271, at *7–8 (S.D.N.Y. June 25, 2015). In this case, by contrast, Dr. Bell already offers an estimate for that

issue—C&D's market share. Accordingly, the survey in *River Light* is being put to use in a different, and more defensible way. The other case, *Volkswagen Aktiengesellschaft v. Uptown Motors*, is inapposite because it focused solely on disgorgement, which involves a separate legal test that places much of the burden on the defendant to argue for deductions. No. 91-CV-3447 (DLC), 1995 WL 605616 (S.D.N.Y. July 13, 1995); *but see Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279, 301–02 (S.D.N.Y. 1997) (awarding all of defendant's profits as disgorgement despite plaintiff's deception survey).

In short, based on the evidence produced at trial including credibility assessments, the Court finds that Dr. Ugone's assumption that the Poret Survey can serve as a proxy for the impact that false advertising had on C&D's profits is not reasonable.

### 3.    Dr. Bell's Market Share Allocation and Criticisms

At the second step in Dr. Bell's lost profits calculation, he apportions the sales SPD made of the Weeks Estimator to C&D according to its share of the market. This assumption—that C&D would have realized this portion of the sales in the absence of the infringement—is another aspect of his methodology criticized by Dr. Ugone. SPD argues that Dr. Bell failed to control for a number of market factors unrelated to the Weeks Estimator, which he argues require the conclusion that the Weeks Estimator had a bigger impact on other Clearblue products.

First, Dr. Bell and Dr. Ugone dispute whether the market share allocation approach sufficiently controls for a number of external factors unrelated to the false advertising that might have impacted First Response's sales. Dr. Ugone acknowledges that the market share allocation approach does account for many factors unrelated to the advertising, and uses the same approach himself. Nonetheless, he argues that Dr. Bell fails to adequately support his apportionment by market share.

In an attempt to test his assumption that sales of the Weeks Estimator came at the expense of the First Response sticks in an amount proportional to its market share, Dr. Bell performed a regression analysis. Bell DT ¶ 26. Based on the results of his first regression analysis, Dr. Bell concluded that the Weeks Estimator did not have a statistically significant impact on the relative share of First Response. *Id.* ¶ 27. After Dr. Ugone lodged certain criticisms of Dr. Bell's first regression analysis, Dr. Bell repeated the regression, this time controlling for time, price, coupons, advertising, particular product withdrawals, and other effects, and concluded that the Weeks Estimator sales actually took a disproportionately *higher* amount of stick sales from First Response pregnancy tests than from other pregnancy tests. *Id.* ¶ 28 & Appx. F & G. Accordingly, Dr. Bell stated that his calculations were, if anything, quite conservative.

Dr. Ugone disputes the accuracy of the regression. He argues that other factors not accounted for in Dr. Bell's regression, such as the instantly redeemable coupon ("IRC") SPD implemented on the Clearblue analog product for almost the entire period over which C&D claims damages, would have reduced First Response's market share. Ugone DT ¶¶ 65–67. C&D's Wendy Bishop conceded that it was possible that IRC activity did impact First Response sales. Tr. (Bishop) 93:2–22, 95:2–10, 9:2–5. And Dr. Bell conceded at trial that his regression analysis did not have a specific control variable for Clearblue's instant redeemable coupon ("IRC") nor a specific control for the promotional activities of other market participants. Tr. 24:8–24. Nonetheless, given that pricing is reflected in the market share and that Dr. Bell's regression began before the launch of the Weeks Estimator, any effect is largely baked into the analysis. *Id.*

SPD also attempts to use C&D's own expenditures, failures, and documents as proof that a market share apportionment is unsupported. Dr. Ugone points to C&D's decreased marketing

expenses at the time of the launch of the Weeks Estimator and failed attempts at innovating its own products as reasons that First Response sales were depressed. Ugone DT ¶ 68. SPD also points to a variety of internal C&D documents that it claims demonstrate that the Weeks Estimator had a smaller impact on First Response than on other brands, including that it cannibalized the sales of other Clearblue products. SPD FOF ¶ 49. Dr. Ugone never attempted to quantify the effect of these allegedly external market factors, arguing only that an appropriate adjustment would make "the numbers move a little bit." *See* Tr. (Ugone) 428:20–430:7.

Dr. Ugone's criticisms are atmospherically compelling in that they lay bare some of the difficulties in finding a way to calculate the effect of the unlawful activity—SPD's false advertising—while controlling for all other forces affecting market share. Nonetheless, these criticisms are undermined by Dr. Ugone's own reliance on a market share allocation methodology. Pricing and promotional data *is* accounted for in the market share data, *see* Tr. (Ugone) 373:23–374:19; 378:2–13, even if the specific Clearblue IRC was not controlled for in Dr. Bell's regression analysis. Dr. Ugone does not quantify the alleged impact of the IRCs and C&D's failures, nor does he make an adjustment to the market share. Tr. (Ugone) 371:5–373:5. Thus, while Dr. Ugone's criticisms at best demonstrate that Dr. Bell's regression is not perfect proof that C&D would have been expected to maintain its market share in the absence of the false advertising, the criticisms furnish no proof that C&D's market share would have declined anyway.

Of course, the burden of defending his methodology remains on Plaintiff's expert, Dr. Bell. But his regression does provide confirmation that his calculations are reasonable. In the absence of complete information, courts have credited the application of a market share allocation methodology because it inherently accounts for a range of market factors. *See BASF Corp. v. Old World Trading Co. Inc.*, 41 F.3d 1081, 1094–95 (7th Cir. 1994) (crediting the

district court's market share allocation approach because it accounted for market factors including price); *Collins & Aikman Floor Coverings, Inc. v. Interface, Inc.*, No. 05-CV-0133-HLM, 2009 WL 10669578, at *5–6 (N.D. Ga. Jan. 8, 2009). This stands in marked contrast to many of the cases SPD draws to the Court's attention. For example, in *American Home Products Corp. v. Johnson & Johnson*, and in *Pharmanetics, Inc. v. Aventis Pharmaceuticals, Inc.*, the plaintiffs' experts were criticized for their reliance on the difference between the projected sales and actual sales without accounting for a number of other factors that might have affected the straight "before and after" calculation. 682 F. Supp. 769, 771 (S.D.N.Y. 1988); 2005 WL 6000369, at *7–11 (E.D.N.C. May 4, 2005). Here, Dr. Bell did control for a number of market factors, including pricing. Dr. Ugone's criticisms are insufficient in degree to persuade the Court to reject Dr. Bell's reasonable market share apportionment.[4]

### 4.    Dr. Bell's Per-Stick Profit Calculation and Criticisms

At the next step, Dr. Bell multiplied C&D's share of SPD's sales by the per-stick profits of its own First Response brand test to arrive at estimated lost profits. SPD contends that Dr. Bell used the wrong First Response per-stick profit margin in calculating lost profits because he did not deduct marketing expenses. Both Dr. Bell and Dr. Ugone agreed that only incremental, or variable, costs should be deducted when calculating First Response's per stick profit margin, Bell DT ¶ 34; Ugone DT ¶ 76, but they disagreed as to whether First Response marketing expenses were incremental (and deductible) or fixed (and not deductible). Bell RT ¶¶ 36–37; Ugone DT ¶¶ 76–82.

---

[4] Dr. Bell conducted additional analysis to rule out that the Weeks Estimator's presence led to an overall increase in pregnancy test sales, and to rule out the possibility that C&D would not have had sufficient manufacturing and sales capacity to produce and sell additional sticks even if the Weeks Estimator had not existed. Bell DT ¶¶ 29–33.

According to C&D, First Response's marketing budget is fixed annually, and would not change because of a single-digit percentage increase in First Response sales over the course of a year or several years. Bishop DT ¶¶ 13–14; Bishop RT ¶¶ 2–3; Krall RT ¶¶ 5–6. Dr. Bell conceded that at a few points during the damages period, C&D would have set or reset its marketing budget. Tr. (Bell) 27:16–20. However, Dr. Bell argued that the sales increase he calculated would have occurred but for the Weeks Estimator—■—would not have triggered an increase in marketing expenditures, given that marketing expenses barely changed between 2012 and 2016 in spite of an ■. *See* Bell RT ¶¶ 37–40.

SPD insists that the fact that the marketing expenses changed at all between 2012 and 2016 suggests that the marketing expenses are incremental, not fixed. Moreover, they cite internal C&D analyses in which, when evaluating the impact of the Weeks Estimator on the First Response market share, C&D measured lost profits in units of "marketing profit contribution," which Ms. Bishop confirmed were calculations that incorporated marketing expenses. *See* Krall DT ¶ 2; Tr. (Bishop) 131:1–6, 132:10–20.

Regardless of what the documents and financial data show, the key issue in determining whether marketing expenses are deducted from the lost profits calculations is whether C&D would have spent more on advertising in order to make the additional sales it would have made absent the sales of the Weeks Estimator. While the evidence offered cannot, and certainly does not, definitively establish what C&D would have done, the relatively stagnant nature of expenditures between 2012 and 2016 indicates that C&D would not have had to substantially alter its marketing budget in order to sell the extra ■ of First Response sticks. This stands in marked contrast to a true incremental cost such as direct manufacturing costs, shipping costs, and brokerage costs, which must increase as additional sales are made. *Cf. Nat'l Presto Indus., Inc. v. Black & Decker Inc.*, No. 89-CV-8978, 1992 WL 125559, at *5 (N.D. Ill. May 27, 1992)

(upholding the jury's determination that advertising costs were fixed despite some evidence suggesting it was incremental). Accordingly, the per-stick profit margin Dr. Bell calculated and uses in his lost profits analysis was reasonable. *See Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 161–62 (E.D.N.Y. 2016) (noting that testimony that defendant's "advertising budget varies from year-to-year" does not support the position that defendant "would have spent *more* advertising dollars to sell the amount of product lost to counterfeiting" and endorsing Dr. Bell's decision not to deduct marketing expenses).

### 5. The Court's Findings as to the Parties' Lost Profits Arguments and Assumptions

Ultimately, based on all evidence presented at trial, including the Court's observations of the testifying expert witnesses, and for the reasons stated above, the methodology Dr. Bell applies—first, including all Weeks Estimator sales as related to the false advertising, then allocating those sales to C&D per its market share allocation, and finally calculating profits based on the per-stick profit margin—is a reasonable way to determine C&D's lost profits.

While it is likely that *some* consumers bought the Weeks Estimators for reasons disconnected from the false advertising,[5] SPD has not supported any one of these alternative reasons, or even the totality of these other reasons, with evidence sufficient to overcome the evidence of the reasonableness of Dr. Bell's core market share assumption. SPD pervasively falsely advertised the Product from its launch, never advertised it in a truthful manner, and has not affirmatively offered any of its own data regarding the number of purchasers who were not

---

[5] As SPD reiterates to great effect in its post-trial briefing, Dr. Bell, Dr. Erdem, and Mr. Poret all conceded that it likely the case that at least some sales of the Product were primarily motivated by a reason unconnected to the false advertising. Tr. (Bell) 11:18–21 (confirming he was not testifying "that every single person that bought the Weeks Estimator bought it because of the advertising"); Tr. (Erdem) 204:16–25 (agreeing he was "not giving the testimony that every single person thought that the measurement [provided by the Weeks Estimator] was the same as a doctor's"); Tr. (Poret) 163:9–24 (confirming that some respondents understood that the product gave a different estimate than what a doctor provides). Dr. Bell also admitted that an important part of a lost profits analysis is figuring out to what extent the lost sales are attributable to the false advertising. Tr. (Bell) 16:12–22.

deceived. Additionally, international sales, C&D's internal documents showing concern with the new product, and the Schoen Survey are not compelling indicators that sales would have been robust but for the false advertising, or that there would be a significant difference in the lost profits calculation were Dr. Bell to more exactly "isolate the impact of the at-issue advertising," as Dr. Ugone put it. Ugone DT ¶ 32. The proxy that Dr. Ugone and SPD provide as a measurement of the apportionment of C&D's lost profits that is attributable to the false advertising—the percent deceived in the Poret Survey—is too flawed an assumption for the Court to adopt.

SPD's criticisms do not reveal Dr. Bell's lost profits analysis to be mere "subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993). Absent this degree of unreliability, any "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). For all the reasons provided above, the Court finds Dr. Bell's testimony persuasive. Dr. Bell's "formula is consistent with this Circuit's accepted methodology for calculating lost profits." *Innovation Ventures*, 176 F. Supp. 3d at 160; *see also id.* at 162 (endorsing Dr. Bell's lost profits calculation using a market share allocation method) (citation omitted). And, most crucially, because the false advertising pertained to "the key feature that differentiates [the Weeks Estimator] from the many other home pregnancy tests on the market," Liability Op. at *25, Dr. Bell's methodology and core assumptions are rendered that much more reasonable.[6]

---

[6] Accordingly, SPD's motion *in limine* to exclude Dr. Bell's testimony is denied as to his lost profits analysis. Moreover, to the extent not addressed above, the Court denies all the reserved motions *in limine*—those with respect to Dr. Erdem, Dr. Bell, Dr. Ugone, and the so-called "economic causation" evidence—with respect to the arguments impacting the lost profits analysis and calculations. As a whole, while the arguments the parties made with support from expert witnesses varied in their persuasiveness, per the broad discretion afforded to the Court under *Daubert* and its progeny, all of the testimony was at least the product of reliable principles and methods reliably applied. *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265–69 (2d Cir. 2002).

## D.    Disgorgement

Because the Court determines below that awarding disgorgement in addition to lost profits would constitute impermissible over-compensation, the Court merely summarizes the evidence and arguments presented regarding disgorgement.

C&D seeks to disgorge SPD's profits gained from the sale of the Weeks Estimator.  In order to calculate SPD's profits, Dr. Bell utilized the ██████████████████████. Tr. (Bell) 283:6–8; 284:1–3.  Dr. Bell first reviewed SPD's financial data to determine the net sales ████████████████████████ from the Product's launch through February 2017.  Bell DT ¶ 19 & App'x C.  Dr. Bell then multiplied the number of sticks SPD sold in a given quarter by the per-stick sales price for that quarter to find SPD's total revenues.  *Id.*  Dr. Bell then deducted costs that SPD incurred to gain those revenues, ██████████████ Bell DT ¶¶ 12–13, 18, 21 & App'x E.  Dr. Bell also deducted incremental costs ██████████████ for the Product. Ugone DT ¶ 49.a.iii; C&D FOF ¶ 27.  Ultimately, Dr. Bell calculated SPD's profits available for disgorgement as ██████████  C&D FOF ¶ 32.

SPD, through Dr. Ugone, attacked Dr. Bell's ██████████████ methodology on various grounds.  Dr. Ugone argued that the ██████████ Dr. Bell used to determine SPD's revenues and costs of goods sold are not suitable for use in a disgorgement analysis because ████████████████████████████████ ██  Ugone DT ¶ 56.



Additionally, SPD argues that disgorgement—which requires a finding of "willful deceptiveness"[7]—would only be available for the profits from the Launch Packaging and related advertising, but not with respect to the Revised Packaging. *See* SPD FOF ¶ 51 (citing Wood DT ¶ 18).

Instead, applying so-called "management accounting," Dr. Ugone used documentary evidence to construct a profit and loss statement for the Weeks Estimator. Ugone DT Dem. 10. Dr. Ugone limited his calculations to the period during which the Launch Packaging was sold, again utilized the Poret Survey as a proxy for isolating the impact of the false advertising, and deducted various additional costs, including direct marketing, P&G distributor costs, and Swiss taxes. *Id.* ¶¶ 47–49 & Dem. 11. Ultimately, Dr. Ugone found that SPD actually suffered a *loss* of ████, meaning that there were no profits to disgorge. Ugone DT ¶¶ 48–51 & Dem. 11.

## E. Motion to Reopen

As referenced above, C&D moved post-trial to reopen the record for the purposes of introducing evidence of the continued public display of advertising for the Weeks Estimator. Dkt. No. 598. According to C&D, large, hanging posters advertising the Weeks Estimator with an image of the front panel of the launch package were spotted in numerous Walgreens stores in Chicago, as well as in Colorado. Additionally, counsel indicated that Google searches were turning up references touting the innovative features of the Weeks Estimator. C&D argues that the additional false advertising heightens the need to award significant money damages in order to deter this behavior in the future.

SPD does not dispute the factual accuracy of C&D's evidence, but rejects its relevance, arguing, *inter alia*, that the evidence is of the same type the Court considered in rejecting C&D's

---

[7] *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 261 (2d Cir. 2014) (citation omitted).

January 3, 2017 motion for contempt, and that the content was created by third party retailers, not SPD. Dkt. No. 603. C&D does not dispute that SPD is not responsible for the advertising, and insists that it is not arguing that SPD is violating the injunction, instead arguing that SPD's failure to control the dissemination of the false advertising underscores the need for deterrence.

For the limited purpose of bolstering C&D's argument for deterrence, the Court GRANTS C&D's motion to reopen the trial record and admit evidence of the ongoing dissemination of enjoined advertising. SPD has presented no reason why admission would unduly prejudice them and the Court finds none; accordingly, despite the limited utility of the evidence, the Court exercises its discretion to admit Plaintiff's Exhibits 690–693. *See Matthew Bender & Co. v. W. Pub. Co.*, 158 F.3d 674, 679 (2d Cir. 1998) ("A district court's decision to reopen the proof to allow a party to submit additional evidence is subject to its sound discretion."); *John v. Sotheby's, Inc.*, 858 F. Supp. 1283, 1288 (S.D.N.Y. 1994), *aff'd*, 52 F.3d 312 (2d Cir. 1995) (outlining the factors for the court's consideration).

## IV. Conclusions of Law

Having made a factual finding that Dr. Bell's lost profits methodology and calculation are reasonable, and having been unpersuaded by SPD's proffered evidence to the contrary, the Court now applies the applicable law to the findings of fact.

### A. Lost Profits

When a plaintiff establishes a violation of the Lanham Act, it may be entitled, "subject to the principles of equity," to recover "any damages sustained by the plaintiff," i.e., lost profits. 15 U.S.C. § 1117(a). But a plaintiff who establishes liability for false advertising "will be entitled only to such damages as were *caused by* the violation." *Burndy*, 748 F.2d at 771 (emphasis added). A court may engage in "some degree of speculation" in determining the *amount* of damages, but "causation must first be established." *Id.*

Beyond the parties' agreement that this generic principle—that the plaintiff must show that damages were caused by the violation—governs, C&D and SPD present different understandings of the extent to which a plaintiff must prove this causation.

According to C&D, *Burndy* merely holds that a plaintiff is not entitled to recover damages if it cannot prove it sustained *any* losses because of the false advertising, but that if causation had already been established, plaintiff only need provide a "fair and reasonable" estimate of its lost profits and may draw reasonable (even crude) inferences to arrive at that estimate. C&D COL ¶¶ 3, 8–9. In terms of proving causation, C&D argues that a plaintiff must prove a diversion of *some* sales from plaintiff to defendant, essentially establishing "a nexus between a competitor's false advertising and a diversion of sales," but "need not individually prove every single buyer who was diverted to the false advertising competitor." *See* C&D COL ¶ 9 (quoting 5 McCarthy on Trademarks and Unfair Competition § 27:42 (5th ed.)).

SPD concedes that *Burndy* allows plaintiffs to engage in speculation, but argues that it does not allow a court to speculate that all sales were caused by the false advertising where the evidence shows otherwise. SPD COL ¶ 9. Relying on various cases discussed below, SPD emphasizes that the record must adequately support the damages calculation. SPD argues that C&D has failed to meet this burden.

The parties' seemingly large disagreements regarding the law are actually those of emphasis and interpretation; in reality, both sides agree that in order to recover lost profits, C&D must prove that the violation—false advertising—caused it damages, and then provide a reasonable basis for the amount of damages.

While C&D argues that the Court's findings at the liability phase "easily support the conclusion that SPD's false advertising caused First Response sales to divert to SPD," C&D COL ¶ 10, the Court was clear that the standard at the liability phase was "whether it is *likely* that

29

[defendant's] advertising has caused or will cause a loss of [plaintiff's] sales, not whether [plaintiff] has come forward with specific evidence that [defendant's] ads *actually* resulted in some definite loss of sales." Liability Op. at *25 (quoting *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir. 1980)) (emphasis added); *see also id.* at *27. Furthermore, while the Second Circuit quoted the Court's finding that C&D "lost sales on account of [Defendant's] false advertising," when the quoted phrase is placed within its original context, it is clear that the Court only concluded that C&D "established a logical causal connection between SPD's false advertising and its market harm that is sufficient to establish SPD's *liability*," not that C&D had established a "definite loss of sales." *See Church & Dwight*, 843 F.3d at 72 (alteration in original); Liability Op. at *27–28.

Nonetheless, despite the fact that C&D cannot simply rely on the findings at the liability phase, the damages trial record before the Court easily supports a finding that C&D is able to establish sufficient causation for *damages* as well. First Response and Clearblue are the two leading brands on the competitive home pregnancy test kit market. Clearblue's new product, the Weeks Estimator, however innovative, was falsely advertised to consumers and to retailers from its launch. As discussed at the liability phase, SPD clearly knew that consumers would wrongly assume the test measured pregnancy duration in a way a doctor would. Liability Op. at *12. Plaintiff's market share decreased, while Defendant's share increased. *Id.* at *26. Defendant's other explanations for why consumers would have purchased the Weeks Estimator, or not purchased the First Response brand tests, do not overcome this evidence. And SPD's own expert, Dr. Ugone, essentially concedes that *some* lost profits are attributable to false advertising, offering his own core assumption in the form of the Poret Survey.

Accordingly, the actual dispute centers on the parties' vociferous argument over what is "reasonable." *See Brookstone*, 920 F. Supp. 2d at 428 ("A plaintiff need only show that its

30

damages calculation is a 'fair and reasonable approximation' of its lost profits." (quoting *GTFM*, 215 F. Supp. 2d at 305)). As discussed above, the Court's task is inherently equitable, and the Plaintiff's burden one of reasonableness. *See supra* Part II.

As both a factual and legal matter, Dr. Bell's calculation is a fair and reasonable approximation. First, as discussed at length above, the Court finds his assumption that all market share sales of the Weeks Estimator are attributable to the false advertising is reasonable. SPD offers no compelling evidence that the complete isolation of the effect of the false advertising, if even possible, would have made a big difference in calculating damages. Despite the numerous factual differences, comparison to *Merck Eprova AG v. Brookstone Pharmaceuticals, LLC*, which both parties discuss at length, is instructive. In *Brookstone*, the district court accepted a lost profits calculation based upon *all* of defendant's sales. 920 F. Supp. 2d at 428–30. Despite recognizing that some sales might have been diverted by the entrance into the market of another competitor, the court, noting that "any doubts regarding the amount of damages must be resolved against the infringer," still endorsed the plaintiff's calculation. *Id.* at 430 (quoting *Victoria Cruises, Inc. v. Changjiang Cruise Overseas Travel Co.*, 630 F. Supp. 2d 255, 262 (E.D.N.Y. 2008) (alteration omitted)). While the Weeks Estimator was still a product consumers might potentially be interested in absent the false advertising and unlike the product in *Brookstone*, and while the pregnancy test market is more stratified than the market in *Brookstone*, Dr. Bell's market share allocation approach is also a *more* reasonable estimation that controls for more external factors. As discussed above, the "indicators" Dr. Ugone points to as proof that Dr. Bell's core assumption is unfounded—the Schoen Survey, international sales, and C&D's internal documents—are not persuasive enough for the Court to adopt an alternative measurement like the Poret Survey as a proxy for the impact of the false advertising.

Second, Dr. Bell's market share apportionment is reasonable. In *BASF Corp. v. Old World Trading Co.*, the Seventh Circuit upheld a damages award in which the district court found that Plaintiff's calculations of the shortfall from lost sales did not take into account that its pricing policies drove away customers, and that there was insufficient evidence to support Plaintiff's contention that it would have made all of Defendant's sales to the plaintiff's former customers but for the false advertising. 41 F.3d at 1086–87. The district court had concluded that the proper fix for this overstatement was to award the plaintiff its claimed lost profits multiplied by its share of the antifreeze market, *see id.* at 1087, and the Court of Appeals, recognizing that a district court has the authority to make a "reasonable estimate of the damage based on relevant data," endorsed the court's use of a market share allocation methodology, *id.* at 1093–95 (quotation omitted). Here, Dr. Bell used a market share analysis *and* conducted a regression to confirm that C&D could be expected to have had a sales boost but for the false advertising in proportion to its share of the market. *See* C&D COL ¶ 60 (explaining the district court's methodology). Similarly, while SPD relies upon *Koon Chun* in criticizing Dr. Bell's market share apportionment, the plaintiff in *Koon Chun* had argued that every sale by defendants was a sale lost by the plaintiff despite "no evidence at trial that [plaintiff's] sales volume declined" and the fact that the counterfeit hoisin sauce at issue was priced at about 10% less than the legitimate sauce, an unaccounted-for external factor. *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt, Inc.*, No. 04-CV-2293 (SMG), 2009 WL 5185808, at *2–3 (E.D.N.Y. Dec. 23, 2009). Here, Dr. Bell's market share allocation approach *did* account for pricing differentials.

In sum, the case law is clear that when a plaintiff cannot prove a diversion of sales, or does *not* account for clearly established external factors—such as the presence of other competitors, pricing differentials, etc.—the plaintiff cannot recover its lost profits. *See, e.g.,*

32

*Burndy*, 748 F.2d at 773; *Koon Chun*, 2009 WL 5185808, at \*3–4; *Verisign, Inc. v. XYZ.com LLC*, 848 F.3d 292, 300–01 (4th Cir. 2017) (rejecting an expert's calculation because he failed to account for other factors that could have explained the drop-off in domain registrations after the defendant's false advertising). Again, despite SPD's attempt to compare this case to the Second Circuit decision in *Burndy* affirming the district court's finding that the prevailing plaintiff did not merit recovery of lost profits because its evidence was "deficient," SPD COL at ¶ 7, here there is sufficient evidence that C&D would have experienced additional sales at least in proportion to its market share, and there is only limited and largely speculative evidence that consumers still would have purchased the Weeks Estimator in the absence of the false packaging and advertising. *Cf. Burndy*, 748 F.2d at 770.

Courts are sensitive to the difficulty plaintiffs may have in establishing actual damages with exactitude, and recognize that the calculation "necessarily involves a certain degree of approximation and inference." *Malletier v. Artex Creative Int'l Corp.*, 687 F. Supp. 2d 347, 357 (S.D.N.Y. 2010). In its discretion to fashion an equitable remedy in this situation, the Court finds the assumptions and methodology Dr. Bell employs, while potentially inexact, are "fair and reasonable." Accordingly, the Court awards C&D damages in the amount $9,955,018, which reflects C&D's lost profits as reasonably calculated by Dr. Bell.

### B. Trebling Lost Profits

Section 35 of the Lanham Act provides that "the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damage, not exceeding three times such amount." 15 U.S.C. § 1117(a). Damages may be enhanced (i) to "compensate the plaintiff for harm that is difficult to quantify," including for loss of goodwill, and (ii) to deter future violations by a defendant whose violation was willful. *Mobius Mgmt. Sys., Inc. v. Fourth Dimensions Software, Inc.*, 880 F. Supp. 1005, 1025–26 (S.D.N.Y. 1994).

33

C&D argues that trebling is warranted because SPD's false advertising of an innovative feature likely increased Clearblue's brand equity and harmed C&D's brand equity and goodwill, a harm that is not reflected in Dr. Bell's lost profits calculation. C&D COL ¶ 75. Additionally, in light of SPD's intentionally false advertising and "bad faith conduct," C&D argues that treble damages are needed to deter SPD from further willful deception. *Id.* (citing *Brookstone*, 920 F. Supp. 2d at 431; *Mobius*, 880 F. Supp. at 1026).

The Court disagrees and will not award treble damages. Whatever the "intangible" harm caused by SPD's false advertising, the Court finds that its award of nearly $10 million is both adequate compensation to C&D for all harm done and adequate deterrence against any future false advertising by SPD. The cases C&D cites in support of trebling are inapposite. For example, in *Brookstone*, the defendant infringed the plaintiff's product directly, attempting to link its cheaper products to the plaintiff's more expense products, used false advertising to enter the market, and engaged in egregious litigation tactics. *See generally* 920 F. Supp. 2d 404. In *Mobius*, the actual damages calculated were quite modest, and thus the court found it necessary to award treble damages of roughly $63,000 in order to more fully compensate the plaintiffs for the goodwill lost when defendant disparaged them, and to provide proper deterrence. 880 F. Supp. at 1025–26. The facts here do not suggest a similar need to enhance the Plaintiff's compensation nor to deter the Defendant.

## C.    Disgorgement

Section 1117(a) of the Lanham Act, while allowing plaintiff to recover "defendant's profits," explicitly states that monetary damages are "subject to the principles of equity." While the Lanham Act uses the word "and" in between "defendant's profits" and "damages sustained by the plaintiff," suggesting that a prevailing plaintiff may recover both its damages and defendant's profits, it is also well-settled that both should *not* be awarded simultaneously if it

34

would result in over-compensation. *See* 5 McCarthy on Trademarks and Unfair Competition §

30:73 (5th ed.). This is especially true in cases, as here, in which the plaintiff's lost profits and

the defendants' profits are based upon the same sales. *See Polo Fashions, Inc. v. Extra Special*

*Prods., Inc.*, 1980 WL 30287, at *8 (S.D.N.Y. Mar. 5, 1980). "A plaintiff seeking compensation

for the same injury under different legal theories is of course only entitled to one recovery."

*Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 497 (2d Cir. 1995). Accordingly, courts in this

district have often followed the Ninth Circuit's holding in *Nintendo of America*, that awarding

the disgorgement of the defendant's profits and plaintiff's own lost profits based on the same

sales would constitute "an impermissible double recovery." *Victoria Cruises*, 630 F. Supp. 2d at

264 (citing *Nintendo of Am., Inc. v. Dragon Pacific Int'l*, 40 F.3d 1007, 1010 (9th Cir. 1994));

*see also* Restatement (Third) of Unfair Competition § 36 cmt. c (1995) (noting that "an award of

both profits and damages" may thus be "prohibited under the rule precluding double recovery for

the same loss."). C&D has made clear that it is not seeking *both* disgorgement and lost profits

remedies, but insists that it is entitled to elect the greater of the two. Reply COL at 1 (citing 3

Gilson on Trademarks § 14.03 (2017)). However, C&D's election is not binding on this Court,

as disgorgement is an inherently equitable remedy.

    In defining the factors courts must consider before awarding disgorgement under the

Lanham Act, the Second Circuit includes the "availability and adequacy of other remedies."

*George Basch*, 968 F.2d at 1540. In speaking of adequacy, the Court considers the permissible

purposes of a disgorgement award: "(1) to deter a willful wrongdoer from doing so again; (2) to

prevent the defendant's unjust enrichment; and (3) to compensate the plaintiff for harms caused

by the infringement." *Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 457 (S.D.N.Y.

2012) (citing *George Basch*, 968 F.2d at 1537–39) [hereafter, "*Merck I*"], *aff'd* 760 F.3d 247 (2d

35

Cir. 2014) [hereafter, "*Merck II*"]. The Court considers in turn whether disgorgement is warranted for purposes of additional compensation or additional deterrence.

First, disgorgement is not warranted here for compensatory purposes. "While damages directly measure the plaintiff's loss, defendant's profits measure the defendant's gain. Thus, an accounting may overcompensate for a plaintiff's actual injury and create a windfall judgment at the defendant's expense." *George Basch*, 968 F.2d at 1540; *accord BASF*, 41 F.3d at 1096 ("Equity did not *require* the district court to award disgorgement, particularly after it awarded damages equivalent to its calculation of [plaintiff's] losses."); *Bracco Diagnostics*, 627 F. Supp. 2d at 485 (finding that injunctive relief and compensatory damages were "adequate and [could] make the Plaintiff in this case whole without the exceptional remedy of disgorgement"). As the Seventh Circuit stated in *BASF*, "disgorgement is most appropriate if damages are otherwise nominal." *BASF*, 41 F.3d at 1096. Here, damages are not simply nominal, but rather significant. The award is sufficient compensation, and the Court finds that additional monetary damages would result in impermissible overcompensation.

Second, while disgorgement might have been warranted for reasons of deterrence, the Court also finds that the lost profits award of nearly $10 million is adequate deterrence. The Second Circuit has noted that disgorgement is "rarely granted" and generally is "limited to situations in which the defendant's profits represent unjust enrichment derived from diversion of business that clearly would otherwise have gone to the plaintiff . . . rather than [situations in which the defendant] engaged simply in false advertising of the defendant's own product." *Burndy*, 748 F.2d at 772. Here, Dr. Bell's measure of lost profits—which itself is initially based upon SPD's revenues—is sufficient to rectify SPD's unjust enrichment from the diversion of business that would have otherwise gone to C&D, and no greater award is necessary for the purposes of deterrence. SPD has complied with the Injunction, has been penalized by the

36

removal of the Product from the market and by the lost profits award, and C&D has not offered

any persuasive rationale for why a lost profits award of this magnitude would not sufficiently

deter SPD and other pregnancy test makers from complying with the requirements of the

Lanham Act in the future. SPD's actions, even if sufficient for a finding of willfulness, are a far

cry from the egregious conduct of the defendant in *Merck I*, upon which C&D relies. *Cf. Merck

I*, 901 F. Supp. 2d at 458 (noting defendant's "appalling" disdain for the law and context in

which defendant used false advertising to gain *entry* into the market in awarding full

disgorgement).

In sum, the Court finds that its awarding of lost profits, which is the most direct

measurement of the harm the false advertising has done to Plaintiff, is both sufficient

compensation and deterrence, and, thus, that an additional award of disgorgement is not

appropriate.

### D. Punitive Damages, Fees, Costs, and Interest

The Court also finds the award of punitive damages under N.Y. Gen. Bus. Law § 349, the

deceptive practices statute under which C&D prevailed at the liability stage, Liability Op. at *17

n.14, 28, 34, is unwarranted. New York law allows punitive damages where there is "clear,

unequivocal and convincing evidence that [the defendant's] conduct was gross, involved high

moral culpability, and was aimed at the general public." *Koch v. Greenberg*, 14 F. Supp. 3d 247,

273, 279 (S.D.N.Y. 2014), *aff'd*, 626 F. App'x 335 (2d Cir. 2015). "New York state law sets an

exceptionally high bar for awarding punitive damages, permitting them only when 'the

defendant's wrongdoing is not simply intentional but evince[s] a high degree of moral turpitude

and demonstrate[s] such wanton dishonesty as to imply a criminal indifference to civil

obligations.'" *See Tiffany & Co. v. Costco Wholesale Corp.*, 127 F. Supp. 3d 241, 261 (S.D.N.Y.

2015) (internal citation omitted). However culpable SPD is for intentionally deceiving

consumers, the Court cannot conclude that SPD's conduct is sufficiently egregious to merit punitive damages.

Similarly, while attorney's fees are available to a prevailing plaintiff in a Lanham Act suit in "exceptional cases," 15 U.S.C. § 1117(a), and when there is "evidence of fraud or bad faith," *Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 166 F.3d 438, 439 (2d Cir. 1999) (citation omitted), SPD's conduct in this litigation has not been sufficiently egregious to justify the award of attorneys' fees. *See Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d 31, 46–47 (S.D.N.Y. 2015) (noting that fees are typically awarded "based on extreme misconduct during litigation"). SPD's litigation positions have been reasonable, and despite C&D's credible arguments to the contrary and the new evidence it presents with its motion to reopen the trial record, *see* C&D FOF ¶¶ 83–90; *supra* Part II.E, none of SPD's actions during this litigation have risen to the level requiring the award of fees. *Cf. Brookstone*, 920 F. Supp. 2d at 433–34 (awarding fees where the testimony of witnesses was "nothing short of deliberately misleading"). Many of the arguments C&D makes were considered and rejected, albeit it under a different standard, in the Court's July 26, 2017 Memorandum and Order denying C&D's motion to hold SPD in contempt and for sanctions. *See* Dkt. No. 475. This is not an "exceptional case" and awarding attorneys' fees is not appropriate.

Because the Court does not find this to be an "exceptional case," C&D is also not entitled to prejudgment interest. *Am. Honda Motor Co. v. Two Wheel Corp.*, 918 F.2d 1060, 1064 (2d Cir. 1990) ("Although Section 1117(a) does not provide for prejudgment interest, such an award is within the discretion of the trial court and is normally reserved for 'exceptional' cases.").

## V. Conclusion

For the foregoing reasons, the Court enters judgment in favor of Plaintiff Church & Dwight in the amount of $9,955,018. The Clerk of Court is respectfully directed to enter judgment and close the case.

This Order resolves Dkt. Nos. 497, 500, 506, 509, 588, 591, 594, and 597.

As explained in the concurrently filed Order, this Opinion and Order will be temporarily filed under seal. After determining which, if any, portions of the Opinion and Order should be redacted, the Court will file the Opinion and Order on the public docket.

SO ORDERED.

Dated: August ___22___, 2018
      New York, New York

_____
ALISON J. NATHAN
United States District Judge